# INDEX OF EXHIBITS

| Exhibit | Description |
|---------|-------------|
| 1 | Curriculum Vitae of Robert Fonzi |
| 2 | Supplemental Expert Report of Robert Fonzi, dated August 23, 2017 |
| 3 | Transcript of the deposition of Robert Fonzi, taken September 8, 2017 |

Offer of Proof - Curriculum Vitae

# Exh. 1

**Robert Fonzi & Associates**
Undersheriff (retired)
*Training and Consulting*
robert.fonzi@yahoo.com

P.O. Box 1154, Yucaipa, CA  92399
951-312-9679

# *Robert J. Fonzi*
Curriculum Vitae

## BIOGRAPHY          (brief summary)

I am a thirty-two-year veteran with the San Bernardino County Sheriff's Department and the San Diego Police Department with several years of patrol experience in the Ontario, San Bernardino, and San Diego areas.  My experience includes patrol, criminal investigations, internal affairs, civil liabilities, jail operations/management, and personnel management with special emphasis on training.

My expertise lies in the use of force, police procedures, and jail operations/management.  I am most recognized in the area of training, with over twenty-five years of experience while training approximately 10,000 law enforcement officers throughout the country.  I have qualified and testified as an expert in over three hundred (300) civil, criminal, and civil service trials in both state and federal courts.  I have provided deposition testimony in over three hundred (300) related matters in the above related fields.

Based on my training, knowledge, and experience, I was recognized as an expert by the San Bernardino County Sheriff's Department's and primary Use of Force Instructor.  My formal education includes an Associate of Arts degree in Criminal Justice and completion of a bachelor's degree program in Vocational Education, Training and Curriculum Design.

I was directly responsible for all use of force training, advanced officer training, in-service, correctional officer training, and FTO (Field Training Officer) programs for the San Bernardino County Sheriff's Training Division for several years.  I also served as the training coordinator and supervisor for the Sheriff's K-9 program.

## SPECIALIZED TRAINING

- Certified instructor - firearms
- Certified instructor - defensive tactics and weaponless defense
- Certified instructor - impact weapons
- Certified instructor - shooting survival techniques
- Certified instructor - crowd control and tactical formations
- Certified instructor - chemical agents
- Certified instructor - electronic control devices (ECD)
- Certified instructor - lateral vascular neck restraint
- Certified instructor - law enforcement incident command system

18

## CAREER OVERVIEW

Undersheriff, San Bernardino County Sheriff's Department (Retired January 24, 2014)

32 years of Law Enforcement experience

25 years of community college teaching experience

California Community College Teaching Credential

## FORMAL EDUCATION

F.B.I. National Academy, Class #215, December 5, 2003, Quantico, VA

Command College Class #34, November 2003
California Commission on Peace Officers Standards & Training

Bachelor's degree equivalent (completed BA degree program, degree pending) Southern Illinois University, Carbondale, IL - Vocational Education, Training Development, and Curriculum Design.

Associate of Arts Degree, (1986), Administration of Justice, Crafton Hills Community College, Yucaipa, CA

## CALIFORNIA PEACE OFFICER STANDARDS AND TRAINING

| | |
|---|---|
| Deputy Sheriff | 1982 Basic Certificate |
| Senior Deputy | 1987 Intermediate Certificate |
| Sergeant | 1990 Advanced Certificate |
| Sergeant | 1992 Supervisory Certificate |
| Lieutenant | 1999 Management Certificate |

## ASSIGNMENTS, RESPONSIBILITIES, AND EXPERIENCE

**Undersheriff**
March 2012 – January 2014

The County of San Bernardino is the largest county in the continental United States covering approximately 20,000 square miles with a population exceeding 2,000,000. The Sheriff's Department has 41 stations and divisions, including nine county and 14 contract city patrol operations. The Sheriff's department has approximately 3,500 employees and has an annual budget exceeding $450,000,000.

19

As Undersheriff, I was second in command of the Department and assumed the duties of the Sheriff in his absence. I was responsible for all administrative, operational and legislative concerns within the Sheriff's Department while directing daily operations including budgetary and personnel matters. In the absence of the Sheriff, I acted on his behalf at all internal and external meetings and events. My administrative duties included directing, planning, coordinating, and managing all functions within the Sheriff's Department.

Additional responsibilities included directing and supervising executive and command staff. Coordinated and commanded personnel in the management of administrative support services and criminal operations. Interpreted and anticipated implications of proposed legislative/regulatory changes regarding correctional facilities. Attended and participated in statewide committees. Developed and directed the implementation of policy and procedure changes resulting from changes in legislation, procedures, or departmental philosophy. Represented the Sheriff's Department in liaison with other governmental agencies and community groups and participated in related law enforcement organizations.

Administrative duties included supervising, planning, coordinating, budgeting, and managing all functions within the Sheriff's Department.

- Supervised Human Resources activities for the department including hiring and disciplinary actions.
- Directed department operations through subordinate management and supervisory staff. Assisted with policy direction and formulation; reviewed decisions on all complex or politically sensitive issues.
- Represented the Sheriff by making presentations to civic groups, conventions, and legislative committees for the purpose of promoting goodwill on behalf of the department.
- Maintained a liaison between staff, other law enforcement agencies, judges, District Attorneys, and defense attorneys to insure optimal success in crime prevention and enforcement.
- Wrote comprehensive reports and letters to obtain support and provide information for drafting legislation at the state and local level.
- Supervised the preparation of the annual budget; recommended and reviewed proposed changes with the Sheriff; determined staffing needs and priorities.
- Assisted in the direction of the Office of Public Safety and County Fire Warden's Office.
- Reviewed and recommended the investigative path to be followed regarding major criminal activity.
- Reviewed department objectives and effectiveness of all organizational divisions within the Sheriff's Department; suggested and/or directed changes to improve efficiency.

**Support Operations – Assistant Sheriff**
January 2011 - March 2012

The Assistant Sheriff's position is the administrative command responsible for Support Operations.  As an Assistant Sheriff, I acted on behalf of the Sheriff in his absence. Administrative duties included directing and supervising subordinate personnel responsible for the management of four major correctional facilities within San Bernardino County.  Coordinated and commanded subordinate personnel in the management of administrative support services and the Frank Bland Regional Training Center. Supervised subordinate personnel responsible for staff development, budget, fiscal matters, personnel, and payroll.

**Detentions and Corrections Bureau - Sheriff's Deputy Chief**
January 2010 – January 2011

As the Bureau Chief, I was responsible for subordinate personnel within four large jail facilities.  The Detention and Corrections Bureau is the largest division within the San Bernardino County Sheriff's Department.  The Bureau is comprised of more than 1,100 dedicated professional staff that includes both safety and civilian employees. Additionally, the department has five Type-I jails capable of holding 288 arrestees, four court holding facilities and four lock-up facilities.

The Bureau provides services to over 6,000 felony and misdemeanant inmates on a daily basis who are incarcerated.  These services include food, hygiene, recreation, medical, dental, mental health, religious, and other support services.  The magnitude of these services provided is significant.  As an example, the Food Services Division produces and serves over 7,350,000 meals each year while Medical Services provide health care in excess of 6,400 inmates monthly.

The Transportation Unit transports over 500 inmates daily throughout the county and travels an average of 1,000,000 miles per year, transporting nearly 300,000 inmates throughout San Bernardino County and the State of California.  Additionally, the United States Marshall transports approximately 13,000 federal inmates from the facility to numerous prisons and court facilities throughout the state.

**Administrative Services Bureau – Sheriff's Deputy Chief**
January 2009 – January 2010

As the Bureau Chief, I was responsible for subordinate personnel over three major divisions, which included the following units:  Training, Aviation, Emergency Operations, Volunteer Forces, and Employee Resources.  The Training Center (which includes the Basic Academy, Advanced Officer, EVOC and Range/Use of Force Units) provides both basic and continuing professional education to law enforcement officers from agencies throughout the County of San Bernardino and Southern California.

The Emergency Operations Division provides operational, logistical, and management support services to field operations during large-scale emergencies. These support services are provided by two units within Emergency Operations; Aviation and Volunteer Forces. The Aviation Unit provides patrol, rescue, and fire operation capabilities. Volunteer Forces provides search and rescue, evacuation, disaster planning, emergency management and Department Operations Center coordination. Volunteer Forces also coordinates all law enforcement mutual aid resources in Mutual Aid Region VI on behalf of the Sheriff.

**Employee Resources Division – Sheriff's Captain**
April 2006 – January 2009

As the commanding officer, I was responsible for all employment/labor issues, grievances, background investigations, hiring, and payroll. The Employee Resources Unit provides a broad range of services for the Sheriff's Department. Under my command, this unit conducted background investigations, participated in state-wide recruiting, and was responsible for the department's payroll and benefits. Additionally, I coordinated hiring and provided a variety of services to department personnel through the Sheriff's Employee Assistance Team (SEAT).

Several categories of business applicants were also required to go through the background process in addition to employment background investigations. Additionally, county residents who want to carry a concealed weapon (CCW) were also required to apply through Employee Resources and pass a background investigation.

**West Valley Detention Center – Sheriff's Captain**
December 2003 – April 2006

As the commanding officer, I was responsible for the largest correctional facility in San Bernardino County with approximately 640 employees. This included the assignment to the West Valley Detention Center as part of the command staff. My direct responsibilities included facility operations and training for the correctional facility. Additional responsibilities included supervision of all correctional staff, personnel matters, grievances, citizen complaints, administrative investigation, use of force, and training.

**Chief of Police for City of Yucaipa – Sheriff's Captain**
May 2000 – December 2003

I served as the Chief of Police for the City of Yucaipa, a contract city with the Sheriff's Department. As the commanding officer, I was responsible for all law enforcement for the unincorporated areas in the county and the City of Yucaipa. This included commanding the Yucaipa Sheriff/Police Station. This dual operation is responsible for law enforcement in the unincorporated areas of Mentone, Forest Falls, Angelus Oaks, and Barton Flats. Additionally, this station serves as the law enforcement agency for the City of Yucaipa.

**Lieutenant -** Yucaipa Sheriff and Police Station in the City of Yucaipa
March 1997 – May 2000

I served as the second in command responsible for all law enforcement for the City of Yucaipa. Additional responsibilities included administrative investigations, use of force, personnel matters, and citizen complaints.

**Lieutenant -** West Valley Detention Center
March 1996 – March 1997

I was responsible for jail operations, management, training, administrative investigations, use of force, personnel matters, and grievances.

**Highland Police Station – Sheriff's Sergeant**
October 1995 – March 1996

I served as a watch commander and patrol supervisor for patrol operations. My duties included watch commander assigned to the Highland Police Station for uniformed patrol personnel. My responsibilities included supervision of all patrol functions, personnel matters, use of force investigations, traffic, training, and administrative duties.

**Advanced Officer/Correctional & Field Training Officer Unit – Sheriff's Sergeant**
October 1990 – October 1995

I supervised the following programs - Basic Academy, Firearms Training Center, Advanced Officer Training, Sheriff's Canine, Correctional Training Officers and Field Training Officers. While assigned to the Training Division, I was responsible for advance, correctional, and field training officer programs. The advance officer training unit provided continuing professional training courses to both safety and reserve employees of the Sheriff's Department, state and federal law enforcement agencies, and California Department of Corrections.

**Firearms Training Center/Use of Force Training Unit – Sheriff's Sergeant**

While assigned to the training division for over 5 years, I developed and supervised the Use of Force Training Unit. The unit was responsible for all use of force training, which included: firearms, defensive tactics, weaponless defense, police baton, chemical agents, electronic devices, and police canine. During this assignment, my direct responsibilities included the training and qualification of department personnel in areas concerning the use of force. Training and qualification required proficiency and competency in the taxonomy of educational objectives relating to training issues involving the use of force.

I was also responsible for the supervision, coordination, management, and curriculum design of all firearms, defensive tactics, weaponless defense, police baton, and canine training for the San Bernardino Sheriff's Department. The training facilitated approximately 2000 officers and included basic academy, advance officers, reserve officers, in-service personnel, military, and civilians. The assignment required the direct supervision of eight full-time instructors and staff support that carried out the responsibilities of the Firearms Training Center/Use of Force Training Unit.

### Canine Coordinator – Sheriff's Sergeant

My experience includes being assigned as the Department's canine coordinator for approximately five years. I was responsible for the supervision and management of all canine training and budget issues. The supervision required quarterly evaluation and recertification of approximately ten K-9 Handlers and police canines.

### Tactical Analysis Training Committee – Sheriff's Sergeant

My experience includes being assigned as a committee member to the Tactical Analysis Training Committee that reviews and evaluates critical incidents involving the use of force. The committee evaluates an officer's actions and reactions against known standards in an effort to improve training offered by the San Bernardino Sheriff's Department.

### San Bernardino Valley College - Program Coordinator – Sheriff's Sergeant

Responsibilities included coordinating the Extended Basic Law Enforcement Academy at San Bernardino Valley College. The position required direct supervision and coordination of training and student learning during the ten-month program. Additionally, I was responsible for teaching all use of force training within the program. The training included firearms, defensive tactics, weaponless defense, police baton, chemical agents, crowd control/tactical formations, and legal issues concerning the use of force.

### Riverside Community College/Ben Clark Training Center

My experience includes staff instructor for RCC at the Ben Clark Training Center with assignments teaching firearms, defensive tactics, police baton, use of force, and other related patrol procedures.

### Corporal/Detective – Yucaipa Sheriff's Station
July1988 – July 1990

I served as Field Training Officer, patrol supervisor, and detective performing criminal investigations.

### Deputy Sheriff - Professional Standards Division
July1987 – July 1988

My responsibilities included Civil Liabilities and Internal Affairs.

### Deputy Sheriff – Sheriff's Central Station, San Bernardino
October 1981 – July 1987

Performed a full range of law enforcement duties including, corrections, county and statewide prisoner transport, patrol, criminal investigations, preparation of reports, court testimony, suspect and victim interviews.

**Police Officer** San Diego Police Department, Western Division
October 1982 – April 1983

Performed a full range of law enforcement duties including, patrol, criminal investigations, preparation of reports, court testimony, suspect and victim interviews.

**Sheriff's Academy**
July1981 – October 1981

Entered the San Bernardino County Sheriff's Department Basic Law Enforcement Academy, Class of 66, and was elected class president/sergeant.


## TEACHING CREDENTIALS & INSTRUCTOR CERTIFICATES

- Community College Teaching Credential - State of California

- Black Belt - International Association of Kung Fu San Soo Self Defense

- Certified Instructor - F.B.I. Defensive Tactics and Weaponless Defense

- Certified Instructor - F.B.I. Police Baton

- Certified Instructor - Impact Weapons

- Certified Instructor - Verbal Judo/Tactical Communication

- Certified Instructor - F.B.I. Firearms Training

- Certified Instructor - Survival Shooting Techniques

- Certified Instructor - Crowd Control Tactics and Field Formations

- Certified Instructor - Lateral Vascular Neck Restraint

- Certified Instructor - Oleoresin Capsicum

- Certified Instructor - Realistic Assault Confrontations

- Certified Instructor - Chemical Agents

- Certified Instructor - Electronic Device/Taser

- Certified Instructor - ASP/Expandable Baton

- Certified Master Instructor to certify instructors in Defensive Tactics and Weaponless

- Defense, Police Baton and PR-24

25

- Certified Instructor - Controlled Force

## PROFESSIONAL ORGANIZATION AFFILIATIONS

| | |
|---|---|
| N.A.C.P. | National Association of Chiefs of Police |
| I.A.C.P. | International Associates of Chiefs of Police |
| C.S.S.A. | California State Sheriff's Association |
| F.B.I.N.A. | FBI National Academy Associates |
| A.C.A. | American Correctional Association |
| A.J.A. | American Jails Association |
| S.E.B.A. | San Bernardino Safety Employee's Benefit Association |
| A.S.L.E.T. | American Society of Law Enforcement Trainers<br>Appointed as "Regional Director of Western States" |
| F.A.T.S. | Firearms Training System<br>Appointed to National Training Advisory Board |
| P.O.R.A.C. | Police Officers' Research Association of California |
| C.P.O.A. | California Police Officer's Association |
| I.A.L.E.F.I. | International Association Law Enforcement Firearms Instructor |
| Kiwanis | Yucaipa/Calimesa Club |
| Footprinters | Chapter #67, past president |

## CALIFORNIA COMMISSION ON PEACE OFFICER STANDARDS AND TRAINING AND CORRECTIONS STANDARD AUTHORITY COMMITTEE APPOINTMENTS

2016 – Subject matter expert
  Use of Force
  San Diego

2012 - Subject matter expert
  Crowd Management and Civil Disobedience Guideline Review
  Sacramento

2011 - C.S.A.
Adult Titles 24 and 15 Regulations Revision Administrative Workgroup
Sacramento

1998 - Continuing Professional Training Steering Committee (CPT)
P.O.S.T. Training
Sacramento

1997 - Subject matter expert (QNA)
Controlling Violent Subjects Tele-course
San Diego

1997 - Subject matter expert
Vehicle Pullover techniques
San Diego

1995 - Subject matter expert
Officer Safety & Field Tactics
San Luis Obispo

1994 - Subject matter expert
Illegal Possession of Firearms Tele-course
San Diego

1994 - Subject matter expert
Chemical Agents - Training Requirements
San Diego

1993 - Subject matter expert
Chemical Agents - Oleoresin Capsicum
Ontario

1993 - Subject matter expert
Use of Force Training issues
Costa Mesa

1992 - Subject matter expert
Defensive Tactics and Weaponless Defense training issues
San Diego

1992 - Subject matter expert
Uniform Canine training and evaluation standards

1992 - Subject matter expert
Uniform Canine training and evaluation standards
City of Orange

27

## CONTINUED PROFESSIONAL LAW ENFORCEMENT TRAINING

1981    Jail Operations

1981    Traffic Accident Investigations

1983    Correctional Officers Update

1983    Institutional Staff Series I

1984    Correctional Officers Update

1984    H & S 11550 (Under the Influence)

1984    Gang Investigations

1986    Officer Safety/Field Tactics

1986    Correctional Officers Update

1986    IR 3000 Breath Alcohol Analysis

1986    Drug Influence - 11550 H & S

1986    Patrol Officer - Vehicle Stops

1986    Patrol Officer - Auto Theft

1986    Patrol Officer - Search Warrants

1986    Patrol Officer - Crimes Against Property

1986    Patrol Officer - Interview and Interrogation

1986    Patrol Officer - Collection of Evidence

1987    Controlled Substance Influence

1987    11550 - Under the Influence

1988    Patrol Officer - Civil Liabilities

1988    Realistic Assailant Control

1988    Police Civil Liability

1988    Patrol Officer - Domestic Violence

| | |
|---|---|
| 1988 | Legal Update Regarding Discovery, Personnel and Liability |
| 1988 | Principles of Shooting - Semi-Auto Transition |
| 1989 | Legislative Update |
| 1989 | Criminal Investigator's Course |
| 1990 | Driver Awareness Instructor |
| 1990 | Developmentally Disabled and Mentally Ill |
| 1990 | Peer Support Counseling Training |
| 1990 | Missing Persons |
| 1991 | Use of Force Issues |
| 1991 | Street Survival - The Tactical Edge |
| 1991 | Street Survival - The Win Seminar |
| 1991 | Exotic Weapons |
| 1991 | Police Supervision |
| 1991 | Lethal Force Management for Police |
| 1992 | Fifth ASLET International Training Seminar |
| 1992 | Supervisor's Training - Mobile Field Force |
| 1992 | Realistic Assault Confrontation |
| 1993 | CopClass "93" Use of Force & Liability |
| 1993 | Simunitions Instructor Development Course |
| 1993 | C.P.O.A. - Use of force Update |
| 1994 | C.P.O.A. - Use of Force - The Rodney King Incident |
| 1994 | C.P.O.A. - Officer Involved Shootings |
| 1994 | Assertive Supervision |
| 1994 | Lateral Vascular Neck Restraint system - update |
| 1995 | Eighth ASLET International Training Seminar, Anchorage, Alaska |

| | |
|---|---|
| 1995 | ASP Baton Instructor's Course |
| 1996 | Use of Force Update - First Trimester |
| 1996 | Ninth ASLET International Training Seminar, Grapevine, Texas |
| 1996 | Use of Force Update - Second Trimester |
| 1996 | Search Manager's Course |
| 1996 | Use of Force Update - Third Trimester |
| 1996 | P.O.S.T. Manager's Course |
| 1997 | Use of Force Update - First Trimester |
| 1997 | STC Correctional Facility Pre-inspection Training. |
| 1997 | Use of Force Update - Second Trimester |
| 1997 | ASLET Use-of-Force Seminar |
| 1997 | Sexual Harassment / Gender Bias |
| 1997 | Use of Force Update - Third Trimester |
| 1997 | L.E.I.C.S. Train the Trainer |
| 1998 | Use of Force Update - Jan |
| 1998 | Use of Force Update - April |
| 1998 | CPT Steering Committee Training |
| 1998 | Use of Force Update - July |
| 1998 | Firearms / Deadly Force / Use of Force Symposium |
| 1998 | Use of Force Update - Oct |
| 1999 | Cycle of Violence |
| 1999 | Civil Rights - Color of Law FBI |
| 1999 | Use of Force - February |
| 1999 | Controlled Force |
| 1999 | Advanced Police Management |

1999    The Challenges of Ethical Leadership

1999    Use of Force Update - June

1999    Use of Force Update - August

2000    Use of Force Update - February

2000    Supervisor Development Course

2000    Use of Force Update - June

2000    Use of Force Update - October

2001    Role of the Police Chief

2001    Use of Force Update - February

2001    Executive Leadership Symposium

2001    Executive Law Enforcement Ethics Symposium

2001    Executive Development Training

2001    Management and Investigations of Hostile Work Environment

2001    Use of Force Update - June

2001    Leadership Development Training

2001    Responses to School Violence

2001    Leadership Development - Target Excellence

2001    Use of Force Update - October

2002    Executive Leadership Symposium

2002    Use of Force Update - February

2002    Faith & Justice Summit

2002    Use of Force Update - June

2002    Use of force Update - October

2003    Use of Force Update - February

2003    Racial Profiling - March

2003    Use of Force Update - September

2004    Use of Force Update - February

2004    Use of Force Update - June

2004    Use of Force Update - June

2004    C.S.S.A. - Correctional Facilities Administrator Seminar

2005    Use of force Update - February

2005    Employment Law

2005    Use of Force Update - June

2005    Southern California Jail Managers Association Training (Orn Co.)

2005    Use of Force Update - October

2005    C.S.S.A. Correctional Facilities Administrator Seminar

2006    Use of Force Update – February

2006    Use of Force Update – May

2006    Use of Force Update – September

2007    Use of Force Update – February

2007    Traumas in Law Enforcement – C.O.P.S.

2007    AELE Lethal and Less Lethal Force

2007    Employment & Labor Law Conference

2007    ICS 300 /400 Training Course

2007    Terrorism Early Warning Group Conference

2008    Use of force Update – February

2008    Use of force Update - May

2008    Use of force Update - September

2008    Use of force Update – January

2009    Use of force Update – May

2010    A.J.A. National Conference – Portland Oregon

2010    First Aid and CPR update – August

2010    Succession Planning

2011    Use of force update - January

2011    Corrections legal updated with Carrie Hill, Esq

2011    Taser use of force update seminar

2011    Taser (ECD X-26/X2) instructor certification

2011    Use of Force, ECD's, and ICDS

2012    CSSA Second in commands conference

2012    Use of force update - June

## ACCOMPLISHMENTS    (brief summary)

While assigned to the Training Division, I took the initiative to research and review an alternate chemical agent for department use.  The research included the review of various products and delivery systems.  I wrote the proposal and made numerous presentations for the approval and authorization to implement pepper spray for the San Bernardino County Sheriff's Department. The proposal included cost analysis for purchasing and training approximately 2000 department personnel.  The training program has proven to be one of the most effective in the state of California.

I have demonstrated my management skills in the supervision of the Department's Use of Force Training program.  The program required a working knowledge of the materials along with staff assignments of personnel to appropriate positions.  The scheduling included approximately 2000 sworn personnel and off site training to various locations within the county.  The County of San Bernardino is approximately 22,000 square miles. The scheduling and logistics experienced many problems and conflicts.  I was able to resolve many of the problems and issues with appropriate solutions.

I have confronted personnel matters that have resulted in written reprimands and work performance contracts.  Additionally, I have developed and administered work performance contracts to individuals who failed to meet the primary proficiency requirements and essential job functions for a deputy sheriff.

I have received numerous requests to lecture on various topics which include:  use of force training, chemical agents, and crowd control.  Additionally, I have given several proposals to the Office of the Sheriff and the Executive Staff of the San Bernardino County Sheriff's Department. The proposals include Use of Force Training Program, Hobble Restraint, ASP Baton, Cap-Stun, and Canine Operations Manual.

I have demonstrated the ability to provide expert witness testimony in numerous civil litigations involving the San Bernardino County Sheriff's Department and Law Enforcement agencies throughout the State of California.  My testimony has earned expert recognition in both state and federal court relating specifically to police procedures and the use of force.

I have participated on several P.O.S.T. committees due to my experience, training, and ability to interact with various agencies on a number of issues.

**Rev: 9/18/16**

# Expert Testimony

| Case: | Court / Hearing / Deposition |
|---|---|
| **2011** | |
| Deats vs. County of Orange<br>CV09-6322 PSG (PJWx) | Deposition |
| Nash vs. City of San Bernardino<br>CV 09-08671-RGK (FFMx) | Deposition |
| Nash vs. City of San Bernardino<br>CV 09-08671-RGK (FFMx) | U.S. District Court – Los Angeles |
| Bernat vs. California City<br>Not available | U.S. District Court - Fresno |
| Rivera vs. City of Santa Ana<br>Not available | U.S. District Court – Santa Ana |
| A.K.C. vs. City of Santa Ana<br>SACV-09-01153 CJC (ANx) | Deposition |
| Radwan vs. County of Orange<br>Not available | U.S. District Court – Santa Ana |
| Deats vs. County of Orange<br>CV09-6322 PSG (PJWx) | U.S. District Court – Los Angeles |
| AKC vs. City Santa Ana<br>SACV-09-01153 CJC (ANx) | U.S. District Court – Santa Ana |
| Allen vs. County of Riverside<br>RIC 498184 | Deposition |
| Dubose vs. County of Los Angeles<br>CV09-07832 CAS (AJWx) | U.S. District Court – Los Angeles |
| Hachett vs. City of Calexico<br>Not available | Deposition |
| Ballard vs. City of San Bernardino<br>CV10-02769DMG (AJWx) | Deposition |
| Rodriguez vs. City of Lon Beach<br>SACV10-00271DOC (ANx) | Deposition |
| Nava vs. City of Santa Clara<br>Not available | U.S. District Court – San Jose |

| | |
|---|---|
| Ballard vs. City of San Bernardino<br>CV10-02769DMG (AJWx) | U.S. District Court – Los Angeles |
| Williams vs. County of Los Angeles<br>CV08-7958JVS (FMOx) | Deposition |
| Patino vs. L.A. Unified School Police<br>BC430225 | State Superior Court – Los Angeles |
| Rodriguez vs. City of Long Beach<br>SACV10-00271DOC (ANx) | U.S. District Court – Santa Ana |
| Krechman vs. County of Riverside<br>CV10-08705 ODW (DTBx) | Deposition |
| Johnston/Codd vs. County of Riverside<br>CV 10-08101 RSWL (JEMx) | Deposition |
| Moore vs. City of Desert Hot Springs<br>INC 060070 | Deposition |
| Krechman vs. County of Riverside<br>CV10-08705 ODW (DTBx) | U.S. District Court – Los Angeles |

**2012**

| | |
|---|---|
| Debellis vs. Abdulla<br>CIVBS 900069 | Deposition |
| Moore vs. City of Desert Hot Springs<br>INC 060070 | State Superior Court – Indio |
| Contreras vs. City of San Jose<br>CV-10-00953 RMW | Deposition |
| Mirzaeyan vs., City of Glendale<br>CV11-01747VBF (JCx) | Deposition |
| Samatua vs. City of San Bernardino<br>CIVDS917832 | Deposition |
| Dubose vs. County of Los Angeles<br>CV09-07832 CAS (AJWx) | U.S. District Court – Los Angeles |
| Day vs. People of the State<br>Not available | State Superior Court – San Bernardino |
| Bowen vs. County of Riverside<br>RIC516303 | Deposition |
| Briones vs. City of San Bernardino<br>Not available | Deposition |

| | |
|---|---|
| Arredondo vs. Co. of Santa Barbra<br>1370977 | Deposition |
| Mirzeayan vs. City of Glendale<br>CV11-01747VBF (JCx) | U.S. District Court – Los Angeles |
| Williams vs. People of the State<br>Not available | State Superior Court – Victorville |
| Riley vs. County of Orange<br>SACV11-00773 JST (ANx) | Deposition |
| R.Z. vs. City of Long Beach<br>SACV-1100536 AG (RNBx)<br>c/w CV11-06379 AG (RNBx) | Deposition |
| Del Castillo vs. City of Santa Ana<br>30-2010-00383134 | Deposition |
| Rosenthal vs. County of Riverside<br>RIC 523816 | Deposition |
| Grobeson vs. City of Los Angeles<br>BC 150151 | Deposition |

**2013**

| | |
|---|---|
| Nida vs. City of Downey<br>CV12-01382 SJO (JEMx) | Deposition |
| Manni vs. City of San Diego<br>11cv0435 W (DHB) | Deposition |
| Williams vs. City of Pasadena<br>BC477905 | Deposition |
| R.Z. vs. City of Long Beach<br>SACV-1100536 AG (RNBx)<br>c/w CV11-06379 AG (RNBx) | U.S. District Court – Santa Ana |
| Lucas vs. City of Visalia<br>09-CV-01015-AWI-JLT | Deposition |
| Muswasua vs. COR<br>RIC 1113335 | State Superior Court – Riverside |
| Chiaese vs. County of Riverside<br>RIC 10012874 | Deposition |
| Rosenthal vs. County of Riverside<br>RIC 523816 | State Superior Court - Murrieta |
| Velasquez vs. City of Santa Clara<br>5:11-CV-03588 PSG | Deposition |

| | |
|---|---|
| Johnson vs. County of Sonoma<br>CV 11-5811-CRB | Deposition |

**2014**

| | |
|---|---|
| MH vs. County of Alameda<br>C11-2868 JST (MEJ) | Deposition |
| Chiease vs. County of Riverside<br>RIC 10012874 | State Superior Court - Temecula |
| Ledezma vs. City of Riverside<br>ED CV 12-01524 VAP (SP) | U.S. District Court – Riverside |
| Ramirez vs. City of Alhambra<br>GC046887 | State Superior Court – Pasadena |
| Nelson vs. County of Riverside<br>RIC 10011174 | Deposition |
| Williams vs. City of Pasadena<br>BC477905 | State Superior Court - Los Angeles |
| McDade vs. City of Pasadena<br>CV12-02892 DMG (JCGx) | Deposition |
| Velasquez vs. City Santa Clara<br>5:11-CV-03588 PSG | U.S. District Court - San Jose |
| Krechman vs. County of Riverside<br>CV10-08705 ODW (DTBx) | U.S. District Court - Los Angeles |
| Bosch vs. County of Riverside<br>EDCV 13-02352-SVW (FFMx) | Deposition |
| Solorzano vs. City of Fontana<br>CIVDS 909991 | State Superior Court - San Bernardino |
| Howard vs. County of Riverside<br>ED CV 12-00700 VAP(OPX) | U.S. District Court – Riverside |
| Rendon vs. City of Indio<br>ED CV 13-00667 VAP (OPx) | U.S. District Court – Riverside |
| Kahsay vs. City of San Diego<br>37-2013-00031271-CU-PA-CTL | Deposition |
| Katz vs. County of Riverside<br>RIV 1213947 | State Superior Court - Riverside |
| Rivera vs. City of Azusa<br>2:13-CV-01510-DMG (VBKx) | Deposition |
| Kahsay vs. City of San Diego<br>37-2013-00031271-CU-PA-CTL | State Superior Court - San Diego |

| | |
|---|---|
| Ford vs. City of Beaumont<br>AI #13-13 | Binding Arbitration Hearing |
| Coronado vs. CHP<br>CV11-03560 DMG (JCx) | Deposition |
| Guinn vs. County of San Bernardino<br>DA-2014-0212-06-G1713 | Deposition for Civil Service Hearing |
| Cordero vs. Hemet<br>EDCV 10-01935-JAK-PJW | Deposition |
| RZ vs. COR<br>13-01251 FMO (DTBX) | Deposition |
| Compton vs. COR<br>CV 10-07490 BRO (DTBx) | Deposition |
| Gomez vs. People of the State<br>Not available | State Superior Court – San Bernardino |

**2015**

| | |
|---|---|
| Bondaug vs. City of Santa Clara<br>Case No. 1-12-CV-238152 | Deposition |
| Nelson vs. City of Riverside<br>Case No. EDCV13-01665 | U.S. District Court – Riverside |
| Bondaug vs. City of Santa Clara<br>Case No. 1-12-CV-238152 | State Superior Court – San Jose |
| Doe (Clinton) vs. PathPoint<br>CASE NO. PC052205 | Deposition |
| Rivera vs. City of Oakland<br>Not available | Arbitration Hearing |
| Larson vs. City of Glendale<br>EC055649 | State Superior Court – Burbank |
| Henriquez vs. City of Bell<br>2:14-CV-00196-GW (SSx) | Deposition |
| Salib vs. City of Riverside<br>ED CV 13-1682 MWF (OPx) | Deposition |
| Dunbar vs. City of Riverside<br>EDCV 13-00847 JGB (SPx) | Deposition |
| Salib vs. City of Riverside<br>ED CV 13-1682 MWF (OPx) | U.S. District Court - Los Angeles |
| Morguita- Johnson vs. City of Fresno<br>1:14-CV000127 LJO-SKO | Deposition |

C. Williams vs. City of Colton
No. 14-CV-01426                          Deposition

Moradian vs. City of Glendale            Deposition
Case No. CV 14-01178 GW (VBKX)

Morguita- Johnson vs. City of Fresno     U.S. District Court - Fresno
1:14-CV000127 LJO-SKO

Moradian vs. City of Glendale            U.S. District Court – Los Angeles
Case No. CV 14-01178 GW (VBKX

Van Audenhove vs. COR                    Deposition
CASE NO.  EDCV 14-00944 FMO (Ex)

Thomas vs. City of Fullerton             Deposition
No. 30-2012-00581299

W. Espinoza vs. County of Riverside      U.S. District Court – Los Angeles
CASE NO.  EDCV 14-00085-JGB (SPx)

Cicineli vs. City of Fullerton           Arbitration Hearing

Ferdinand vs. City of Los Angeles        Deposition
NO. CV-14-7056FMO (JPRx)

Rodriguez vs. City of Los Angeles        Deposition
NO. CV11-01135 DMG (JEMx)

Wolfe vs. City of Fullerton              Arbitration Hearing

People vs. Lang                          State Superior Court - Banning

James vs. Granger (DOJ BOF)              Deposition
CASE NO: 1:13-CV-00983-AWI-SKO

Jordan vs. City of Hawthorne             Deposition
Case No. CV14-07554 ODW (JPRx)

**2016**
Stanfill vs. City of Indio               Administrative Appeals Hearing

Aguilar vs. City of Azusa                Deposition
Case No: 2:14-CV-09183-GW (JPRx)

Dolak vs. Torrance                       Deposition
Case No. CV 14 07463 BRO-MRW

Alarcon vs. City of Calexico             Administrative Hearing - Arbitration

Hoffman vs. County of Los Angeles        Deposition
CASE NO.: CV 15-03724 FMO (ASx)

Dolak vs. Torrance                              U.S. District Court – Los Angeles
Case No. CV 14 07463 BRO-MRW

N.W. / Woods vs. City of Long Beach             Deposition
Case No. EDCV14-01569-VAP (SP)

Easley vs. City of Riverside                    U.S. District Court – Los Angeles
Case No. EDCV14-0117 THJ (SPx)

Perez vs. Diaz, Nelson, USA                     Deposition
Case No. 3:13-cv-01417 – WQH (BGS)

Jackson vs. County of San Bernardino            Deposition
Case No.: 5:13-CV-01650-JGB-DTB

Jones vs, County of San Bernardino              U.S. District Court – Riverside
Case No.: 5:15-cv-00080-DTB

NW Woods vs. City of Long Beach                 U.S. District Court – Los Angeles
Case No.: EDCV 14-01569-VAP (SPx)

Chang vs. County of Santa Clara                 Deposition
Case No.: 15-CV-02502 RMW (NC)

Palmer vs. City of Santa Monica                 Deposition
Case No. 15-CV-06183

Jackson vs. County of San Bernardino            U.S. District Court – Riverside
Case No. 5:13-CV-01650-JGB-DTB

Wyatt vs. County of Riverside                   Deposition
Case No. 5:15-cv-586-CBM - FFM

Del Real vs. City of Long Beach                 Deposition
Case No.: CV14-02831 MWF

Cobb vs. City of San Diego                      US District Court – San Diego
Case No. 3:13-cv-01353-BEN(JMA)

Del Real vs. City of Long, et al.               U.S. District Court – Los Angeles
Case No.: CV14-02831 MWF

Dorsey vs. City of San Diego, et al             Deposition
Case No. 15-cv-1441-L-vs- (WVG)

Palmer vs. City of Santa Monica                 U.S. District Court – Los Angeles
Case No. 15-CV-06183

Herrera vs. City of Ontario, et al.             Deposition
Case No. EDCV 15- 1370 JGB (SPx)

Scott vs. City of San Diego                     Deposition
Case No.: 37-2015-00001940-CU-OE-CTL

Arellano vs. City of Santa Ana, et al.                 Deposition
Case No. SACV14-1886 N S (DFMx)
(consolidated with SACV15-0432)

Ramos vs. City of Fullerton                            Arbitration Hearing
No case reference

Lopez vs. City of Santa Clara                          Deposition
Case No. CV13-3870 CRB (PR)

Herrera, et al., vs. City of Ontario                   U.S. District Court – Riverside
Case No. EDCV 15- 1370 JGB (SPx)

Lopez vs. City of Santa Clara, et al.                  U.S. District Court –San Francisco
Case No.: CV13-3870 CRB (NJV)

Wyatt vs. County of Riverside, et al.                  U.S. District Court – Los Angeles
Case No: 15-cv-586-CMB (FFMx)

Kirsch vs. County of Santa Barbara                     Civil Service Commission

Maurer vs. People of the State                         Superior Court – West Covina

Torres vs. County of San Bernardino                    Deposition
Case No.: CV 16-00992 PA (DTB)

**2017**
Donaldson vs. USA                                      Deposition
Case No. 15cv0908-BAS-KSC

Scott vs.  City of San Diego                           State Superior Court – San Diego
Case No. 37-2015-00001940-CU-OE-CTL

Oppenheimer vs. City of La Habra                       Deposition
Case No: 8:16-CV-00018-JVS-DFM

Hoffman vs. County of Los Angeles                      U.S. District Court – Los Angeles
Case No.: CV 15-03724 FMO (ASx)

Monica vs. City of Santa Clara, et al.                 U.S. District Court – San Jose
Case No.:  5:15-CV-04857 BFL

Arias vs. COLA                                         U.S. District Court – Los Angeles
Case NO.: 2-15-cv-02170 AB (ASx)

People vs. Downy                                       State – Court – San Bernardino

Ketron v. City of Santa Monica                         Deposition
Case No. 2:16-CV-01478 MWF (PJWx)

Oppenheimer vs. City of La Habra, et al. U.S. District Court – Santa Ana
Case No.: 8:16-CV-00018-JVS-DFM

Garcia v. City of Santa Clara Deposition
Case No.:  CV10-02424 Sl (pr)

Centeno vs. City of Fresno, et al. Deposition
Case NO. 1:16-CV-00653-DAD-SAB

Avila vs. Co. of Madera & State of Ca. Deposition
Case No. 1:15-cv-00996 JAM-EPG

Finger vs. County of Riverside, et al. U.S. District Court – Riverside
Case No: 14-cv-01585 JGB (KKx)

Moody vs. County of San Bernardino Civil Service Commission

Garcia v. City of Santa Clara U.S. District Court – San Francisco
Case No.: CV10-02424 Sl (pr)

Holmes vs. County of Orange Deposition
Case No.:  8:16-CV-00867-JLS-JCG

Sandra Salazar vs. COSB Deposition
Case No.: 5:16-CV-01103-JFW-KK

Curtin v. County of Orange Deposition
Case No.:  8:16-cv-00591-SVW-PLA

Alexis Yancy, et al. v. State of Ca (CHP) Deposition
Case No. 15-cv-0580 JM (PCL)

Curtin v. County of Orange U.S. District Court – Los Angeles
Case No.:  8:16-cv-00591-SVW-PLA

Grant vs. County of Orange Deposition
No. 30-2015-00786861

**Note:** There may be some discrepancy in the number of cases contained within this list. The list is only as accurate as records and memory can reflect. There may be other cases not identified, which is due to errors in record keeping.

Rev: 8/11/17

Offer of Proof - Expert Report

# Exh. 2

## Robert Fonzi & Associates
*Training and Consulting*
robert.fonzi@yahoo.com

**P.O. Box 1154, Yucaipa, CA  92399**
**951-312-9679**

**August 23, 2017**

Office of City Attorney / City of Long Beach
City Hall 333 West Ocean Boulevard
Eleventh Floor
Long Beach, CA  90802-4664

Attention:  Howard Russell
Re:  ***Khanly Saycon, Jr., et al. v. City of Long Beach, et al.***
Case No. 2:16-cv-05614
File No.  L16-0107

Dear Mr. Russell,

In accordance with the Federal Rules of Civil Procedure 26(a)(2)(B), this report sets forth my opinions with respect to the police procedures; specifically, the issues related to police investigation, reasonable suspicion, probable cause, imminent danger, and the use of force involving Officers Cruz and Nguyen with the Long Beach Police Department.

It is my understanding that additional discovery materials may still be pending.  I reserve the right to obtain additional discovery that may assist in my further evaluation of this matter. Additionally, I reserve the right to add, change and/or delete any of my opinions based on additional discovery, at which time a supplemental report may be submitted.  I will make myself available for deposition upon reasonable request by plaintiffs, prior to the discovery cut-off date at a mutually agreeable date and time.

## I.    Brief Summary of Qualifications:

I am retired as Undersheriff from the San Bernardino County Sheriff's Department.  As Undersheriff, I was responsible for all administrative and operational commands within the Sheriff's Department while directing day to day operations.  In the absence of the Sheriff, I acted on his behalf at all internal and external meetings and events. Administrative duties included but were not limited to:  directing, planning, coordinating, and managing all functions within the Sheriff's Department.

Additional responsibilities included:  directing and supervising subordinate executive and command staff.  Coordinated and commanded subordinate personnel in the management of administrative support services and criminal operations.  Accountable for approving or recommending for approval, recommendations submitted by either of the Assistant Sheriffs or the Chief of the Professional Standards and Training Division which identify changes to procedures or policies that are consistent with effective risk management.

1

Ensured professional competence and skillful enforcement of the law at the highest levels by instilling such values in subordinate command personnel. Interpreted and anticipated implications of proposed legislative/regulatory changes regarding correctional facilities. Developed, directed and implemented policy and procedural changes resulting from legislative changes, procedures, or departmental philosophy. Attended and participated in statewide committees. Represented the Sheriff's Department as the liaison with other law enforcement organizations, government agencies and community groups.

Prior to my position as Undersheriff, I was an Assistant Sheriff with the San Bernardino County Sheriff's Department. As the Assistant Sheriff, I was responsible for all support operations within the organization. Administrative duties included: directing, planning, coordinating, and managing all functions within a major area of assigned responsibility for the Sheriff's Department. Responsible for judging the performance of personnel assigned to his respective areas of responsibility embodied in law (both statutory and case law), MOU's, the Department's Manual of Policy and Procedures, all Division Directives in support of the Manual, our Mission Statement, Core Values Statement, and the Law Enforcement Code of Ethics.

Prior to my position as Assistant Sheriff, I was a Deputy Chief with the San Bernardino County Sheriff's Department with responsibilities over several bureaus that included Administrative Services, Court Security, Training Division, Detentions and Corrections.

Prior to my promotion to Deputy Chief, I was the commanding officer for the Sheriff's Employee Resources Division, which provides a broad range of services for the Sheriff's Department. Under my command, this unit conducted background investigations, participated in state-wide recruiting, was responsible for the department's payroll and benefits, coordinated hiring through County Human Resources and provided services for department personnel through the Sheriff's Employee Assistance Team (SEAT).

In my assignment as commanding officer for the West Valley Detention Center prior to my Deputy Chief position, I was responsible for various issues involving personnel matters, disciplinary actions and policies and procedures in adherence with applicable state and federal laws.

I served as the Chief of Police for the City of Yucaipa (a contract city with the San Bernardino County Sheriff's Department). My responsibilities included station operations, personnel management, criminal investigations, use of force training, and management of support staff. As the Chief of Police, I served on a number of community projects, committees, and participated in city events.

I am a 32-year veteran with the San Bernardino County Sheriff's Department and the San Diego Police Department. I have several years of patrol experience in the Ontario, San Bernardino, and San Diego areas. My experience includes patrol operations, criminal investigations, internal affairs, civil liabilities, training, canine coordinator and corrections. I am most recognized in the area of peace officer training. With over 30 years of experience, I have trained approximately 10,000 law enforcement officers from all over the country. My expertise is extensive in the use of force and police procedures. I have testified as an expert witness in numerous civil and criminal trials in both state and federal court.

2

I have read the materials provided to me with respect to the December 14, 2015 incident involving Officers Cruz, Nguyen and Mharloun Saycon (hereinafter referred to as Saycon). As a result of my careful review and study into the incident, I am prepared to offer expert opinions concerning police procedures, practices, and tactics employed during the incident; specifically, the issues related to police investigation, reasonable suspicion, probable cause, imminent danger, and the use of force.

II. **Curriculum Vitae and Court Testimony:** I have attached my curriculum vitae, which outlines my training, knowledge, and experience. Additionally, I have attached a list of court testimony within the past five years.

III. **Compensation:** A copy of my fee schedule, which outlines my compensation for professional services, is attached.

IV. **Charts/Exhibits:** Pursuant to the Federal Rules of Civil Procedure I have attached charts/exhibits that I may use for testimony and/or trial proceedings.

V. **Materials Reviewed:** As of this writing, I have reviewed the following reports and documents:

1. FAC compliant
2. Deposition - Donovan with exhibits
3. Deposition - Suafoa with exhibits
4. Deposition - Zuniga with exhibits
5. Deposition - Rev Antonio with exhibits
6. Deposition - PMK Lt. Cox
7. Deposition - Patrick O'Dowd
8. Deposition -  Sergeant Gallo
9. 1 - EDISC 1 - surveillance videos (RFP 2)
10. EDISC 2 – Audio recordings
11. Coroner photos (147)
12. Officer and Taser Photos (18)
13. Scene Photos (208)
14. Witness Donovan position photos (10)
15. Training and policies
16. 4 - OIS 15-010_15-76868 Index (bates 384-626)
17. 11 – Fire
18. D-COLB's First Supp Resp to RFP, Set One
19. D-COLB's Response to Plf, Saycon's RFP, Set One
20. Applicable P.O.S.T. Training
21. Applicable policies and procedures

Note:  I am informed and believe that I have received all Disclosures and Discovery Responses produced in this case, as well as all deposition transcripts that have been completed prior to the date of this report.  The foregoing list underscores those records to which I devoted substantial consideration.  In the event that any items reviewed were inadvertently omitted from the foregoing list, this expert will gladly supplement this list upon questioning under oath and reserves the right to supplement this list in a supplemental report.

**VI.    Summary of Opinions:**  The foregoing opinions are based on my review of the above listed materials in addition to my training, knowledge, and experience.  I am prepared to testify and/or explain my opinions regarding the use of force in this incident.

I do not intend to offer my opinions as to the ultimate issues in this action, though I reserve the right to offer opinions based on my areas of expertise even if such opinions embrace the ultimate issues in the incident.  I reserve the right to amend these opinions based upon additional testimony and/or discovery documents.

***Police practices and procedures*** is the application of training that involve a variety of topics related to police response(s), communication, resources, use of force, and tactics based on the totality of the circumstances.  The application of police practices and procedures may vary depending on the information known or unknown by the officer(s) at the time of the incident.  Additionally, the decision as to the appropriate police practices and procedures also depend on the time constraints, the risks presented by a suspect(s), public, and the tools available to the officer(s).

1.    Based on my review of the listed materials it is my opinion, as determined by standard police practices and training, that the police investigation, response, and tactics deployed by the involved officers (Nguyen and Cruz) under the totality of the circumstances, was consistent with standard police practices.  Additionally, this is based on the officers' perception, training, threat assessment, and the totality of the circumstances known to them at the time.

2.    Based on my review of the listed materials it is my opinion, an officer conforming to standard police practices and training would conclude that there was ***reasonable suspicion***[1] to ***detain***[2] (detention) Saycon to further investigate his reported suspicious activity.  Saycon was armed with a knife and was waiving it at employees and customers of the business, causing them to be concerned for their safety.

Additionally, an officer conforming to standard police practices and training would conclude that there was ***probable cause***[3] to arrest Saycon based on the information available.  The information included facts that: 1) Saycon was armed and brandishing a weapon (knife), 2) possibly threatening customers, 3) commencing vandalism, as well as the officers' observations (suspect matching description and holding a knife),

---

[1] **Reasonable suspicion:**  The basis for an investigative stop or detention.  In order for it to be valid an officer must articulate specific facts justifying a stop for investigative purposes.  First, he must be able to identify the criminal activity and/or the suspicious circumstances.  Secondly, the officer must reasonably suspect the person to be detained is possibly connected to the criminal activity.  Finally, the officer must articulate those specific facts that exist under the totality of the circumstances at the time.

[2] **Detention:**  A temporary seizure based on reasonable suspicion by a police officer to stop a person and to investigate if, a crime is about to take place, is in progress, or has taken place.

[3] **Probable cause:**  Probable cause exists when the totality of the circumstances cause an officer a strong suspicion that the person is guilty of a crime.  The totality of the circumstances and the person/s involved has acted in an unusual or suspicious manner that is related to some criminal act/s and the person being detained is directly involved.

all leading officers to believe that Saycon had committed a series of threatening criminal acts. The acts included brandishing a knife, delaying, obstructing and resisting a police officer while in the performance of his duties, and assault with a deadly weapon (knife).

3. Based on my review of the listed materials it is my opinion, an officer conforming to standard police practices and training would conclude that it was reasonable to believe that Saycon posed an immediate threat of serious injury, up to and including death, to the officers for a number of reasons that included:

   - Information provided by the reporting party that Saycon was armed with a knife and was waiving it at employees and customers.
   - Saycon refused repeated commands to drop the knife and to get on the ground.
   - Saycon deliberately locking the knife in the open position in preparation to use it against the officers and moving to stand up and assault the officers.

   An officer conforming to standard police practices and training would conclude that Saycon presented an immediate threat of death and/or serious bodily injury based on the totality of the circumstances.

   Furthermore, Saycon's deliberate and intentional acts included; refusing to comply with repeated commands, actions consistent with an attempt to arm himself, assault on a police officer with a deadly weapon (knife), and placing others in imminent danger, all enhancing the officers' perceived threat assessment.

4. Based on my review of the listed materials it is my opinion, as determined by standard police practices and training, that under the circumstances the use of force by Officer Nguyen and Cruz was consistent with standard police practices. The force used by Officer Nguyen included repeated verbal commands, deployment of the Taser, and firing his service weapon. The use of force by Officer Cruz included the use of a Taser and a baton strike.

   It's important to mention that both officers, even when faced with a potentially life threatening situation, attempted to resolve the threat by Saycon in the lowest and most reasonable manner possible, which included placing themselves at risk.

5. Based on my review of the listed materials it is my opinion, as determined by standard police practices and training, that under the circumstances the use of deadly force by Officer Nguyen was consistent with standard police practices. Therefore, an officer conforming to standard police practices and training would conclude in that split-second moment, it was objectively reasonable based on his perception and *fear for his life and/or that of others*[4], to use deadly force to stop the life-threatening actions that were presented by Saycon.

---

[4] **Fear for life and/or that of others:** An officer may use deadly force to protect oneself or others when (from the perspective of a reasonable law enforcement officer) the officer has the objective and reasonable belief that his/her life, or the life of another, is in imminent danger of death or serious physical injury based upon the totality of the facts known to the officer at the time.

The actions of Saycon would cause a reasonable officer acting consistently with standard police practices under the same circumstances to believe that he was attempting to assault the officers with a deadly weapon (knife) and threaten the safety of others in the immediate area; thus, creating a situation that appeared to be life threatening.  Furthermore, the use of deadly force in an effort to stop Saycon's life threatening actions under the totality of the circumstances comports with both national and statewide training standards.

6.  Based on my review of the listed materials it is my opinion, as determined by standard police practices and training, it appears that the officers (Nguyen and Cruz) followed appropriate state law, department policies, tactics, escalation of force principles, and the training guidelines taught statewide by ***P.O.S.T.***[5]

7.  Based on my review of the listed materials it is my opinion, under the totality of the circumstances, that it would be reasonable for an officer acting consistently with standard police practices and training to believe that Saycon posed a threat of ***Imminent Danger***[6] that was life threatening.  Saycon's non-compliant and perceived assaultive behavior contributed to a reasonable belief that he had the intent to commit an assault with a deadly weapon (knife) on the officers.

8.  Based on my review of the listed materials it is my opinion that there appears to be nothing in the Long Beach Department policies, procedures, or training that indicates the existence of a custom policy, or practice that encourages or condones poor police tactics, procedures, or the use of excessive force (deadly or non-deadly) by any member of the Long Beach Police Department.

Note:  None of my opinions are intended to usurp the province of the jury and are not stated as ultimate issues.  Rather, my opinions involve the consistency of the officers' actions with standard police practices.

**VII.    Basis for Opinions:**

Note:  Any fact summary is provided for convenience and does not necessarily itemize every single fact relied upon by this expert in the formation of my opinions-conclusions in this matter: it is based on my review of the aforementioned records-materials.  I do not contend to have direct personal knowledge of the incident facts.

1.  **Initial incident and use of force:**  According to reports and statements, on December 14, 2015, at approximately 2210 hours, Officer Nguyen responded to a call at a business (Loof's), located at 2500 Long Beach Boulevard in reference to a man with a knife. The reporting party called to report that an Asian male, approximately 40 years old, wearing a black and white jacket and pants was possibly intoxicated and waving a knife around inside the business.  The reporting party indicated that when

---

[5] **P.O.S.T.:**  California Peace Officer Standards and Training is a statewide organization that establishes training standards and mandates.

[6] **Imminent danger:**  Means a significant threat that peace officers reasonably believe will result in death or serious bodily injury to themselves or to other persons. Imminent danger is not limited to "immediate" or "instantaneous." A person may pose an imminent danger even if they are not at the very moment pointing a weapon at another person.

the staff asked the subject (later identified as Mharloun Saycon) to leave, he pulled a knife out and brandished it at customers. The reporting party further indicated that Saycon had been kicked out of the business previously for causing a disturbance with the manager.

As Officers Nguyen and Cruz arrived on scene, they saw Saycon seated inside the business, approximately 15' to 20' feet away from the north entrance. While seated in a chair, Saycon was waving a knife around. Officer Cruz entered through the south entrance door and saw that Saycon was holding a black object in his hands that was resting in his lap. Because he was approximately 35 to 40 feet away, Officer Cruz was unable to discern the object in Saycon's lap. At that point, there was approximately 15 to 20 patrons inside the business.

As Officer Nguyen approached the north entrance, he un-holstered his handgun and immediately issued commands to Saycon, "Drop the knife! Get on your knees! Drop the knife," and/or words to that effect. In response, Saycon refused to comply and continued to sit in the chair and hold the knife with both hands resting in his lap. Officer Nguyen saw Officer Cruz enter the business from the south entrance and then heard the distinct sound of a Taser (Electronic Control Device or ECD) being deployed. Officer Nguyen then saw two probes strike Saycon's front torso area; however, it appeared that the Taser was ineffective. It appeared that the Taser only angered Saycon as he grabbed at the probes while still holding the knife in his right hand. At the time of the incident, Saycon was wearing a thick jacket, which may have prevented the Taser from completing a full and complete cycle.

Officer Nguyen then re-holstered his handgun and removed his Taser while Saycon was still trying to remove the probes from Officer Cruz's deployment. Officer Nguyen then deployed his Taser; however, it appeared to be ineffective. In response, Saycon attempted to remove the probes that were stuck to his jacket, while he continued to hold onto the knife.

Officer Cruz then moved in and delivered a baton strike to Saycon's left body area. Despite the baton strike, Saycon remained seated and continued holding onto the knife. It was Officer Nguyen's belief that the baton strike was ineffective and only angered and agitated Saycon. Saycon's facial expression appeared angry and he began to breathe heavily. It was Officer Nguyen's belief that Saycon was preparing to attack the officers. As Officer Cruz stepped back, Saycon motioned with both hands trying to unfold and lock the blade to the knife (switch blade) into an open position. Saycon leaned forward slightly and used both of his hands and wrists to push downward on his lap, as if he was bracing himself to stand upright.

At that moment, Officer Nguyen believed that Saycon posed an immediate threat and feared that he would lunge forward and stab one of the officers with the knife, causing great bodily injury and/or death. Officer Nguyen immediately removed his firearm and aimed it at Saycon, who was approximately three to four steps away. Saycon leaned forward indicating he was going to stand up. The blade of the knife was partially exposed as Saycon moved in a manner as if he was going to stand up and attack the officers. In fear for his life and that of others, Officer Nguyen fired approximately three to four times. In response, Saycon did not respond to being shot but continued to open the knife with both hands while attempting to stand up.

7

Officer Nguyen then noticed that the knife was fully locked in an open position with Saycon bent slightly forward, both wrists pressed downward on his knees, indicating to Officer Nguyen that the he was preparing to stand, while still armed with the knife. Officer Nguyen fired additional rounds until Saycon dropped the knife and fell to the ground.

Shortly thereafter, Officer Golz requested dispatch to request medical aid to the scene. As the customers and employees exited the building, both Officers Golz and Cruz approached and secured Saycon in handcuffs. After Saycon was safely handcuffed, both Officers Cruz and Golz administered CPR until fire and paramedic personnel arrived on scene.

2. **According to Officer Nguyen**, on December 14, 2015, at approximately 2210 hours, he was working patrol when he was dispatched to Loof's (located at 2500 Long Beach Boulevard), in reference to a person armed with a knife. The call was designated as a priority one call, which authorizes code-3 emergency lights and sirens; however, Office Nguyen elected not to respond code-3, so not to alert the suspect that police were arriving on scene.

According to Officer Nguyen, while en route, dispatch advised that the suspect was in the business with a knife. The suspect (later identified as Saycon) was described as an Asian male, approximately 40 years old, wearing a black and white jacket and pants, and who appeared to be under the influence of alcohol. Employees of Loof's staff had asked Saycon to leave the business; however, he refused to comply and instead, he pulled out a knife and began brandishing it at customers. It was unknown to Officer Nguyen as to the manner in which Saycon was brandishing the knife (threatening or non-threatening manner). Dispatch updated the status by indicating that Saycon was still inside the business and was scratching the glass with the knife.

According to Officer Nguyen, he was familiar with the layout of Loof's because he had been dispatched to the business on several previous occasions. Based on the information, it was Officer Nguyen's belief that Saycon was damaging the glass window with a knife. Shortly thereafter, dispatch advised the responding officers that Saycon had been kicked out of the business because of a dispute with the manager and he was now waving the knife around causing the customers to leave.

According to Officer Nguyen, he was concerned and believed that Saycon was possibly under the influence of alcohol because his behavior was escalating (waiving the knife with customers present). Based on Officer Nguyen's experience and training, he realized that a knife was a lethal weapon. As he was responding, it was Officer Nguyen's belief that Saycon had committed several crimes and posed an imminent threat to the employees and customers.

According to Officer Nguyen, as he arrived on the scene, he saw another patrol unit with Officer Cruz pulling up behind him. As the two officers (Nguyen and Cruz) walked up to the business, an unknown male subject (Hispanic male, beard, 40's, yellow jacket, appeared to be a customer) walked out of the south door and pointed inside the business and indicated that the suspect (Saycon) was still inside and was wearing a white jacket.

According to Officer Nguyen, as he walked towards the north entrance he saw a subject (Saycon), who was seated in a chair and who matched the description. Saycon was approximately 15' to 20' away from the north entrance, and was slightly seated towards the center of the business. Saycon's back and chair were pushed up against some gaming machines that were facing east, while Saycon was facing west, towards Long Beach Boulevard. Based on his initial observations, Officer Nguyen believed that Saycon was a male Asian (possibly Filipino or Cambodian), approximately 40 years old, and 5'8" to 6'0" tall, between 250 to 280 pounds. Saycon was wearing a thick winter type jacket.

According to Officer Nguyen, before entering the business, he removed his handgun from his holster. As Officer Nguyen entered the business, he immediately started assessing the situation while trying to formulate a plan to safely confront Saycon. While still seated in the chair, Saycon was holding a black colored folding knife with both his hands as it was resting in his lap. The knife was a moderate sized knife and it appeared to be in a closed or folded position. Despite Saycon's hands gripping the knife, it was still protruding out of his hands.

According to Officer Nguyen, there were approximately 10 to 15 customers scattered throughout the business. In fear that Saycon might stand up and attack one of the customers (innocent bystanders), Officer Nguyen opened the door slightly and started to give Saycon verbal commands, "Drop the knife, get on your knees, drop the knife," and/or words to that effect. In response, Saycon refused to comply with the commands and continued to hold the knife while passing it from his right to his left hand. While Officer Nguyen was issuing commands, he saw Officer Cruz enter the business from the south door. Shortly thereafter, Officer Nguyen heard the distinct sound of a Taser being deployed and believed it was coming from Officer Cruz's direction.

According to Officer Nguyen, as he re-directed his attention towards Saycon, he noticed two probes strike Saycon's front torso area. The Taser deployment appeared to be ineffective and only angered Saycon based on his facial expression. Saycon, who was still holding the knife in his right hand, started to pull on the Taser probes. The thick jacket that Saycon was wearing appeared to have prevented the probes from penetrating deep enough to create an effective electrical cycle.

According to Officer Nguyen, he then re-holstered his handgun and removed his Taser as Saycon was still trying to remove the initial probes from Officer Cruz's Taser. While Saycon was approximately 10 to 15 feet away, Officer Nguyen deployed his Taser towards Saycon's abdomen area. The probes struck Saycon's jacket and again appeared to be ineffective.

According to Officer Nguyen, Officer Cruz suddenly moved in and struck Saycon's left body area with his baton. The baton strike had little to no effect on Saycon, who remained seated and continued holding the knife. Saycon's facial expression appeared to be angry as he started breathing heavily. It was at that moment, that Officer Nguyen believed that Saycon was preparing to attack the officers. As Officer Cruz stepped back, Saycon tried to lock the blade in an open position. Suddenly Saycon leaned forward and pushed up with the use of both hands in his lap, as if he was bracing himself to stand upright.

9

According to Officer Nguyen, it was his belief that Saycon posed an immediate threat to both officers as he locked the blade of the knife in an open position. At that point, both officers were approximately 10 to15 feet away from Saycon. Officer Nguyen was concerned that Saycon was going to lunge at them with the knife, causing serious injury or death.

According to Officer Nguyen, because the other force applications had little to no effect on Saycon and because he posed an immediate threat that was life threatening, Officer Nguyen immediately un-holstered his firearm. As Saycon was approximately three to four steps away from the officers, he suddenly leaned forward with his back and shoulder, which indicated that he was attempting to stand up. The blade of the knife was exposed and believing that Saycon going to attack, Officer Nguyen fired his handgun approximately three to four times in self-defense. In response to being shot, Saycon continued to try and open the knife with both hands while attempting to stand up.

According to Officer Nguyen, Saycon was still attempting to stand up and appeared to be unaffected by being shot. Officer Nguyen then noticed that the knife was locked in the open position as Saycon was trying to standing up. In response to the threat, Officer Nguyen fired additional rounds at Saycon until he dropped the knife and went to the ground. Officer Nguyen immediately ordered customers and employees to exit the building. Shortly thereafter, Officer Nguyen advised via radio of shots fired and to roll medical aid to the scene. After Officers Golz and Cruz assisted in handcuffing Saycon, they immediately administered CPR.

**3. According to Officer Cruz,** on December 14, 2015, at approximately 2210 hours, he overheard dispatch give a call to Officer Nguyen to respond to 2500 Long Beach Boulevard (Loof's Lite-A-Line, regarding a suspect (later identified as Mharloun Saycon) with a knife. While en route, dispatch further advised that the suspect (Saycon) had pulled a knife out on the employees and indicated that the knife was a switchblade.

According to Officer Cruz, as he was walking towards the business, he made contact with a male patron who had just exited the business. Officer Cruz was informed by the male patron (unidentified) that Saycon had a knife and was still inside the business and was seated near the door. Officer Cruz then saw the Saycon seated in a chair wearing a black and white jacket. Officer Cruz confirmed with the male patron, that Saycon was wearing a black and white jacket.

According to Officer Cruz, he entered the south entrance and saw Saycon sitting in a chair facing west. Saycon was holding a black object in his hands that was resting in his lap. Officer Cruz was unable to tell exactly what the object was due to the distance of approximately 35 to 40 feet away. There were approximately 15 to 20 patrons inside the business with multiple people sitting behind Saycon. Officer Cruz motioned with his hands to the patron to move out of the way. There were several customers and employees still inside the business increasing the threat assessment for the officers.

According to Officer Cruz, Officer Nguyen opened the north entrance door and took a shooting stance while pointing his handgun at Saycon. In a very loud and clear voice, Officer Nguyen immediately ordered Saycon to, "Drop the knife," and/or words to that effect. At that moment, Office Cruz was approximately 30 feet away from Officer Nguyen. In response, Saycon refused to drop the knife and commands issued by Officer Nguyen. Because of Officer Nguyen's statement, it was now Officer Cruz's belief that the black object in Saycon's hands was in fact a knife.

According to Officer Cruz, he walked closer to Saycon while he tried to take a position of cover behind an object. Once again, in a loud and clear voice, Officer Nguyen issued two additional commands to drop the knife. Officer Nguyen also ordered Saycon to get on the ground at least twice. Saycon ignored the commands and continued to hold the knife in his lap, while looking directly at Officer Nguyen.

According to Officer Cruz, as he moved closer to Saycon, Officer Cruz was able to determine that Saycon's attention was preoccupied with Officer Nguyen, who was giving him commands. As Officer Cruz was approximately 15 to 20 feet away from Saycon, he removed his Taser from its holster. Officer Cruz was then able to clearly see that the object Saycon was holding a black folding knife (three to four inches in length in the closed position). Saycon refused to drop the knife, refused to comply with Officer Nguyen's orders, and was in possession of a deadly weapon.

According to Officer Cruz, Officer Nguyen had attempted to utilize multiple lower levels of force including his physical presence, verbal commands, and firearm pointed at the Saycon. Instead of showing any signs of cooperating, Saycon refused to drop the knife. For the safety of the employees, customers, and officers present, Officer Cruz approached Saycon and deployed his Taser from a distance of approximately ten feet. While Saycon was still in the chair, the Taser completed a full five second cycle and appeared to have little to no effect. It appeared that the heavy jacket that Saycon was wearing may have contributed to the Taser's lack of effectiveness. Officer Cruz realized that the probes from the Taser did not come into contact with Saycon's skin.

According to Officer Cruz, Saycon then attempted to pull the wires away with both hands. Officer Cruz observed Saycon's movements and formed the opinion that he was under the influence of an unknown substance. Saycon's movements were slow and uncoordinated, his face was flushed, his words were slurred and he was swaying slowly from side to side while sitting in the chair. Officer Nguyen then deployed his Taser at Saycon and once again it had little to no effect. Saycon continued to pull the wires away from his body without success.

According to Officer Cruz, as Saycon was distracted by pulling at the wires, he removed his baton and struck Saycon's left hand one time in an attempt to get him to drop the knife. The baton strike was also ineffective and Saycon maintained possession of the knife while continuing to sit in the chair. As Officer Cruz was backing away from Saycon, it was apparent that he was very upset. Saycon was making a grunting noise, taking deep breaths and saying something to himself while he opened the knife. The knife, approximately five to seven inches in length, was now in the open position in Saycon's left hand that was resting on his left leg and pointed towards Officer Nguyen.

11

According to Officer Cruz, at that moment, Officer Nguyen fired his weapon approximately six to seven times in the direction of Saycon. Officer Nguyen was approximately ten feet away from Saycon when he fired the shots. Saycon then leaned forward and fell out of the chair. Shortly thereafter, Officer Golz arrived on scene and officers secured Saycon in handcuffs. Officer Cruz and Golz then administered medial aid (CPR) to Saycon until the Long Beach Fire Department arrived on scene.

4. **According to Officer Golz,** on December 14, 2015, at approximately 2210 hours, he responded to assist Officer Nguyen with a suspect (later identified as Saycon) with a knife call at 2500 Long Beach Boulevard. Dispatch advised that the initial calling party reported a male Asian, 40's, wearing a black and white jacket was inside the business armed with a knife. The reporting party also indicated that the Saycon was walking around showing customers the knife, which was described as a switchblade. While en route, the reporting party indicated that Saycon had been kicked out of the business in the past for causing problems with the manager. Dispatch came on the air and further advised the responding officers that Saycon was waving the knife causing customers to leave.

According to Officer Golz, as he approached the location, Officer Nguyen advised over his radio "998" indicating there was an officer involved shooting. As Officer Nguyen aired the "998" Officer Golz was parking his patrol unit at the northeast corner of Long Beach Boulevard and 25th Street, just south of the dispatched location.

According to Officer Golz, he ran to the north entrance and saw Officer Nguyen standing inside the business a few feet from the entrance. Officer Golz then saw Saycon lying on the ground while partially on his left side and stomach. Officer Golz saw an opened knife on the floor just north of Saycon. Officer Golz immediately assisted Officer Cruz in securing Saycon in handcuffs then advised dispatch that it was safe for Long Beach Fire to come inside and render first aid.

*Based on my review of the aforementioned materials and statements, it is my opinion that officers conforming to standard police practices and training would conclude that under the totality of the circumstances, the officers had reasonable suspicion and probable cause to detain (detention) Saycon because of the reported suspicious activity and the fact that he was armed with a knife.*

*Officers conforming to standard police practices and training would perceive Saycon's refusal to comply with repeated verbal commands to drop the knife and to get on the ground as a threat to themselves and/or others. Additionally, officers conforming to standard police practices would have viewed the movements and actions of Saycon as contributing to the reasonable belief that Saycon was armed with a knife and was trying to commit an assault with a deadly weapon on the officers.*

*An officer conforming to standard police practices and training would conclude that Saycon presented an immediate threat of death or serious bodily injury during the incident based on the totality of the circumstances, which included; (1) the suspicious activity reported by the reporting party, (2) Saycon was reported to be armed with a knife and was waiving it around at customers and employees, (3) Saycon refusing to comply to repeated verbal commands to drop the knife and to get on the ground, and (4) Saycon's deliberate and intentional act of arming himself with a knife and his actions and movements which led Officer Nguyen to believe that he was attempting to assault the officers with a deadly weapon (knife), all of which enhanced the officers' perceived threat assessment.*

5. **Decision to engage and deploy deadly force:**  According to police reports and statements, it was Officer Nguyen's reasonable belief and perception that Saycon's actions posed an imminent danger to them and others that was life threatening. Therefore, standard police practices and training would conclude that it was objectively reasonable and appeared to be necessary for the officers to deploy deadly force for the following reasons:

   - Saycon engaged in suspicious activity that caused innocent bystanders to fear for their safety and the safety of others, which led to the call for service
   - Saycon arming himself with a knife and waiving it at employees and customers at the business (Loof's)
   - Saycon's refusal to comply with repeated commands to drop the knife and to get on the ground
   - Saycon deliberately opening and locking the knife in the open position in preparation to use the knife against the officers
   - Saycon's actions and behavior was consistent with a suspect who was armed and who presented a threat of serious harm and/or injury to others
   - Saycon's deliberate actions placed the officers in a position of imminent danger that resulted in an escalated threat assessment that was serious and life threatening

In response to the threat posed by Saycon, Officer Nguyen fired his weapon in an effort to protect himself and others because of imminent danger of serious bodily injury, up to and including death.

*Based on my review of the listed materials and statements, it is my opinion that the use of deadly force (firearm) under the circumstances was consistent with standard police practices and training.  Additionally, a reasonable officer conforming to standard police practices and training would conclude that the use of force by Officers Nguyen and Cruz was objectively reasonable given the circumstances and obvious threat.*

*Standard police practices and training hold that under such circumstances it was reasonable for the officers to believe that Saycon posed an imminent threat to the officers and to the community for the above reasons; therefore, justifying the use of force in self-defense and in defense of others.*

13

6. **Use of force Continuum & Analysis (Graham factors):**  Factors to consider when making a determination of reasonable force include: threat to the officer or others, severity of the crime, resisting and/or refusing to comply, whether the subject is attempting to flee or committing an assault, and whether the circumstances are tense, uncertain, and rapidly evolving.  Officers conforming to standard police practices would conclude that it was reasonable to perceive that Saycon posed an imminent threat to the officers and to the community based on his deliberate threatening actions.

- *Imminent threat:*  reasonable belief that Saycon was armed with a deadly weapon (Knife) and, in that split-second moment appeared to be moving into a position to use it against the officers
- *Severity of the crime:*  Saycon engaging in acts that were perceived as an assault on a police officer with a deadly weapon (knife)
- *Resisting and/or refusing to comply:*  Saycon refusing to comply with repeated commands to drop the knife and to get down on the ground
- *Subject is attempting to flee:*  refusing repeated commands
- *Circumstances are tense, uncertain, and rapidly evolving:*  information available to the officer and coupled with the actions of Saycon that required split second decisions by the officers

Based on my review into the incident, there appears to be no evidence that shows that any of the officers acted inconsistently with standard police practices in his perception or reaction, or that, they otherwise engaged in excessive force and/or improper police tactic/procedures in violation of standard police practices.

The incident by itself had a significant degree of uncertainty that was obviously tense and rapidly changing.  The dynamics gave rise to reasonable concern for the officers' safety and more importantly the safety of the community.  The seriousness of the circumstances escalated rapidly which caused a perceived threat of violence against the officers and the community.

*Based on my review of the listed materials and statements, it is my opinion that the escalation of force (firearm) was consistent with standard police practices and such policing standards hold such use of force to be reasonable given the circumstances and threat assessment.*

*Law Enforcement officers are entitled to protect themselves and others against a reasonably perceived attack and/or threat.  Both state law and training authorizes the use of reasonable force to prevent an escape and to overcome resistance. Additionally, officers are trained that reasonable force may be used for self-defense as well as protecting others.*

7. **Law Enforcement Standard:**  Based on my training, knowledge, and experience, I am familiar with the standards followed by police officers nationally with respect to police procedures and the use of deadly force. Although, the wording of the standard may appear to vary somewhat, the standard applied to police officers allows an officer to use deadly force when he reasonably perceives the threat to be serious bodily injury or death to himself or another.

The following law enforcement principles apply. Clearly, the case at hand represents an application of deadly force.

- An officer is vested with an affirmative duty to ensure public safety.
- An officer is vested with an affirmative duty to investigate unknown circumstances that tend to support criminal activity.
- An officer maintains the absolute right to self-defense in face of a reasonably perceived threat.
- An officer is vested with an affirmative duty to overcome resistance.
- An officer is vested with an affirmative duty to protect innocent bystanders and the community.
- An officer is vested with an affirmative duty to prevent the suspect's escape.

8. **Precipitating Acts:** An officer acting consistently with standard police practices would believe that Saycon committed certain *PRECIPITATING ACTS* that either caused and/or contributed to the probability of a police response, intervention, and the use of deadly force. The *PRECIPITATING ACTS* observed in the case include:

- Acting in a threatening manner that caused concern for officers' safety
- Refusing to comply with lawful orders given by the officers, including orders given at gunpoint
- Non-compliant and active resistance
- Saycon causing the officers to reasonably believe that he was attempting to assault the officers with a knife, thus placing the officers in imminent danger
- By Saycon's own actions and behavior, he placed the officers and others in imminent danger involving serious bodily harm and/or injury up to and including death

The use of force against Saycon by the officers (Nguyen and Cruz) comports with the training, policies, and practices commonly recognized by the law enforcement community. In fact, such circumstances if repeated, would predictably cause trained law enforcement personnel to respond and act in the same manner regardless of jurisdiction or agency.

9. **Threat assessment and decision to use force:** The threat assessment is an important factor to consider when an officer is making a decision to use force. The threat assessment escalates under the totality of the circumstances when there is a reasonable risk to public and officer's safety. The risk factors that an officer will consider includes:

- Suspect's actions
- Public safety concerns
- Officers' safety concerns
- Suspect's ability to access a weapon (s)
- Suspect's ability to escape (i.e. flee on foot)
- The inherent risk posed by the suspect(s) if allowed to continue with actions that placed others in danger

In the case at hand, it was reasonable for the officer to believe that Saycon posed a significant risk to public safety because of the danger he placed others in during and at the conclusion of the incident. The decision to use force by the officers was objectively reasonable and consistent with standard law enforcement training both statewide and nationally.

10. **Action vs. Reaction Time -** An officer's split-second response to a suspect's actions: If this is an issue in this matter, I would like to reserve the right to discuss and/or testify as to my experience, training, and knowledge with respect to action vs. reaction time. Action vs. reaction time can be defined or explained as the difference in the amount of time between an action and a reaction. In law enforcement, it's the reaction by an officer to the actions of a suspect. This is because the suspect will have the advantage of lag-time, which is that brief period of time (normally 1/3 to 1/2 second) that it necessarily takes for an officer to perceive a threat, formulate a response, and execute a reaction.

There are many factors that affect lag-time, which include distractions, divided attention, focused vision, environment, and other associated variables. A suspect has the advantage of knowing and making the decision to act before an officer has the opportunity to perceive the act, translate it to danger, and decide how to react.

Analysis showed that the suspects on average were able to fire in just 0.38 second after initial movement of their gun. Officers fired back in an average of 0.39 second after the suspect's movement began. The process of perceiving the suspect's movement, interpreting the action, deciding on a response, and executing the response for the officer generally took longer than it took the suspect to execute the action of shooting, even though the officer already had his gun aimed at the suspect.

Research and training has concluded that many of the elements that occur in real-life shootings would undoubtedly add significant time to the average officer's reaction time. Police officers have a legal right to use force, including lethal force, when it is reasonable to do so, "An officer may shoot when there is an imminent risk of harm to self or others, or to stop someone who poses a danger to others."

To further illustrate the principal of action vs. reaction time, the following video examples provide insight into the research findings:

1. 90-degree turn
2. 180-degree turn
3. 360-degree turn
4. Arm extended shooting (from hip to shooting)
5. Full Combat (waist to combat shooting)
6. Gun_20Cross_20body_ 20Under arm (Suspect running, turning to left and shooting) (under arm)
7. Gun Extended Strong Side (Suspect running, turning to right and shooting)
8. Over Shoulder Cross Body (Suspect running, turning to left and shooting over shoulder)
9. Gun at console (suspect sitting and shooting from console)
10. Gun at console – passenger (suspect sitting and shooting from passenger's side)

16

## VIII.   Conclusion:

The foregoing opinions are based upon my review of the materials and information received to date concerning the incident that gave rise to this litigation.  I understand that there may be depositions not yet conducted in the case and/or additional discovery may be produced by any party.  Thus, to that extent, this report should be considered a preliminary report.  Should I receive additional information that materially affects any of these opinions; I will submit a supplemental report and/or be prepared to discuss them during future proceedings, as appropriate.  I will expect to receive in a timely manner any additional materials or information that might affect my opinions in this matter.

This report is signed on this **23ʳᵈ** day of August, 2017, in City of Yucaipa, State of California.

**Robert J. Fonzi**

**Robert Fonzi & Associates**
Undersheriff (retired)
*Training and Consulting*
robert.fonzi@yahoo.com

P.O. Box 1154, Yucaipa, CA  92399
951-312-9679

# *Robert J. Fonzi*
Curriculum Vitae

## BIOGRAPHY          (brief summary)

I am a thirty-two-year veteran with the San Bernardino County Sheriff's Department and the San Diego Police Department with several years of patrol experience in the Ontario, San Bernardino, and San Diego areas.  My experience includes patrol, criminal investigations, internal affairs, civil liabilities, jail operations/management, and personnel management with special emphasis on training.

My expertise lies in the use of force, police procedures, and jail operations/management.  I am most recognized in the area of training, with over twenty-five years of experience while training approximately 10,000 law enforcement officers throughout the country.  I have qualified and testified as an expert in over three hundred (300) civil, criminal, and civil service trials in both state and federal courts.  I have provided deposition testimony in over three hundred (300) related matters in the above related fields.

Based on my training, knowledge, and experience, I was recognized as an expert by the San Bernardino County Sheriff's Department's and primary Use of Force Instructor.  My formal education includes an Associate of Arts degree in Criminal Justice and completion of a bachelor's degree program in Vocational Education, Training and Curriculum Design.

I was directly responsible for all use of force training, advanced officer training, in-service, correctional officer training, and FTO (Field Training Officer) programs for the San Bernardino County Sheriff's Training Division for several years.  I also served as the training coordinator and supervisor for the Sheriff's K-9 program.

## SPECIALIZED TRAINING

- Certified instructor - firearms
- Certified instructor - defensive tactics and weaponless defense
- Certified instructor - impact weapons
- Certified instructor - shooting survival techniques
- Certified instructor - crowd control and tactical formations
- Certified instructor - chemical agents
- Certified instructor - electronic control devices (ECD)
- Certified instructor - lateral vascular neck restraint
- Certified instructor - law enforcement incident command system

18

## CAREER OVERVIEW

Undersheriff, San Bernardino County Sheriff's Department (Retired January 24, 2014)

32 years of Law Enforcement experience

25 years of community college teaching experience

California Community College Teaching Credential

## FORMAL EDUCATION

F.B.I. National Academy, Class #215, December 5, 2003, Quantico, VA

Command College Class #34, November 2003
California Commission on Peace Officers Standards & Training

Bachelor's degree equivalent (completed BA degree program, degree pending) Southern Illinois University, Carbondale, IL - Vocational Education, Training Development, and Curriculum Design.

Associate of Arts Degree, (1986), Administration of Justice, Crafton Hills Community College, Yucaipa, CA

## CALIFORNIA PEACE OFFICER STANDARDS AND TRAINING

| Deputy Sheriff | 1982 Basic Certificate |
|---|---|
| Senior Deputy | 1987 Intermediate Certificate |
| Sergeant | 1990 Advanced Certificate |
| Sergeant | 1992 Supervisory Certificate |
| Lieutenant | 1999 Management Certificate |

## ASSIGNMENTS, RESPONSIBILITIES, AND EXPERIENCE

**Undersheriff**
March 2012 – January 2014

The County of San Bernardino is the largest county in the continental United States covering approximately 20,000 square miles with a population exceeding 2,000,000. The Sheriff's Department has 41 stations and divisions, including nine county and 14 contract city patrol operations. The Sheriff's department has approximately 3,500 employees and has an annual budget exceeding $450,000,000.

As Undersheriff, I was second in command of the Department and assumed the duties of the Sheriff in his absence. I was responsible for all administrative, operational and legislative concerns within the Sheriff's Department while directing daily operations including budgetary and personnel matters. In the absence of the Sheriff, I acted on his behalf at all internal and external meetings and events. My administrative duties included directing, planning, coordinating, and managing all functions within the Sheriff's Department.

Additional responsibilities included directing and supervising executive and command staff. Coordinated and commanded personnel in the management of administrative support services and criminal operations. Interpreted and anticipated implications of proposed legislative/regulatory changes regarding correctional facilities. Attended and participated in statewide committees. Developed and directed the implementation of policy and procedure changes resulting from changes in legislation, procedures, or departmental philosophy. Represented the Sheriff's Department in liaison with other governmental agencies and community groups and participated in related law enforcement organizations.

Administrative duties included supervising, planning, coordinating, budgeting, and managing all functions within the Sheriff's Department.

- Supervised Human Resources activities for the department including hiring and disciplinary actions.
- Directed department operations through subordinate management and supervisory staff. Assisted with policy direction and formulation; reviewed decisions on all complex or politically sensitive issues.
- Represented the Sheriff by making presentations to civic groups, conventions, and legislative committees for the purpose of promoting goodwill on behalf of the department.
- Maintained a liaison between staff, other law enforcement agencies, judges, District Attorneys, and defense attorneys to insure optimal success in crime prevention and enforcement.
- Wrote comprehensive reports and letters to obtain support and provide information for drafting legislation at the state and local level.
- Supervised the preparation of the annual budget; recommended and reviewed proposed changes with the Sheriff; determined staffing needs and priorities.
- Assisted in the direction of the Office of Public Safety and County Fire Warden's Office.
- Reviewed and recommended the investigative path to be followed regarding major criminal activity.
- Reviewed department objectives and effectiveness of all organizational divisions within the Sheriff's Department; suggested and/or directed changes to improve efficiency.

**Support Operations – Assistant Sheriff**
January 2011 - March 2012

The Assistant Sheriff's position is the administrative command responsible for Support Operations. As an Assistant Sheriff, I acted on behalf of the Sheriff in his absence. Administrative duties included directing and supervising subordinate personnel responsible for the management of four major correctional facilities within San Bernardino County. Coordinated and commanded subordinate personnel in the management of administrative support services and the Frank Bland Regional Training Center. Supervised subordinate personnel responsible for staff development, budget, fiscal matters, personnel, and payroll.

**Detentions and Corrections Bureau - Sheriff's Deputy Chief**
January 2010 – January 2011

As the Bureau Chief, I was responsible for subordinate personnel within four large jail facilities. The Detention and Corrections Bureau is the largest division within the San Bernardino County Sheriff's Department. The Bureau is comprised of more than 1,100 dedicated professional staff that includes both safety and civilian employees. Additionally, the department has five Type-I jails capable of holding 288 arrestees, four court holding facilities and four lock-up facilities.

The Bureau provides services to over 6,000 felony and misdemeanant inmates on a daily basis who are incarcerated. These services include food, hygiene, recreation, medical, dental, mental health, religious, and other support services. The magnitude of these services provided is significant. As an example, the Food Services Division produces and serves over 7,350,000 meals each year while Medical Services provide health care in excess of 6,400 inmates monthly.

The Transportation Unit transports over 500 inmates daily throughout the county and travels an average of 1,000,000 miles per year, transporting nearly 300,000 inmates throughout San Bernardino County and the State of California. Additionally, the United States Marshall transports approximately 13,000 federal inmates from the facility to numerous prisons and court facilities throughout the state.

**Administrative Services Bureau – Sheriff's Deputy Chief**
January 2009 – January 2010

As the Bureau Chief, I was responsible for subordinate personnel over three major divisions, which included the following units: Training, Aviation, Emergency Operations, Volunteer Forces, and Employee Resources. The Training Center (which includes the Basic Academy, Advanced Officer, EVOC and Range/Use of Force Units) provides both basic and continuing professional education to law enforcement officers from agencies throughout the County of San Bernardino and Southern California.

The Emergency Operations Division provides operational, logistical, and management support services to field operations during large-scale emergencies. These support services are provided by two units within Emergency Operations; Aviation and Volunteer Forces. The Aviation Unit provides patrol, rescue, and fire operation capabilities. Volunteer Forces provides search and rescue, evacuation, disaster planning, emergency management and Department Operations Center coordination. Volunteer Forces also coordinates all law enforcement mutual aid resources in Mutual Aid Region VI on behalf of the Sheriff.

**Employee Resources Division – Sheriff's Captain**
April 2006 – January 2009

As the commanding officer, I was responsible for all employment/labor issues, grievances, background investigations, hiring, and payroll. The Employee Resources Unit provides a broad range of services for the Sheriff's Department. Under my command, this unit conducted background investigations, participated in state-wide recruiting, and was responsible for the department's payroll and benefits. Additionally, I coordinated hiring and provided a variety of services to department personnel through the Sheriff's Employee Assistance Team (SEAT).

Several categories of business applicants were also required to go through the background process in addition to employment background investigations. Additionally, county residents who want to carry a concealed weapon (CCW) were also required to apply through Employee Resources and pass a background investigation.

**West Valley Detention Center – Sheriff's Captain**
December 2003 – April 2006

As the commanding officer, I was responsible for the largest correctional facility in San Bernardino County with approximately 640 employees. This included the assignment to the West Valley Detention Center as part of the command staff. My direct responsibilities included facility operations and training for the correctional facility. Additional responsibilities included supervision of all correctional staff, personnel matters, grievances, citizen complaints, administrative investigation, use of force, and training.

**Chief of Police for City of Yucaipa – Sheriff's Captain**
May 2000 – December 2003

I served as the Chief of Police for the City of Yucaipa, a contract city with the Sheriff's Department. As the commanding officer, I was responsible for all law enforcement for the unincorporated areas in the county and the City of Yucaipa. This included commanding the Yucaipa Sheriff/Police Station. This dual operation is responsible for law enforcement in the unincorporated areas of Mentone, Forest Falls, Angelus Oaks, and Barton Flats. Additionally, this station serves as the law enforcement agency for the City of Yucaipa.

22

**Lieutenant -** Yucaipa Sheriff and Police Station in the City of Yucaipa
March 1997 – May 2000

I served as the second in command responsible for all law enforcement for the City of Yucaipa. Additional responsibilities included administrative investigations, use of force, personnel matters, and citizen complaints.

**Lieutenant -** West Valley Detention Center
March 1996 – March 1997

I was responsible for jail operations, management, training, administrative investigations, use of force, personnel matters, and grievances.

**Highland Police Station – Sheriff's Sergeant**
October 1995 – March 1996

I served as a watch commander and patrol supervisor for patrol operations. My duties included watch commander assigned to the Highland Police Station for uniformed patrol personnel. My responsibilities included supervision of all patrol functions, personnel matters, use of force investigations, traffic, training, and administrative duties.

**Advanced Officer/Correctional & Field Training Officer Unit – Sheriff's Sergeant**
October 1990 – October 1995

I supervised the following programs - Basic Academy, Firearms Training Center, Advanced Officer Training, Sheriff's Canine, Correctional Training Officers and Field Training Officers. While assigned to the Training Division, I was responsible for advance, correctional, and field training officer programs. The advance officer training unit provided continuing professional training courses to both safety and reserve employees of the Sheriff's Department, state and federal law enforcement agencies, and California Department of Corrections.

**Firearms Training Center/Use of Force Training Unit – Sheriff's Sergeant**

While assigned to the training division for over 5 years, I developed and supervised the Use of Force Training Unit. The unit was responsible for all use of force training, which included: firearms, defensive tactics, weaponless defense, police baton, chemical agents, electronic devices, and police canine. During this assignment, my direct responsibilities included the training and qualification of department personnel in areas concerning the use of force. Training and qualification required proficiency and competency in the taxonomy of educational objectives relating to training issues involving the use of force.

I was also responsible for the supervision, coordination, management, and curriculum design of all firearms, defensive tactics, weaponless defense, police baton, and canine training for the San Bernardino Sheriff's Department. The training facilitated approximately 2000 officers and included basic academy, advance officers, reserve officers, in-service personnel, military, and civilians. The assignment required the direct supervision of eight full-time instructors and staff support that carried out the responsibilities of the Firearms Training Center/Use of Force Training Unit.

### Canine Coordinator – Sheriff's Sergeant

My experience includes being assigned as the Department's canine coordinator for approximately five years.  I was responsible for the supervision and management of all canine training and budget issues.  The supervision required quarterly evaluation and recertification of approximately ten K-9 Handlers and police canines.

### Tactical Analysis Training Committee – Sheriff's Sergeant

My experience includes being assigned as a committee member to the Tactical Analysis Training Committee that reviews and evaluates critical incidents involving the use of force. The committee evaluates an officer's actions and reactions against known standards in an effort to improve training offered by the San Bernardino Sheriff's Department.

### San Bernardino Valley College - Program Coordinator – Sheriff's Sergeant

Responsibilities included coordinating the Extended Basic Law Enforcement Academy at San Bernardino Valley College.  The position required direct supervision and coordination of training and student learning during the ten-month program. Additionally, I was responsible for teaching all use of force training within the program. The training included firearms, defensive tactics, weaponless defense, police baton, chemical agents, crowd control/tactical formations, and legal issues concerning the use of force.

### Riverside Community College/Ben Clark Training Center

My experience includes staff instructor for RCC at the Ben Clark Training Center with assignments teaching firearms, defensive tactics, police baton, use of force, and other related patrol procedures.

### Corporal/Detective – Yucaipa Sheriff's Station
July1988 – July 1990

I served as Field Training Officer, patrol supervisor, and detective performing criminal investigations.

### Deputy Sheriff - Professional Standards Division
July1987 – July 1988

My responsibilities included Civil Liabilities and Internal Affairs.

### Deputy Sheriff – Sheriff's Central Station, San Bernardino
October 1981 – July 1987

Performed a full range of law enforcement duties including, corrections, county and statewide prisoner transport, patrol, criminal investigations, preparation of reports, court testimony, suspect and victim interviews.

**Police Officer** San Diego Police Department, Western Division
October 1982 – April 1983

Performed a full range of law enforcement duties including, patrol, criminal investigations, preparation of reports, court testimony, suspect and victim interviews.

**Sheriff's Academy**
July1981 – October 1981

Entered the San Bernardino County Sheriff's Department Basic Law Enforcement Academy, Class of 66, and was elected class president/sergeant.

## TEACHING CREDENTIALS & INSTRUCTOR CERTIFICATES

- Community College Teaching Credential - State of California

- Black Belt - International Association of Kung Fu San Soo Self Defense

- Certified Instructor - F.B.I. Defensive Tactics and Weaponless Defense

- Certified Instructor - F.B.I. Police Baton

- Certified Instructor - Impact Weapons

- Certified Instructor - Verbal Judo/Tactical Communication

- Certified Instructor - F.B.I. Firearms Training

- Certified Instructor - Survival Shooting Techniques

- Certified Instructor - Crowd Control Tactics and Field Formations

- Certified Instructor - Lateral Vascular Neck Restraint

- Certified Instructor - Oleoresin Capsicum

- Certified Instructor - Realistic Assault Confrontations

- Certified Instructor - Chemical Agents

- Certified Instructor - Electronic Device/Taser

- Certified Instructor - ASP/Expandable Baton

- Certified Master Instructor to certify instructors in Defensive Tactics and Weaponless

- Defense, Police Baton and PR-24

25

- Certified Instructor - Controlled Force

## PROFESSIONAL ORGANIZATION AFFILIATIONS

| | |
|---|---|
| N.A.C.P. | National Association of Chiefs of Police |
| I.A.C.P. | International Associates of Chiefs of Police |
| C.S.S.A. | California State Sheriff's Association |
| F.B.I.N.A. | FBI National Academy Associates |
| A.C.A. | American Correctional Association |
| A.J.A. | American Jails Association |
| S.E.B.A. | San Bernardino Safety Employee's Benefit Association |
| A.S.L.E.T. | American Society of Law Enforcement Trainers<br>Appointed as "Regional Director of Western States" |
| F.A.T.S. | Firearms Training System<br>Appointed to National Training Advisory Board |
| P.O.R.A.C. | Police Officers' Research Association of California |
| C.P.O.A. | California Police Officer's Association |
| I.A.L.E.F.I. | International Association Law Enforcement Firearms Instructor |
| Kiwanis | Yucaipa/Calimesa Club |
| Footprinters | Chapter #67, past president |

## CALIFORNIA COMMISSION ON PEACE OFFICER STANDARDS AND TRAINING AND CORRECTIONS STANDARD AUTHORITY COMMITTEE APPOINTMENTS

2016 – Subject matter expert
     Use of Force
     San Diego

2012 - Subject matter expert
     Crowd Management and Civil Disobedience Guideline Review
     Sacramento

2011 - C.S.A.
Adult Titles 24 and 15 Regulations Revision Administrative Workgroup
Sacramento

1998 - Continuing Professional Training Steering Committee (CPT)
P.O.S.T. Training
Sacramento

1997 - Subject matter expert (QNA)
Controlling Violent Subjects Tele-course
San Diego

1997 - Subject matter expert
Vehicle Pullover techniques
San Diego

1995 - Subject matter expert
Officer Safety & Field Tactics
San Luis Obispo

1994 - Subject matter expert
Illegal Possession of Firearms Tele-course
San Diego

1994 - Subject matter expert
Chemical Agents - Training Requirements
San Diego

1993 - Subject matter expert
Chemical Agents - Oleoresin Capsicum
Ontario

1993 - Subject matter expert
Use of Force Training issues
Costa Mesa

1992 - Subject matter expert
Defensive Tactics and Weaponless Defense training issues
San Diego

1992 - Subject matter expert
Uniform Canine training and evaluation standards

1992 - Subject matter expert
Uniform Canine training and evaluation standards
City of Orange

## CONTINUED PROFESSIONAL LAW ENFORCEMENT TRAINING

1981   Jail Operations

1981   Traffic Accident Investigations

1983   Correctional Officers Update

1983   Institutional Staff Series I

1984   Correctional Officers Update

1984   H & S 11550 (Under the Influence)

1984   Gang Investigations

1986   Officer Safety/Field Tactics

1986   Correctional Officers Update

1986   IR 3000 Breath Alcohol Analysis

1986   Drug Influence - 11550 H & S

1986   Patrol Officer - Vehicle Stops

1986   Patrol Officer - Auto Theft

1986   Patrol Officer - Search Warrants

1986   Patrol Officer - Crimes Against Property

1986   Patrol Officer - Interview and Interrogation

1986   Patrol Officer - Collection of Evidence

1987   Controlled Substance Influence

1987   11550 - Under the Influence

1988   Patrol Officer - Civil Liabilities

1988   Realistic Assailant Control

1988   Police Civil Liability

1988   Patrol Officer - Domestic Violence

1988    Legal Update Regarding Discovery, Personnel and Liability

1988    Principles of Shooting - Semi-Auto Transition

1989    Legislative Update

1989    Criminal Investigator's Course

1990    Driver Awareness Instructor

1990    Developmentally Disabled and Mentally Ill

1990    Peer Support Counseling Training

1990    Missing Persons

1991    Use of Force Issues

1991    Street Survival - The Tactical Edge

1991    Street Survival - The Win Seminar

1991    Exotic Weapons

1991    Police Supervision

1991    Lethal Force Management for Police

1992    Fifth ASLET International Training Seminar

1992    Supervisor's Training - Mobile Field Force

1992    Realistic Assault Confrontation

1993    CopClass "93" Use of Force & Liability

1993    Simunitions Instructor Development Course

1993    C.P.O.A. - Use of force Update

1994    C.P.O.A. - Use of Force - The Rodney King Incident

1994    C.P.O.A. - Officer Involved Shootings

1994    Assertive Supervision

1994    Lateral Vascular Neck Restraint system - update

1995    Eighth ASLET International Training Seminar, Anchorage, Alaska

1995  ASP Baton Instructor's Course

1996  Use of Force Update - First Trimester

1996  Ninth ASLET International Training Seminar, Grapevine, Texas

1996  Use of Force Update - Second Trimester

1996  Search Manager's Course

1996  Use of Force Update - Third Trimester

1996  P.O.S.T. Manager's Course

1997  Use of Force Update - First Trimester

1997  STC Correctional Facility Pre-inspection Training.

1997  Use of Force Update - Second Trimester

1997  ASLET Use-of-Force Seminar

1997  Sexual Harassment / Gender Bias

1997  Use of Force Update - Third Trimester

1997  L.E.I.C.S. Train the Trainer

1998  Use of Force Update - Jan

1998  Use of Force Update - April

1998  CPT Steering Committee Training

1998  Use of Force Update - July

1998  Firearms / Deadly Force / Use of Force Symposium

1998  Use of Force Update - Oct

1999  Cycle of Violence

1999  Civil Rights - Color of Law FBI

1999  Use of Force - February

1999  Controlled Force

1999  Advanced Police Management

1999    The Challenges of Ethical Leadership

1999    Use of Force Update - June

1999    Use of Force Update - August

2000    Use of Force Update - February

2000    Supervisor Development Course

2000    Use of Force Update - June

2000    Use of Force Update - October

2001    Role of the Police Chief

2001    Use of Force Update - February

2001    Executive Leadership Symposium

2001    Executive Law Enforcement Ethics Symposium

2001    Executive Development Training

2001    Management and Investigations of Hostile Work Environment

2001    Use of Force Update - June

2001    Leadership Development Training

2001    Responses to School Violence

2001    Leadership Development - Target Excellence

2001    Use of Force Update - October

2002    Executive Leadership Symposium

2002    Use of Force Update - February

2002    Faith & Justice Summit

2002    Use of Force Update - June

2002    Use of force Update - October

2003    Use of Force Update - February

2003    Racial Profiling - March

2003    Use of Force Update - September

2004    Use of Force Update - February

2004    Use of Force Update - June

2004    Use of Force Update - June

2004    C.S.S.A. - Correctional Facilities Administrator Seminar

2005    Use of force Update - February

2005    Employment Law

2005    Use of Force Update - June

2005    Southern California Jail Managers Association Training (Orn Co.)

2005    Use of Force Update - October

2005    C.S.S.A. Correctional Facilities Administrator Seminar

2006    Use of Force Update – February

2006    Use of Force Update – May

2006    Use of Force Update – September

2007    Use of Force Update – February

2007    Traumas in Law Enforcement – C.O.P.S.

2007    AELE Lethal and Less Lethal Force

2007    Employment & Labor Law Conference

2007    ICS 300 /400 Training Course

2007    Terrorism Early Warning Group Conference

2008    Use of force Update – February

2008    Use of force Update - May

2008    Use of force Update - September

2008    Use of force Update – January

2009    Use of force Update – May

32

2010    A.J.A. National Conference – Portland Oregon

2010    First Aid and CPR update – August

2010    Succession Planning

2011    Use of force update - January

2011    Corrections legal updated with Carrie Hill, Esq

2011    Taser use of force update seminar

2011    Taser (ECD X-26/X2) instructor certification

2011    Use of Force, ECD's, and ICDS

2012    CSSA Second in commands conference

2012    Use of force update - June


**ACCOMPLISHMENTS**      (brief summary)

While assigned to the Training Division, I took the initiative to research and review an alternate chemical agent for department use. The research included the review of various products and delivery systems. I wrote the proposal and made numerous presentations for the approval and authorization to implement pepper spray for the San Bernardino County Sheriff's Department. The proposal included cost analysis for purchasing and training approximately 2000 department personnel. The training program has proven to be one of the most effective in the state of California.

I have demonstrated my management skills in the supervision of the Department's Use of Force Training program. The program required a working knowledge of the materials along with staff assignments of personnel to appropriate positions. The scheduling included approximately 2000 sworn personnel and off site training to various locations within the county. The County of San Bernardino is approximately 22,000 square miles. The scheduling and logistics experienced many problems and conflicts. I was able to resolve many of the problems and issues with appropriate solutions.

I have confronted personnel matters that have resulted in written reprimands and work performance contracts. Additionally, I have developed and administered work performance contracts to individuals who failed to meet the primary proficiency requirements and essential job functions for a deputy sheriff.

I have received numerous requests to lecture on various topics which include: use of force training, chemical agents, and crowd control. Additionally, I have given several proposals to the Office of the Sheriff and the Executive Staff of the San Bernardino County Sheriff's Department. The proposals include Use of Force Training Program, Hobble Restraint, ASP Baton, Cap-Stun, and Canine Operations Manual.

33

I have demonstrated the ability to provide expert witness testimony in numerous civil litigations involving the San Bernardino County Sheriff's Department and Law Enforcement agencies throughout the State of California.  My testimony has earned expert recognition in both state and federal court relating specifically to police procedures and the use of force.

I have participated on several P.O.S.T. committees due to my experience, training, and ability to interact with various agencies on a number of issues.

**Rev: 9/18/16**

34

# Expert Testimony

| Case: | Court / Hearing / Deposition |
|---|---|
| **2011** | |
| Deats vs. County of Orange<br>CV09-6322 PSG (PJWx) | Deposition |
| Nash vs. City of San Bernardino<br>CV 09-08671-RGK (FFMx) | Deposition |
| Nash vs. City of San Bernardino<br>CV 09-08671-RGK (FFMx) | U.S. District Court – Los Angeles |
| Bernat vs. California City<br>Not available | U.S. District Court - Fresno |
| Rivera vs. City of Santa Ana<br>Not available | U.S. District Court – Santa Ana |
| A.K.C. vs. City of Santa Ana<br>SACV-09-01153 CJC (ANx) | Deposition |
| Radwan vs. County of Orange<br>Not available | U.S. District Court – Santa Ana |
| Deats vs. County of Orange<br>CV09-6322 PSG (PJWx) | U.S. District Court – Los Angeles |
| AKC vs. City Santa Ana<br>SACV-09-01153 CJC (ANx) | U.S. District Court – Santa Ana |
| Allen vs. County of Riverside<br>RIC 498184 | Deposition |
| Dubose vs. County of Los Angeles<br>CV09-07832 CAS (AJWx) | U.S. District Court – Los Angeles |
| Hachett vs. City of Calexico<br>Not available | Deposition |
| Ballard vs. City of San Bernardino<br>CV10-02769DMG (AJWx) | Deposition |
| Rodriguez vs. City of Lon Beach<br>SACV10-00271DOC (ANx) | Deposition |
| Nava vs. City of Santa Clara<br>Not available | U.S. District Court – San Jose |

| | |
|---|---|
| Ballard vs. City of San Bernardino<br>CV10-02769DMG (AJWx) | U.S. District Court – Los Angeles |
| Williams vs. County of Los Angeles<br>CV08-7958JVS (FMOx) | Deposition |
| Patino vs. L.A. Unified School Police<br>BC430225 | State Superior Court – Los Angeles |
| Rodriguez vs. City of Long Beach<br>SACV10-00271DOC (ANx) | U.S. District Court – Santa Ana |
| Krechman vs. County of Riverside<br>CV10-08705 ODW (DTBx) | Deposition |
| Johnston/Codd vs. County of Riverside<br>CV 10-08101 RSWL (JEMx) | Deposition |
| Moore vs. City of Desert Hot Springs<br>INC 060070 | Deposition |
| Krechman vs. County of Riverside<br>CV10-08705 ODW (DTBx) | U.S. District Court – Los Angeles |

**2012**

| | |
|---|---|
| Debellis vs. Abdulla<br>CIVBS 900069 | Deposition |
| Moore vs. City of Desert Hot Springs<br>INC 060070 | State Superior Court – Indio |
| Contreras vs. City of San Jose<br>CV-10-00953 RMW | Deposition |
| Mirzaeyan vs., City of Glendale<br>CV11-01747VBF (JCx) | Deposition |
| Samatua vs. City of San Bernardino<br>CIVDS917832 | Deposition |
| Dubose vs. County of Los Angeles<br>CV09-07832 CAS (AJWx) | U.S. District Court – Los Angeles |
| Day vs. People of the State<br>Not available | State Superior Court – San Bernardino |
| Bowen vs. County of Riverside<br>RIC516303 | Deposition |
| Briones vs. City of San Bernardino<br>Not available | Deposition |

| | |
|---|---|
| Arredondo vs. Co. of Santa Barbra<br>1370977 | Deposition |
| Mirzeayan vs. City of Glendale<br>CV11-01747VBF (JCx) | U.S. District Court – Los Angeles |
| Williams vs. People of the State<br>Not available | State Superior Court – Victorville |
| Riley vs. County of Orange<br>SACV11-00773 JST (ANx) | Deposition |
| R.Z. vs. City of Long Beach<br>SACV-1100536 AG (RNBx)<br>c/w CV11-06379 AG (RNBx) | Deposition |
| Del Castillo vs. City of Santa Ana<br>30-2010-00383134 | Deposition |
| Rosenthal vs. County of Riverside<br>RIC 523816 | Deposition |
| Grobeson vs. City of Los Angeles<br>BC 150151 | Deposition |

**2013**

| | |
|---|---|
| Nida vs. City of Downey<br>CV12-01382 SJO (JEMx) | Deposition |
| Manni vs. City of San Diego<br>11cv0435 W (DHB) | Deposition |
| Williams vs. City of Pasadena<br>BC477905 | Deposition |
| R.Z. vs. City of Long Beach<br>SACV-1100536 AG (RNBx)<br>c/w CV11-06379 AG (RNBx) | U.S. District Court – Santa Ana |
| Lucas vs. City of Visalia<br>09-CV-01015-AWI-JLT | Deposition |
| Muswasua vs. COR<br>RIC 1113335 | State Superior Court – Riverside |
| Chiaese vs. County of Riverside<br>RIC 10012874 | Deposition |
| Rosenthal vs. County of Riverside<br>RIC 523816 | State Superior Court - Murrieta |
| Velasquez vs. City of Santa Clara<br>5:11-CV-03588 PSG | Deposition |

37

| | |
|---|---|
| Johnson vs. County of Sonoma<br>CV 11-5811-CRB | Deposition |

**2014**

| | |
|---|---|
| MH vs. County of Alameda<br>C11-2868 JST (MEJ) | Deposition |
| Chiease vs. County of Riverside<br>RIC 10012874 | State Superior Court - Temecula |
| Ledezma vs. City of Riverside<br>ED CV 12-01524 VAP (SP) | U.S. District Court – Riverside |
| Ramirez vs. City of Alhambra<br>GC046887 | State Superior Court – Pasadena |
| Nelson vs. County of Riverside<br>RIC 10011174 | Deposition |
| Williams vs. City of Pasadena<br>BC477905 | State Superior Court - Los Angeles |
| McDade vs. City of Pasadena<br>CV12-02892 DMG (JCGx) | Deposition |
| Velasquez vs. City Santa Clara<br>5:11-CV-03588 PSG | U.S. District Court - San Jose |
| Krechman vs. County of Riverside<br>CV10-08705 ODW (DTBx) | U.S. District Court - Los Angeles |
| Bosch vs. County of Riverside<br>EDCV 13-02352-SVW (FFMx) | Deposition |
| Solorzano vs. City of Fontana<br>CIVDS 909991 | State Superior Court - San Bernardino |
| Howard vs. County of Riverside<br>ED CV 12-00700 VAP(OPX) | U.S. District Court – Riverside |
| Rendon vs. City of Indio<br>ED CV 13-00667 VAP (OPx) | U.S. District Court – Riverside |
| Kahsay vs. City of San Diego<br>37-2013-00031271-CU-PA-CTL | Deposition |
| Katz vs. County of Riverside<br>RIV 1213947 | State Superior Court - Riverside |
| Rivera vs. City of Azusa<br>2:13-CV-01510-DMG (VBKx) | Deposition |
| Kahsay vs. City of San Diego<br>37-2013-00031271-CU-PA-CTL | State Superior Court - San Diego |

| | |
|---|---|
| Ford vs. City of Beaumont<br>AI #13-13 | Binding Arbitration Hearing |
| Coronado vs. CHP<br>CV11-03560 DMG (JCx) | Deposition |
| Guinn vs. County of San Bernardino<br>DA-2014-0212-06-G1713 | Deposition for Civil Service Hearing |
| Cordero vs. Hemet<br>EDCV 10-01935-JAK-PJW | Deposition |
| RZ vs. COR<br>13-01251 FMO (DTBX) | Deposition |
| Compton vs. COR<br>CV 10-07490 BRO (DTBx) | Deposition |
| Gomez vs. People of the State<br>Not available | State Superior Court – San Bernardino |

**2015**

| | |
|---|---|
| Bondaug vs. City of Santa Clara<br>Case No. 1-12-CV-238152 | Deposition |
| Nelson vs. City of Riverside<br>Case No. EDCV13-01665 | U.S. District Court – Riverside |
| Bondaug vs. City of Santa Clara<br>Case No. 1-12-CV-238152 | State Superior Court – San Jose |
| Doe (Clinton) vs. PathPoint<br>CASE NO. PC052205 | Deposition |
| Rivera vs. City of Oakland<br>Not available | Arbitration Hearing |
| Larson vs. City of Glendale<br>EC055649 | State Superior Court – Burbank |
| Henriquez vs. City of Bell<br>2:14-CV-00196-GW (SSx) | Deposition |
| Salib vs. City of Riverside<br>ED CV 13-1682 MWF (OPx) | Deposition |
| Dunbar vs. City of Riverside<br>EDCV 13-00847 JGB (SPx) | Deposition |
| Salib vs. City of Riverside<br>ED CV 13-1682 MWF (OPx) | U.S. District Court - Los Angeles |
| Morguita- Johnson vs. City of Fresno<br>1:14-CV000127 LJO-SKO | Deposition |

C. Williams vs. City of Colton
No. 14-CV-01426

Deposition

Moradian vs. City of Glendale
Case No. CV 14-01178 GW (VBKX)

Deposition

Morguita- Johnson vs. City of Fresno
1:14-CV000127 LJO-SKO

U.S. District Court - Fresno

Moradian vs. City of Glendale
Case No. CV 14-01178 GW (VBKX

U.S. District Court – Los Angeles

Van Audenhove vs. COR
CASE NO.  EDCV 14-00944 FMO (Ex)

Deposition

Thomas vs. City of Fullerton
No. 30-2012-00581299

Deposition

W. Espinoza vs. County of Riverside
CASE NO.  EDCV 14-00085-JGB (SPx)

U.S. District Court – Los Angeles

Cicineli vs. City of Fullerton

Arbitration Hearing

Ferdinand vs. City of Los Angeles
NO. CV-14-7056FMO (JPRx)

Deposition

Rodriguez vs. City of Los Angeles
NO. CV11-01135 DMG (JEMx)

Deposition

Wolfe vs. City of Fullerton

Arbitration Hearing

People vs. Lang

State Superior Court - Banning

James vs. Granger (DOJ BOF)
CASE NO: 1:13-CV-00983-AWI-SKO

Deposition

Jordan vs. City of Hawthorne
Case No. CV14-07554 ODW (JPRx)

Deposition

**2016**

Stanfill vs. City of Indio

Administrative Appeals Hearing

Aguilar vs. City of Azusa
Case No: 2:14-CV-09183-GW (JPRx)

Deposition

Dolak vs. Torrance
Case No. CV 14 07463 BRO-MRW

Deposition

Alarcon vs. City of Calexico

Administrative Hearing - Arbitration

Hoffman vs. County of Los Angeles
CASE NO.: CV 15-03724 FMO (ASx)

Deposition

Dolak vs. Torrance                           U.S. District Court – Los Angeles
Case No. CV 14 07463 BRO-MRW

N.W. / Woods vs. City of Long Beach          Deposition
Case No. EDCV14-01569-VAP (SP)

Easley vs. City of Riverside                 U.S. District Court – Los Angeles
Case No. EDCV14-0117 THJ (SPx)

Perez vs. Diaz, Nelson, USA                  Deposition
Case No. 3:13-cv-01417 – WQH (BGS)

Jackson vs. County of San Bernardino         Deposition
Case No.: 5:13-CV-01650-JGB-DTB

Jones vs, County of San Bernardino           U.S. District Court – Riverside
Case No.: 5:15-cv-00080-DTB

NW Woods vs. City of Long Beach              U.S. District Court – Los Angeles
Case No.: EDCV 14-01569-VAP (SPx)

Chang vs. County of Santa Clara              Deposition
Case No.: 15-CV-02502 RMW (NC)

Palmer vs. City of Santa Monica              Deposition
Case No. 15-CV-06183

Jackson vs. County of San Bernardino         U.S. District Court – Riverside
Case No. 5:13-CV-01650-JGB-DTB

Wyatt vs. County of Riverside                Deposition
Case No. 5:15-cv-586-CBM - FFM

Del Real vs. City of Long Beach              Deposition
Case No.: CV14-02831 MWF

Cobb vs. City of San Diego                   US District Court – San Diego
Case No. 3:13-cv-01353-BEN(JMA)

Del Real vs. City of Long, et al.            U.S. District Court – Los Angeles
Case No.: CV14-02831 MWF

Dorsey vs. City of San Diego, et al          Deposition
Case No. 15-cv-1441-L-vs- (WVG)

Palmer vs. City of Santa Monica              U.S. District Court – Los Angeles
Case No. 15-CV-06183

Herrera vs. City of Ontario, et al.          Deposition
Case No. EDCV 15- 1370 JGB (SPx)

Scott vs. City of San Diego                  Deposition
Case No.: 37-2015-00001940-CU-OE-CTL

| | |
|---|---|
| Arellano vs. City of Santa Ana, et al.<br>Case No. SACV14-1886 N S (DFMx)<br>(consolidated with SACV15-0432) | Deposition |
| Ramos vs. City of Fullerton<br>No case reference | Arbitration Hearing |
| Lopez vs. City of Santa Clara<br>Case No. CV13-3870 CRB (PR) | Deposition |
| Herrera, et al., vs. City of Ontario<br>Case No. EDCV 15- 1370 JGB (SPx) | U.S. District Court – Riverside |
| Lopez vs. City of Santa Clara, et al.<br>Case No.: CV13-3870 CRB (NJV) | U.S. District Court –San Francisco |
| Wyatt vs. County of Riverside, et al.<br>Case No: 15-cv-586-CMB (FFMx) | U.S. District Court – Los Angeles |
| Kirsch vs. County of Santa Barbara | Civil Service Commission |
| Maurer vs. People of the State | Superior Court – West Covina |
| Torres vs. County of San Bernardino<br>Case No.: CV 16-00992 PA (DTB) | Deposition |

**2017**

| | |
|---|---|
| Donaldson vs. USA<br>Case No. 15cv0908-BAS-KSC | Deposition |
| Scott vs.  City of San Diego<br>Case No. 37-2015-00001940-CU-OE-CTL | State Superior Court – San Diego |
| Oppenheimer vs. City of La Habra<br>Case No: 8:16-CV-00018-JVS-DFM | Deposition |
| Hoffman vs. County of Los Angeles<br>Case No.: CV 15-03724 FMO (ASx) | U.S. District Court – Los Angeles |
| Monica vs. City of Santa Clara, et al.<br>Case No.:  5:15-CV-04857 BFL | U.S. District Court – San Jose |
| Arias vs. COLA<br>Case NO.: 2-15-cv-02170 AB (ASx) | U.S. District Court – Los Angeles |
| People vs. Downy | State – Court – San Bernardino |
| Ketron v. City of Santa Monica<br>Case No. 2:16-CV-01478 MWF (PJWx) | Deposition |

| | |
|---|---|
| Oppenheimer vs. City of La Habra, et al.<br>Case No.: 8:16-CV-00018-JVS-DFM | U.S. District Court – Santa Ana |
| Garcia v. City of Santa Clara<br>Case No.:  CV10-02424 Sl (pr) | Deposition |
| Centeno vs. City of Fresno, et al.<br>Case NO. 1:16-CV-00653-DAD-SAB | Deposition |
| Avila vs. Co. of Madera & State of Ca.<br>Case No. 1:15-cv-00996 JAM-EPG | Deposition |
| Finger vs. County of Riverside, et al.<br>Case No: 14-cv-01585 JGB (KKx) | U.S. District Court – Riverside |
| Moody vs. County of San Bernardino | Civil Service Commission |
| Garcia v. City of Santa Clara<br>Case No.: CV10-02424 Sl (pr) | U.S. District Court – San Francisco |
| Holmes vs. County of Orange<br>Case No.:  8:16-CV-00867-JLS-JCG | Deposition |
| Sandra Salazar vs. COSB<br>Case No.: 5:16-CV-01103-JFW-KK | Deposition |
| Curtin v. County of Orange<br>Case No.:  8:16-cv-00591-SVW-PLA | Deposition |
| Alexis Yancy, et al. v. State of Ca (CHP)<br>Case No. 15-cv-0580 JM (PCL) | Deposition |
| Curtin v. County of Orange<br>Case No.:  8:16-cv-00591-SVW-PLA | U.S. District Court – Los Angeles |
| Grant vs. County of Orange<br>No. 30-2015-00786861 | Deposition |

**Note:** There may be some discrepancy in the number of cases contained within this list. The list is only as accurate as records and memory can reflect. There may be other cases not identified, which is due to errors in record keeping.

Rev: 8/11/17

# Robert Fonzi and Associates
### Undersheriff (retired)
### *Training and Consulting*
robert.fonzi@yahoo.com

P.O. Box 1154, Yucaipa, CA. 92399
951-312-9679

## Fee Schedule Agreement

**Case Review, Consultation, & Retainer**          **$6000.00**

    This fee is charged upon initiating a case file with the agreement/retainer for consulting. It includes the preliminary case assessment, research materials, fixed office expenses and operating costs. This fee is applied to all activities and professional services performed, i.e., case review, analysis, research, trial preparation, production of exhibits, site visits, and court testimony. (NON-REFUNDABLE)

**Case Review and Preparation**          **$300.00**

    This fee is the hourly rate applied to all professional services associated with case review, analysis, research, trial preparation, production of exhibits, site visits, and is applied to the retainer fee as worked is performed.

**Deposition Fee / Court Testimony**          **$2000.00**

    This basic fee applies to all hearings and/or court appearances and is in compliance with the Federal and State rules governing "expert witnesses". There is a four-hour minimum with each hour following to be billed at a rate of five hundred ($500) dollars an hour and any part of an hour will be billed as a whole.

**Travel time for Deposition, Trial Testimony and/or standby time: Portal to Portal**

        **Half Day**    **$1000.00**
        **Full Day**    **$2000.00**

    Local cost (southern California).  Out of state or extended travel will be billed based on time and travel arrangements.

**Travel Expenses**                    **Direct billing**

    All travel related expenses, including transportation, insurance, and lodging will be billed at actual cost. Automotive expenses including rental, fuel, parking and cleaning will be billed at cost.  Meals will be billed on a daily basis at $100 per day, which includes meals, taxes, tips, and incidentals.

**Statement of Account**                    **Interest**

    Itemized billings (Statement of Professional Services) will be prepared and submitted on a periodic basis consistent with the activities of the account. Payment is due upon receipt of the billing (within 30 days). Late charges may be assessed on overdue accounts at the rate of 1.5% interest per month on the unpaid balance.

**Rev: 04/21/17**

# Reasonable Suspicion

*Valid investigative stop or detention, you must have:*

There may be criminal activity
Person detained is possibly connected
Specific facts exist and the totality of the circumstances

# Detention

*A police officer is empowered to stop a person and to investigate if,*

A criminal act is about to take place,
is in progress, or
has taken place

# Probable Cause

*Totality of the circumstances cause an officer a strong suspicion that the person is guilty of a crime.*

Unusual or suspicious activity
Related to some criminal act
Person being detained is directly involved

# Officer's decision to use force

## *"OBJECTIVELY REASONABLE FOR A LAWFUL PURPOSE"*

### Self -Defense
**(police officer's right)**

### Defense of others
**(police officer's duty)**

### Effect an Arrest
**835a**

### Overcome Resistance
**835a**

### Prevent Escape
**835a**

## *ESCALATION AND DE-ESCALATION*

## A police officers measured response to the Totality of the circumstances

46

# Totality of the circumstances

**Factors affecting selection**

# Officer(s) vs. Suspect(s)

**Factors include but not limited to**

## Number of Officers vs. Subjects

## Information known and/or Unknown

## Prior contacts

## Age, Size, Relative Strength

## Special Knowledge/Skills

## Injury/Exhaustion

## Mentally Ill and/or Under the Influence

## Environmental Factors

## Proximity to Potential Weapons

47

# Police Officer's measured response

P.O.S.T. LD 20: Chapter 2 – Force Options 2-5

| Factor | Considerations |
|---|---|
| **A police officer's threat assessment** | **suspect's intent, ability and/or jeopardy** |
| **Public safety** | **- Immediate action required for self-defense or defense of others** |
| **Amount and nature of the resistance which must be overcome** | **- Passive resistance**<br>**- Active resistance**<br>**- Assaultive resistance**<br>**- Life-threatening** |
| **Presence of a weapon and type of weapon** | **- Other Weapons**<br>**- Firearms** |
| **Seriousness and nature of the offense** | **- Infraction**<br>**- Misdemeanor**<br>**- Felony** |
| **Characteristics of the subject as compared to the characteristics of the officer** | **- Size**<br>**- Age**<br>**- Knowledge or capabilities**<br>**- Criminal history** |
| **Availability of assistance** | **- Number of officers**<br>**- Available backup units** |
| **Nature and condition of the location and surroundings** | **- Danger to bystanders**<br>**- Availability of weapons** |

# FORCE OPTIONS

# *HIGH LEVELS OF FORCE*

**Imminent threat that is life threatening**

Lethal Force Applications

# *MODERATE LEVELS OF FORCE*

**Active resistance and assaultive behavior**

**Police Canine**              **Impact weapons**
    **Neck Restraints**        **TASER (ECD)**
        **Personal body weapons**
    **Physical Control Measures (PCM)**
        **Chemical Weapons (OC)**

# *LOW LEVELS OF FORCE*

**Subject(s) / Suspect(s) are Cooperative**

**Firm Grip / Passive PCM / ECD Drive stun**
**Verbal Commands**
**Uniform Presence**

---

**Force options:** Choices available to a police officer in order to overcome resistance, effect arrest, prevent escape, or gain control of the situation. P.O.S.T. Force Options [20.02.EO1, 20.02.EO2, 20.02.EO4]

49

# Graham Factors

P.O.S.T LD 20: Chapter 1 – Introduction to the Use of Force 1-3

## "OBJECTIVELY REASONABLE"

*Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865) (1989)

**Whether officer's actions are "objectively reasonable" in light of facts and circumstances confronting the officer without regard to underlying intent or motivation.**

- **Immediate Threat to officers or others**

- **Active Resistance and/or assault behavior**

- **Circumstances tense, uncertain, rapidly evolving ("pace" of events) "Split-second judgments"**

- **Severity of the Crime**

- **Attempting to Evade/Escape**

# Resistance vs. Force options

P.O.S.T LD-20 Resistance [20.02.EO3]

Subjects' resistance/actions to an arrest will determine the type of force used by peace officers.

**Subjects actions**
The following illustrates how a subject's resistance/actions can correlate to the force applied by an officer:

| Subject's Actions | Description | Possible Force Option |
|---|---|---|
| **Cooperative** | Subject offers no resistance | - Mere professional appearance<br>- Nonverbal actions<br>- Verbal requests and commands |
| **Passive non-compliance** | Does not respond to verbal commands but also offers no physical form of resistance | - Officer's strength to take physical control, including lifting/carrying<br>- Control holds and techniques to direct movement or immobilize a subject |
| **Active resistance** | Physically evasive movements to defeat an officer's attempt at control, including bracing, tensing, running away, or verbally signaling an intention to avoid or prevent being taken into or retained in custody | - Control holds and techniques to control the subject and situation<br><br>- Use of personal weapons in self-defense and to gain advantage over the subject<br><br>- Use of devices to secure compliance and ultimately gain control of the situation |

51

| Subject's actions (continued) | Description | Possible Force Option |
|---|---|---|
| **Assaultive** | Aggressive or combative; attempting or threatening to assault the officer or another person | - Use of devices and/or techniques to secure compliance and ultimately gain control of the situation<br>- Use of personal body weapons in self-defense and to gain advantage over the subject |
| **Life-threatening** | Any action likely to result in serious injury or possibly the death of the officer or another person | - Utilizing firearms or any other available weapon or action in defense of self and others |

**NOTE:** Officers must take into account the *totality of the circumstances* when selecting a reasonable force option. It is not the intent of this chart to imply that an officer's force options are limited based on any single factor.

**NOTE:** Officers must be aware of and comply with their specific agency policies regarding appropriate force options.

| **Constant reevaluation** | Peace officers must use the force option appropriate for the situation as conditions may change rapidly. Officers must continually reevaluate the subject's action and must be prepared to transition as needed to the appropriate force options. |
|---|---|

## *"Use of Deadly Force"*

**Imminent danger:** means a significant threat that peace officers reasonably believe will result in death or serious bodily injury to themselves or to other persons. Imminent danger is not limited to "immediate" or "instantaneous." A person may pose an imminent danger even if they are not at the *very moment* pointing a weapon at another person.

**Death or serious bodily injury:**  means a serious impairment of physical condition, including, but not limited to, the following: loss of consciousness, concussion, bone fracture, protracted loss or impairment of function of any bodily member or organ, a wound requiring extensive suturing, and serious disfigurement. *(Penal Code Section 243(f)(4))*

**Reasonable necessity:** means that delay in apprehension would create substantial and unreasonable risk to officers or others possibly resulting in serious physical injury or death.

**To protect self or life:** An officer may use deadly force to protect oneself or others when the officer has the objective and reasonable belief that his/her life, or the life of another, is in imminent danger of death or serious physical injury based upon the totality of the facts known to the officer at the time.

**Exigent circumstances:** An emergency situation requiring swift action to prevent imminent danger to life, serious danger to property, imminent escape of a suspect, or the destruction of evidence.

Offer of Proof - Depo Transcript

Exh. 3

**Atkinson-Baker Court Reporters**
**www.depo.com**

```
 1                    UNITED STATES DISTRICT COURT

 2                 CENTRAL DISTRICT OF CALIFORNIA

 3

 4   KHANLY SAYCON, JR., and ANNA) CASE NO. 2:16-cv-05614JFW
     LUZ SAYCON, individually and)          (ASx)
 5   As surviving heirs and      )
     Successors in interest of   )
 6   MHARLOUN SAYCON (deceased), )
                                 )
 7              Plaintiff,        )
                                 )
 8   vs.                         )
                                 )
 9   CITY OF LONG BEACH, ROBERT  )
     LUNA, VUONG NGUYEN, and DOES)
10   1-20, inclusive,            )
                                 )
11              Defendants.       )
     _____)
12

13

14                            EXPERT DEPOSITION OF

15                            ROBERT FONZI

16                      REDLANDS, CALIFORNIA

17                      SEPTEMBER 8, 2017

18

19   ATKINSON-BAKER, INC.
     COURT REPORTERS
20   (800) 288-3376
     www.depo.com
21

22

23

24   REPORTED BY:  CRYSTAL A. JOHNSON, CSR NO. 13696

25   FILE NO:  AB09B81
```

Page 1

**Robert Fonzi**
**September 8, 2017**

**Atkinson-Baker Court Reporters**
**www.depo.com**

---

1        UNITED STATES DISTRICT COURT
2        CENTRAL DISTRICT OF CALIFORNIA
3   KHANLY SAYCON, JR., and ANNA) CASE NO. 2:16-cv-05614JFW
   LUZ SAYCON, individually and)      (ASx)
4   As surviving heirs and     )
   Successors in interest of   )
5   MHARLOUN SAYCON (deceased), )
                      )
6      Plaintiff,     )
                      )
7   vs.             )
                      )
8   CITY OF LONG BEACH, ROBERT )
   LUNA, VUONG NGUYEN, and DOES)
9   1-20, inclusive,      )
                      )
10     Defendants.    )
   _____)
11
12
13
14
15
16
17
18     Expert deposition of ROBERT FONZI, taken on
19 behalf of Plaintiff, at 1230 West Colton Avenue,
20 Boardroom, Redlands, California, commencing at 04:23
21 P.M., Friday, September 08, 2017, before CRYSTAL A.
22 JOHNSON, CSR No. 13696.
23
24
25

---

1           I N D E X
2 WITNESS:  Robert Fonzi
3
4 EXAMINATION                   PAGE
5    By Mr. Stormer             5
6
7
8
9
10         E X H I B I T S
11 NUMBER       DESCRIPTION       PAGE
12 Exhibit 161   Rule of 26 Report       9
13 Exhibit 162   Notes                 9
14 Exhibit 163   Notice             111
15 Exhibit 164   Notice             111
16
17      INSTRUCTED NOT TO ANSWER:
18        (None.)
19
20
21
22
23
24
25

---

1 APPEARANCES:
2
3 For Plaintiff:
   HANDSELL STORMER & RENICK
4   BY:  DAN STORMER
   Attorney at Law
5   128 N. Fair Oaks Avenue
   Pasadena, California 91103
6   626.585.9600
   dstormer@hadsellstormer.com
7 For Defendant:
8   HOWARD RUSSELL
   BY:  HOWARD RUSSELL
9   Attorney at Law
   333 West Ocean Boulevard
10   11th Floor
   Long Beach, California 90802
11   562.570.2200
   Howard.Russell@longbeach.gov
12
   FERGUSON, PRAET & SHERMAN, APC
13   BY:  ALLEN CHRISTIANSEN
   Attorney at Law
14   1631 E. 18th Street
   Santa Ana, California 92705
15   achristiansen@law4cops.com
16
17
18
19
20
21
22
23
24
25

---

1    REDLANDS, CA; FRIDAY, SEPTEMBER 8, 2017; 04:23 P.M.
2
3         ROBERT FONZI,
4    having first been duly sworn, was
5    examined and testified as follows:
6
7         EXAMINATION
8 BY MR. STORMER:
9    **Q.  So we've met before?**
10   A.  I think we have.
11    **Q.  So I don't have to do a lot on your background.**
12   A.  Fine with me.
13    **Q.  I knew that would be just dandy with you.  I'm**
14 **going to show you a document which I'm going to mark as**
15 **161.  I think today we're going through a bunch of**
16 **documents.**
17   A.  Is this what you're handing me?
18    **Q.  That is.  Unfortunately I don't have a copy.**
19      MR. CHRISTIANSEN:  I have my own copy.
20 BY MR. STORMER:
21    **Q.  Okay.  Do you recognize this document?**
22   A.  Yes, sir.  I do.
23    **Q.  And what is this document which we marked as**
24 **Exhibit 161?**
25   A.  It's my Rule 26 report that outlines my opinions

---

2 (Pages 2 to 5)

**Robert Fonzi**
**September 8, 2017**

**Atkinson-Baker Court Reporters**
**www.depo.com**

1  with respect to this litigation?
2      Q. Does it contain all of the opinions that you are
3  prepared to offer today?
4      A. I would say yes with the added comment that I had
5  just been provided a supplemental report of Scott Defoe
6  --
7      Q. Okay.
8      A. -- which I didn't have. I'd like an opportunity
9  to review it and I may respond to it. If they ask, I
10  got opinions with respect to or I would say rebuttal
11  perhaps is a better comment with Defoe and Mr. Griffin.
12      Q. Okay. Are you prepared to offer opinions as it
13  relates to the original report by Mr. Defoe?
14      A. Yes, I am.
15      Q. And are they contained within your Rule 26
16  report?
17      A. Not his opinions.
18      Q. No. Your opinions.
19      A. My opinions are contained.
20      Q. As it relates to Mr. Defoe?
21      A. Not specifically.
22      Q. Well, generally are they in there?
23      A. Yes.
24      Q. Where?
25      A. Where it says opinions.

Page 6

1  completely. That's why I'm slightly surprised to hear
2  that he's responding to Mr. Defoe's report. I don't
3  think he could have, but if he is I would need to know. And I
4  need to know where it is in his report.
5          THE WITNESS: Are you asking me a question
6  because I'll respond.
7  BY MR. STORMER:
8      Q. I haven't asked you a question.
9      A. Okay. I'll just wait politely.
10      Q. The question I'm asking you is, where is it
11  contained within Exhibit 161, your Rule of 26 report
12  where you are responding to Mr. Defoe?
13      A. As I said a moment ago, I specifically do not
14  mention Mr. Defoe by name. However, my opinions reflect
15  what they are and after reviewing Mr. Defoe's report,
16  which was after the fact, I can honestly say mine differ
17  from his and cover the same area.
18      Q. Okay. What areas do you cover that Mr. Defoe
19  covers?
20      A. Well --
21      Q. In your report. Let's go to your report.
22      A. You're asking me a question. You need to allow
23  me to answer.
24      Q. No, no. I need you to refer to your report.
25      A. This is my notes which is my report.

Page 8

1      Q. Where does it say that you are responding to the
2  opinions of Mr. Defoe?
3      A. Well, this is not a rebuttal so I don't have
4  specific rebuttal opinions with respect to Mr. Defoe.
5      Q. Do you have general rebuttal opinions as it
6  applies to Mr. Defoe?
7      A. I do not have rebuttal opinions with respect to
8  Mr. Defoe in this original report.
9      Q. Do you have any opinions as it relates to
10  Mr. Defoe in your report which is 161?
11      A. I'm going to have to say yes because --
12      Q. Okay. Where?
13      A. -- give me an opportunity to finish. If you look
14  at his opinions and you look at mine, we parallel the
15  same areas, however our opinions differ. So with
16  respect to your question, yes, my opinions will reflect
17  a difference with relationship to Mr. Defoe.
18      Q. Where? No. I'm not asking you where they differ
19  with Mr. Defoe. Where do they comment on Mr. Defoe's
20  opinions?
21          MR. ATTORNEY: The question is argumentative
22  because Mr. Defoe's report was not available at the time
23  that Mr. Fonzi's report was prepared. You know we had
24  simultaneous exchange of reports.
25          MR. STORMER: I agree completely. I agree

Page 7

1      Q. Okay. So you're referring to your report?
2      A. It's my notes. They're slightly different
3  because it's got a format it has to follow.
4      Q. Okay. Do you have a copy of your notes that I
5  can use?
6      A. I do.
7      Q. Can I have them?
8      A. I have them available on my thumb drive which is
9  my entire file. I was asked to bring my entire file
10  which I did. It's on that thumb drive. If you want a
11  copy, a hard copy of this, then we'll have to stop and
12  make a copy of it. Whatever your preference is.
13      Q. We'll stop and make a copy if you're going to
14  refer to the notes. Thanks.
15          MR. CHRISTIANSEN: Off the record?
16          MR. STORMER: Yes, we are.
17              (Off the record.)
18  BY MR. STORMER:
19      Q. Okay. So we have marked your report as 161 and
20  we're marking your notes as 162. Do you have any other
21  documents here today that you brought with you?
22              (Exhibits 161 & 162 marked.)
23          THE WITNESS: Yes. Yes, I do.
24  BY MR. STORMER:
25      Q. What do you have?

Page 9

3 (Pages 6 to 9)

**Robert Fonzi**
**September 8, 2017**

**Atkinson-Baker Court Reporters**
**www.depo.com**

1    A. I have my entire file which is on this thumb
2  drive. I have a couple of CDs. Actually three CDs, but
3  what is on the CDs is on the thumb drive.
4    **Q. Okay. So which are you prepared to give me?**
5    A. I'm prepared to give you my file as asked.
6    **Q. Okay. In what form? In CD or thumb drive?**
7    A. Okay. I said a moment ago everything I have is
8  on the thumb drive.
9    **Q. Are you going to give me the thumb drive?**
10   A. Well, for a copy. Yes, you can have the thumb
11  drive.
12   **Q. I have no capacity for copying it.**
13        MR. CHRISTIANSEN: Do you have any capacity
14  to look at it while we're sitting here?
15        MR. STORMER: I don't intend to look at it.
16        MR. CHRISTIANSEN: He can probably give it
17  to you when we're done.
18        MR. STORMER: Yeah. That's fine.
19  BY MR. STORMER:
20   **Q. Is what's on the thumb drive just what you've**
21  **looked at?**
22   A. That's correct.
23   **Q. Okay. I don't care to look at it at this point.**
24  **I'll just look at it at the end.**
25        Is that anything different for the CDs?

Page 10

1    A. I just said a moment ago that these three CDs are
2  on the thumb drive.
3    **Q. Right. Are there other things on the thumb drive**
4  **that are not on the CDs?**
5    A. Yes.
6    **Q. The CDs are on the thumb drive, correct?**
7    A. That is correct.
8    **Q. And there are other things on the thumb drive,**
9  **correct?**
10   A. That's correct.
11   **Q. And at the end of this you will give me the thumb**
12  **drive?**
13   A. That is correct.
14   **Q. Okay. We were back to the question of what part**
15  **of your report directly addresses Scott Defoe's**
16  **opinions. And by your report I'm referring to 161.**
17   A. My 161 which is my Rule of 26 report is only my
18  original report that states my opinions.
19   **Q. Okay. Have you done another report?**
20   A. I have not.
21   **Q. Okay. And in 162 what is it?**
22   A. My notes.
23   **Q. Are these -- how are these notes kept?**
24   A. Generally when I'm required to write a report I
25  start making notes involving a case and I transfer my

Page 11

1  notes, become the report the Rule of 26 report.
2    **Q. Okay. And in your notes there are highlights**
3  **which are yellow which had come through as darker**
4  **portions in line. What does the highlighted mean?**
5    A. It just means it's highlighted.
6    **Q. It has no greater or lesser degree of importance?**
7    A. No.
8    **Q. You mean "yes"?**
9    A. That was a double-negative question then. It has
10  no importance other than it's a section to identify a
11  section of the notes for easy reviewing purposes for me.
12  That's all. There's no greater emphasis on a highlight.
13   **Q. So if we look at Page 11 there are highlights**
14  **there. Those are green highlights in your file. Those**
15  **have no greater or lesser significance than any other**
16  **portion; is that correct?**
17   A. That's correct.
18   **Q. And why do you highlight them?**
19   A. Well, it's easier to find things in my notes if
20  asked specific questions.
21   **Q. Okay. Now, just very briefly on your background,**
22  **you testified previously that 98 percent of your**
23  **testimony, 98 percent of the time you testify for the**
24  **defense in police cases. Is that still the case?**
25   A. That's a fair statement. In those cases I've

Page 12

1  been asked to testify and that's correct.
2    **Q. 98 percent?**
3    A. That's correct.
4    **Q. And the other two percent are hearings or some**
5  **other employment issues?**
6    A. Well, it depends on how -- the question is as you
7  know there's several different formats. Civil
8  litigation, criminal, administrative which would all
9  still be about the same. I have testified on behalf of
10  the plaintiff. The remaining two percent would be where
11  I would not be testifying for the officer specifically.
12   **Q. Okay. And how many times have you testified in**
13  **either deposition or trial or both?**
14   A. Well, let's break it down. Trial testimony
15  probably in the area of about 300 and deposition maybe a
16  few more than that. Between three and 400 would be the
17  fairest amount.
18   **Q. And how many of those times did you testify as an**
19  **expert?**
20   A. I would say the majority of them. 95 percent
21  have been designated, deposed, and testified as a PMK if
22  that's qualifying. I'm not sure what qualifies in your
23  mind, but I would say the majority of them were as an
24  expert. That's the majority of them.
25   **Q. Okay. How many of them were situations in which**

Page 13

**Robert Fonzi**
**September 8, 2017**

**Atkinson-Baker Court Reporters**
**www.depo.com**

| | |
|---|---|
| 1  you were retained as an expert of the 300 at trial? | 1  Q. I really don't have them. |
| 2  A. I'd say the majority. Vast majority. 95 percent | 2  A. I don't have them. I'm only going to give you |
| 3  or higher. | 3  approximates because I don't have any breakdown. I can |
| 4  Q. So 95 would be 285? | 4  only do my best and provide you with my best estimates. |
| 5  A. That's a fair estimate. | 5  I can't give you exacts because I see you there writing |
| 6  Q. Okay. And would the same be true for | 6  things on paper trying to do the math. I can only give |
| 7  depositions? | 7  you approximates. I'll do my best. |
| 8  A. Yes. I would agree with that as well. | 8  Q. Okay. So of the three to 400 cases in which you |
| 9  Q. Somewhere between 285 and 380 you testified as a | 9  have had your deposition taken approximately a dozen you |
| 10  retained expert in depositions? | 10  testified that the officer did not violate a particular |
| 11  A. And trial. | 11  duty? |
| 12  Q. Oh. The trial -- you said 300 for trial? | 12  A. No. You turned it around. I said I did testify |
| 13  A. Yeah. Let me clarify if I could. I've testified | 13  in the deposition. |
| 14  300 -- approximately 300 times in format of trial | 14  Q. I thought what's I just said. If I didn't, I |
| 15  whether it would be court or civil service hearing, | 15  apologize. |
| 16  arbitration, under oath, but not all of those I've been | 16  A. No. You said that those 12 I testified that the |
| 17  deposed in. | 17  actions were appropriate. That's not what I just said. |
| 18  Q. Right. | 18  You turned it around. |
| 19  A. And I've been deposed between 3 and 400 times in | 19  Q. My mistake. |
| 20  the same area as I just mentioned, but not always do I | 20  A. That's why I'm trying to follow you. |
| 21  go to trial in those cases. There's two separate. | 21  Q. Okay. It's intentional trickery. |
| 22  Q. So approximately 300 trial testimonies and | 22  A. Perhaps. I'm listening. |
| 23  approximately 3 to 400 deposition testimonies? | 23  Q. So of the 3 to 400 depositions, approximately 12 |
| 24  A. Yes, that's fair. | 24  -- in approximately 12 you testified that the officer |
| 25  Q. And of those you were retained as an expert 285 | 25  did not -- did violate a duty? |
| Page 14 | Page 16 |

| | |
|---|---|
| 1  -- approximately -- times for trial and 285 to 380 times | 1  MR. RUSSELL: I'm going to object. You keep |
| 2  in deposition as a retained expert? | 2  using the term "duty." It misstates his testimony. He |
| 3  A. Yes. | 3  didn't use the term "duty" in his testimony. |
| 4  Q. And 98 percent of those were for the defense in | 4  BY MR. STORMER: |
| 5  police cases? | 5  Q. What term would you use? I don't care what term |
| 6  A. I would agree. | 6  it is. |
| 7  Q. And would it be correct that in every one of the | 7  A. You keep using 12. I just said 12 as a fair |
| 8  98 percent you testified that the officer did not | 8  estimate. There could have been a few more. |
| 9  violate the particular duty that he or she was claimed | 9  Q. How about 20? |
| 10  to have violated? | 10  A. I think it's probably a few more. I'm trying to |
| 11  A. No. | 11  give you my best estimate. |
| 12  Q. How many of those did you testify on behalf of | 12  Q. Uh-huh. |
| 13  the defense that the officer did not violate or did | 13  A. And in those cases my testimony was that the |
| 14  violate their duties? | 14  officer's actions were unreasonable, inappropriate, or |
| 15  A. Well, you're starting to confuse apples and | 15  not consistent with training policies or practices. |
| 16  oranges here because I did say a moment ago there are | 16  Q. Okay. And these were the ones that fell within |
| 17  different formats in which I've testified in. Some of | 17  the arbitration or some form of hearing. Is that what |
| 18  which are administrative, civil service, binding | 18  you're saying? |
| 19  arbitrations, and I have testified a dozen or so cases | 19  A. No. I testified in Federal Court in January for |
| 20  in which my opinions were that the officers actions were | 20  a plaintiff that an officer arrest was unreasonable and |
| 21  inappropriate, unreasonable, or excessive. | 21  the force was excessive. So it includes all of those |
| 22  Q. Okay. And were that as dozen within the 340 to | 22  areas in which I've testified in. |
| 23  400 depositions? | 23  Q. Okay. So the two percent includes the dozen? |
| 24  A. Yes. I would say it's quite possible. Yes. | 24  A. You're going to have to reask the question |
| 25  You're asking for specific numbers and -- | 25  because we're all over the board here. |
| Page 15 | Page 17 |

5 (Pages 14 to 17)

**Robert Fonzi**
**September 8, 2017**

**Atkinson-Baker Court Reporters**
**www.depo.com**

| | |
|---|---|
| 1   **Q. Well, I don't think so.** | 1   **Q. As an expert.** |

Q. Well, I don't think so.

A. You are because I don't understand now.

Q. Let me ask the question. So you said 98 percent of the time you testified for the defendant, correct?

A. That's a fair statement.

Q. So of the two percent where you said that the police officer did -- acted in a way that -- I forget your terminology -- was inappropriate or contrary to some obligation that he had, that falls within the two percent?

A. Yes.

Q. Okay.

A. But I wouldn't use the term "obligation."

Q. What term would you?

A. The term that I testified to a moment ago.

Q. Can you tell me what that term is?

A. Several terms.

Q. Use them all.

A. The actions of the officers were either unreasonable, excessive, inappropriate and nonconsistent with policies, practices, and/or training.

Q. Okay. Great. How much did you make in 2016 as an expert?

A. Oh, gosh. I couldn't tell you the accurate. I would estimate 200,000 is an estimate.

Page 18

Q. And is that on top of your retirement from the sheriff's office?

A. Yes.

Q. How much is your retirement from the sheriff's office?

A. Am I required to disclose that?

MR. CHRISTIANSEN: Object to relevancy.

MR. RUSSELL: Yeah. I don't think he's required to disclose that. It violates his informational privacy rights.

MR. STORMER: Okay.

MR. RUSSELL: There is federal law that recognizes people.

MR. STORMER: On informational privacy.

MR. RUSSELL: Look it up.

MR. STORMER: I know. I argued the case.

MR. RUSSELL: Did you win?

MR. STORMER: No. They said there is informational privacy, but not for you.

MR. RUSSELL: I think there is for him. It's JPL Scientist.

BY MR. STORMER:

Q. And while you were still employed I think you said that you were earning about 80,000 a year?

A. Yeah.

Page 19

Q. As an expert.

A. That's probably about right.

Q. And while you were employed as a -- you were the undersheriff, right?

A. When I retired I was. Yes.

Q. And what was your salary as the undersheriff?

A. 180 is an estimate.

Q. So let's go to your opinions. Can I see the ones I gave you guys? Can I see what I gave you? Or the one I gave you. Can I see that one? One of them has my notes.

So Exhibit 161 contains all of the opinions that you're prepared to discuss today, correct?

A. Yes, sir.

Q. So let's look at the -- starting at Page 7. And looking at the paragraph that begins with "As officers Nguyen and Cruz arrived on the scene." Do you see that?

A. Sure. Can I ask that I look at them on the computer and reason I ask is I have monovision. It's easier for me to see.

Q. Sure. That's fine.

A. You said -- I'm sorry. Page 7?

Q. Page 7. What is monovision?

A. When you have one eye distance and one eye is close up.

Page 20

Q. So you had Lasiks on one eye, but not on the other?

A. No. I had them on both eyes. I had trifocal vision. I had distance, computer, and readers. Now I have distance in my right eye and computer in my left eye. Sometimes they don't and don't converge properly. I have to do most of my reading on a computer because I can get the font a little bit bigger. It makes it easier.

Q. Do you see the paragraph, "As Officers Nguyen and Cruz"?

A. Yes, sir.

Q. And it says in the next sentence, "While seated in a chair Saycon was waving a knife around." Do you see that?

A. Yes, sir.

Q. Where did you get that?

A. Just from the documents I reviewed.

Q. Which documents?

A. There were some police reports, some interviews, some statements.

Q. So did either Officer Nguyen or Officer Cruz say that when they arrived that Mr. Saycon was waving a knife around?

A. Yes. And the waving is a little more subjective

Page 21

6 (Pages 18 to 21)

**Robert Fonzi**
**September 8, 2017**

**Atkinson-Baker Court Reporters**
**www.depo.com**

Page 22

1  than that. There's reference to him. At some point he
2  was passing it back and forth from one hand to the
3  other. That's how I gathered that he was waving it.
4      Q. So as they arrived on the scene it's your
5  testimony that you understand that Mr. Saycon was waving
6  his knife and passing it back and forth from hand to
7  hand; is that correct?
8      A. At some point in time, yes. It says, "As they
9  arrived." It doesn't say the exact moment they arrived.
10  It's my report. Allow me to define it. There were some
11  passing of the knife back and forth that I'm aware of.
12      Q. At what point did their arrival end because you
13  were using that terminology in your report.
14      A. Their report says arrival was on the scene.
15      Q. Okay. So does it end once they are there?
16      A. I'm not clear on that question.
17      Q. Well, you said here, "As Officers Nguyen and Cruz
18  arrived on the scene," you say Saycon was waving a knife
19  around. I'm trying to figure out, is it when they got
20  there that he was waving the knife around?
21      A. My understanding is as they arrived and they are
22  there. At some point. I don't have a specific time
23  stamp when the passing. It's just my understanding he
24  was passing the knife at some point and that's what that
25  reflects.

Page 22

1      Q. Well, why didn't you say "At some point" as
2  opposed to "Upon arriving"?
3          MR. RUSSELL: It's argumentative as phrased.
4          THE WITNESS: I think it is argumentative.
5  I stated as it's written and I'm trying to explain what
6  it means just how I wrote it.
7  BY MR. STORMER:
8      Q. Okay. So "As they arrived" means to you the
9  arrival and some time thereafter?
10      A. Yes.
11      Q. How long?
12      A. I don't have a specific timeframe because I don't
13  have a specific timestamp in there. I just know as they
14  arrived and they are there there is some interaction,
15  but at some point the knife is being waved back and
16  forth.
17      Q. At what point?
18      A. In the scenario?
19      Q. Yeah.
20      A. I believe some time in the area of -- I'm trying
21  to recall whether it was before or after the taser. I
22  think it was before the taser.
23      Q. Before which taser?
24      A. Cruz.
25      Q. So sometime between the point that they arrived

Page 23

1  using the terminology and the point at which the taser
2  was used he was waving the knife and passing it from
3  hand to hand, correct?
4      A. It occurred. Yes. That's correct.
5      Q. And who said that that occurred?
6      A. I think it was Nguyen.
7      Q. So Officer Nguyen, it's your testimony, said that
8  at some point upon arrival at the scene and thereafter
9  until Cruz tased Mr. Saycon. Mr. Saycon was waving his
10  knife and passing it from hand to hand?
11          MR. RUSSELL: I'm going to object as
12  misstates his testimony.
13          MR. CHRISTIANSEN: Join.
14          THE WITNESS: Give me a moment.
15  BY MR. STORMER:
16      Q. So you have to consult your notes?
17      A. Yeah. Of course I do. There's a lot of material
18  here. I want to make sure I'm accurate.
19      Q. So do I.
20      A. Yes, it is. Before -- a few seconds before, a
21  few moments before Cruz deploys the taser there's the
22  passing of the knife.
23      Q. Okay. Where's the waving?
24      A. I'm using "waving" as a generic term for that
25  statement. It's on Page 11 of my notes.

Page 24

1      Q. So on Page 11 of your notes you're saying it says
2  where that he was passing it from hand to hand?
3      A. Second bullet, Page 11.
4      Q. So that's what you use to determine, to use the
5  term "waving"?
6      A. Yes.
7      Q. Okay. Did you ever teach POST courses?
8      A. Yes.
9      Q. Ever teach one in report writing?
10      A. I did.
11      Q. And what are -- is it critical in report writing
12  to be accurate?
13      A. Yes.
14      Q. And is it critical -- why is it critical to be
15  accurate?
16      A. You want to be able to reflect at a later time
17  your testimony and make sure that you're accurate.
18      Q. Why?
19      A. I think it's an obligation as a police officer.
20      Q. Isn't it an obligation of an expert?
21      A. I think so. Yeah. I would agree with that.
22      Q. Let's go on. "As Officer Nguyen approached the
23  north entrance, he unholstered his gun and immediately
24  issued commands to Saycon." Do you see that?
25      A. No.

Page 25

**Robert Fonzi**
**September 8, 2017**

**Page 26**

1    Q.  Next paragraph.
2    A.  I'm sorry.  Next paragraph?  Yes.  I see it.
3    Q.  So as he approached the north entrance you're
4    saying he issued commands to Saycon?
5    A.  Yes.
6    Q.  Did he issue any commands after he entered?
7    A.  As he approached he's entering.
8    Q.  It doesn't say he's entering?
9    A.  Well, you are trying to discern or define or
10   testify what my report means.  That's what I'm here for.
11   I'm telling you my understanding.  He approaches the
12   door.  He does enter.  He issues commands.  He
13   unholsters.  That's my understanding as to the
14   sequential order.
15   Q.  So let me see if I get this straight.  You're
16   saying as Officer Nguyen approached the north entrance,
17   he unholstered his gun, and immediately issued commands
18   to Saycon.  So that should read, "As he approached the
19   entrance and entered he issued commands," correct?
20   A.  No.  I'm going to stand by what I said here and
21   my understanding.
22   Q.  Okay.
23   A.  That's what I'm here for to tell you what it
24   means and how it reflects as to my understanding of the
25   incident.

**Page 27**

1    Q.  Okay.  So what you have written is how you
2    understand the incident, correct?
3    A.  That is correct.
4    Q.  Okay.  So if you say "As Officer Nguyen
5    approached the north entrance he unholstered his handgun
6    and immediately issued commands to Saycon."  We can take
7    that to mean exactly what it says, correct, because
8    that's your job as the expert.
9    MR. RUSSELL:  That's argumentative.
10   MR. CHRISTIANSEN:  And it misstates his
11   testimony.
12   THE WITNESS:  I'm telling you the sequential
13   order and my understanding and what that reflects.
14   BY MR. STORMER:
15   Q.  Okay.  And your testimony is that what Officer
16   Nguyen said is, "Drop the knife.  Get on your knees.
17   Drop the knife"?
18   A.  And/or words to that effect.
19   Q.  Well, what does that mean "words to that effect"?
20   A.  I don't have a specific transcript and dialogue
21   as to exactly what was said.  It's my understanding that
22   he ordered him to drop the knife, get on the ground.
23   Words to that effect.
24   Q.  Now, did you read Officer Nguyen's deposition?
25   A.  I have.  Yes.

**Page 28**

1    Q.  What did he say he said?
2    A.  Something to that effect.
3    Q.  So you don't know anything more than he said
4    words to that effect; is that correct?
5    MR. RUSSELL:  Misstates his testimony.
6    THE WITNESS:  I said I don't have an audio
7    recording of the exact words that were said.  If I knew
8    the exact words, I would say these are the exact words
9    spoken.  I don't have that.
10   BY MR. STORMER:
11   Q.  But you do have what Officer Nguyen said,
12   correct?
13   A.  And he said words to that effect, drop the knife.
14   Q.  What words did Officer Nguyen say he said?
15   A.  Words to that effect.
16   Q.  Okay.  And that's the best you can tell us as
17   we're sitting here today?
18   A.  Yes, sir.
19   Q.  You say in response, "Saycon refused to comply
20   and continued to sit in the chair and hold the knife
21   with both hands resting in his lap."  Do you see that?
22   A.  Yes, sir.
23   Q.  How did he refuse to comply?
24   A.  Based on what I reviewed he didn't drop the
25   knife.  He's been given commands to drop the knife and

**Page 29**

1    in response he doesn't.  Then that's noncompliance.
2    Q.  I'm now confused because you said just a little
3    while ago he didn't know if he gave the command drop the
4    knife.  He just knew that it was words to that effect.
5    Did he say drop the knife or did he say words to that
6    effect?
7    MR. CHRISTIANSEN:  Hang on.  I'm going to
8    object that it's argumentative and misstates his
9    testimony.
10   MR. RUSSELL:  Join.
11   THE WITNESS:  Yes.  And I think you're
12   playing a little game in words because I did there were
13   commands, "Drop the knife," words to that effect.  Those
14   are pretty specific.  He may have said "Drop the knife"
15   several times.  I know I heard from witnesses that said
16   several commands were given.  If you want me to I'll
17   pull it up what -- what his deposition testimony was.
18   He said something to the effect of "Drop the knife."
19   That is my understanding, and words to that effect.
20   BY MR. STORMER:
21   Q.  So he didn't say, "Drop the knife."  He said,
22   "Words to that effect," correct?
23   A.  No.  That's incorrect.
24   Q.  Well, tell me what's incorrect about it.
25   A.  You know, I'm going to look at my notes here.

**Robert Fonzi**
**September 8, 2017**

**Atkinson-Baker Court Reporters**
**www.depo.com**

---

1  One of the witnesses, Mary Fern Lafoya, she even said,
2  "The officer opened the north door holding the gun and
3  reached in both hands.  He said, "Drop the knife."  I
4  think that's what I said here, "Drop the knife."
5      **Q.  Or words to that effect?**
6      A.  Yes, sir.
7      **Q.  Okay.**
8      A.  Now, I'm not done because you want to know all of
9  this.
10     **Q.  I want to know what you mean.  So words as we**
11  **know have meaning.  I want to know what you mean when**
12  **you say words to that effect.**
13     A.  There were more commands.
14     **Q.  By whom?**
15     A.  The officer.  My understanding is Nguyen was the
16  only one that issued commands and he did it repeatedly.
17     **Q.  And what were those commands?**
18     A.  "Drop the knife, get on the ground," and words to
19  that effect.
20     **Q.  What were the other words that were used?**
21     A.  What I just clarified.
22         MR. CHRISTIANSEN:  No.  Just take your time.
23  Get it on the record and move on.
24         MR. STORMER:  I would love to.
25         THE WITNESS:  In his interview he said he

Page 30

---

1  told them to "Drop the knife, get on the ground."  Words
2  to that effect.
3  BY MR. STORMER:
4      **Q.  My question -- I've read his deposition.**
5  **Actually I took his deposition.  Trying to figure out**
6  **whether he said drop the knife, get on the ground, or**
7  **words to that effect.  Get on the ground.**
8      A.  Yes.  I agree with that.
9      **Q.  Which?**
10     A.  He said those words.
11     **Q.  There's an "or" in there.**
12     A.  He told him to drop the knife, get on the ground,
13  and/or words to that effect.
14     **Q.  Is that what Officer Nguyen said he said?**
15     A.  Issued those types of commands.  Yes.
16     **Q.  So what Officer Nguyen said to the best of your**
17  **recollection in your notes is he said drop the knife,**
18  **get on the ground, or words to that effect.**
19         MR. CHRISTIANSEN:  I'm going to object.
20  This is argumentative at this point.  He wasn't a
21  witness to the event and the deposition of Nguyen speaks
22  for itself.
23         MR. RUSSELL:  Join.
24  BY MR. STORMER:
25     **Q.  You can answer.**

Page 31

---

1      A.  Nguyen didn't say words to that effect.  That's
2  me saying them.
3      **Q.  Great.**
4         MR. RUSSELL:  Did we just spend 15 minutes
5  for you to find out that Nguyen did not say "words to
6  that effect"?
7  BY MR. STORMER:
8      **Q.  I'm trying to figure out whether your expert is**
9  **being accurate in his description.  I know what Officer**
10  **Nguyen said because I took his deposition.  I know he**
11  **did not say "words to that effect."**
12     A.  I never suggested nor did I say that he said
13  that.  I apologize if you thought that, but I never said
14  that.
15     **Q.  I think the record will speak for itself.  So**
16  **let's go on.**
17        It says, "Officer Nguyen saw Officer Cruz enter
18  the business from a south entrance and then heard the
19  distinct sound of a taser being deployed."  Do you see
20  see that?  It's about halfway through the paragraph.
21     A.  Yes, sir.
22     **Q.  Okay.  Is this correct in your notes that Officer**
23  **Nguyen said he saw Officer Cruz enter the business from**
24  **the south entrance?**
25     A.  Yes.

Page 32

---

1      **Q.  And is it your testimony that he immediately**
2  **heard the distinct sound or at a later time heard the**
3  **distinct sound?**
4      A.  He heard the distinct sound of the taser.
5      **Q.  How long after you claim Officer Nguyen stated**
6  **that he saw Officer Cruz enter the business from the**
7  **south entrance of the business?**
8      A.  I'm sorry.  What?
9      **Q.  How long was it from the time Officer Nguyen see**
10  **Officer Cruz enter the business from the south entrance**
11  **was it until he heard the click, the distinct sound of**
12  **the taser?**
13     A.  I don't know if he put any timeline, but I want
14  to say it was probably less than 10 seconds.
15     **Q.  Okay.  So within 10 seconds?**
16     A.  And I did say I don't believe he put a specific
17  time on it.
18     **Q.  Where did you get the 10 seconds?**
19     A.  Well, I'm looking at the timeline based on some
20  video stamps and taser logs based you can assume based
21  on the time he actually entered and the taser is
22  deployed it's roughly around seven seconds.  It's less
23  than 10 seconds.  I did watch the video.  There were
24  several video clips and it's -- if you look at the time
25  clicker, it's within that, less than 10 seconds.

Page 33

---

9 (Pages 30 to 33)

**Robert Fonzi**
**September 8, 2017**

**Atkinson-Baker Court Reporters**
**www.depo.com**

1    Q. What is less than 10 seconds?
2    A. From the time Officer Cruz enters to the time of
3    the first deployment of the taser.
4    Q. And the timeline that you have here on Page 2 of
5    your notes at the top that you were just referring to,
6    where did you get that timeline?
7    A. I believe it's within the investigation and also
8    by reviewing the video to confirm that they are
9    accurate.
10    Q. So you went through the video and looked at also
11    time from the investigation and you determined that
12    they were exactly the same or did you make changes?
13    A. I'm not going to say exactly because that's kind
14    of subjective because some of them isn't as clear when
15    you're watching the video. You can only speculate that
16    certain things are occurring because as you have seen in
17    most of the videos they are from a distance. You can
18    only deduce that some of the actions are occurring and
19    it's just approximate times. I can't tell you they are
20    absolutely 100 percent exact times.
21    Q. So you're saying this is your own creation
22    correct these time lines?
23    MR. CHRISTIANSEN: Objection.
24    MR. RUSSELL: That's argumentative. It
25    misstates his testimony.

Page 34

1    are timelines, correct?
2    A. That is correct.
3    Q. And that you got those timelines from the
4    investigation and then in some form confirmed them by
5    viewing the video.
6    A. I reviewed the video. Correct.
7    Q. And then you said that you can't be specific
8    because it's all somewhat nebulous.
9    MR. RUSSELL: Do you need to do the air
10    quotes?
11    MR. STORMER: I didn't do air quotes. I did
12    this.
13    MR. RUSSELL: Air quotes is this.
14    MR. STORMER: No air quotes.
15    MR. RUSSELL: You did something to the
16    effect of air quotes.
17    MR. STORMER: Motions to that effect.
18    MR. CHRISTIANSEN: I'm going object it's
19    argumentative at this point.
20    MR. STORMER: He's getting 500 bucks an
21    hour. He's happy.
22    MR. CHRISTIANSEN: I think you're getting
23    more than that.
24    BY MR. STORMER:
25    Q. Where did I go wrong before the hand quotes, air

Page 36

1    MR. CHRISTIANSEN: Join.
2    THE WITNESS: I didn't say that.
3    BY MR. STORMER:
4    Q. I thought you said you went through and viewed
5    and made notes and it's a combination of the
6    investigation in your notes is what's contained on the
7    top of Page 2 of Exhibit 162.
8    A. I don't think that's what I said. I think if you
9    have her read back my answer it's exactly what I said.
10    You changed what I just said.
11    Q. How did I change it?
12    A. You're not even remotely close. So I don't know
13    what you heard. You asked me where I got that. I told
14    you I got that from the investigation and to include I
15    actually looked at the videos myself and then you asked
16    me if they were accurate and I just told you there are
17    some things you can't see exactly because you can only
18    speculate that's what's occurring. And I can't testify
19    that these are absolutely 100 percent exact times.
20    Q. No. These being which?
21    A. We're talking about these times, right?
22    Q. Is that what you're talking about?
23    A. You need to start over because you apparently
24    jumped.
25    Q. No. You told us that on the top of Page 2 there

Page 35

1    quotes, hand motions?
2    MR. CHRISTIANSEN: Objection. Incomplete
3    question.
4    THE WITNESS: Probably most of it.
5    BY MR. STORMER:
6    Q. Most of what I said was wrong, correct?
7    A. You said so many different things that don't make
8    sense. You're going to need to start over for me and
9    make sure we're both on the same sheet of music because
10    we're obviously in different --
11    Q. We're obviously in different areas.
12    A. Yes, sir.
13    Q. And so looking at the top of Page 2 where did you
14    get that?
15    A. As I said a couple of times I obtained those from
16    the investigation.
17    Q. Okay. Great. That's all I needed to know.
18    A. I've said it twice.
19    Q. Okay. So you didn't confirm them through
20    watching the video?
21    A. No. That's not true because I did tell you I
22    watched the video and the times reflected there are the
23    times. What I said is I can't testify a hundred percent
24    accuracy. For example, let me give you an example, when
25    it says, "Cruz uses baton strike, 22:13:59." I believe

Page 37

10 (Pages 34 to 37)

**Robert Fonzi**
**September 8, 2017**

**Atkinson-Baker Court Reporters**
**www.depo.com**

1 that to be close and accurate, but what if it's 22:13:58
2 which is one tenth of a second earlier. What I'm trying
3 to explain to you is you see some of the motion in
4 action occurring. It isn't completely a hundred percent
5 discernible. You can speculate that's what's occurring
6 because of the testimony and the sequential order that
7 things occurred. So all I'm saying is this isn't time
8 lined. Is it absolutely 100 percent accurate, I can't
9 tell you for sure.
10    Q. So is it correct you can't tell us whether the
11 timeline offered in the investigation is 100 percent
12 accurate?
13    A. Not based on the quality of the video. I can
14 tell you it looks pretty close if not -- I would say
15 it's pretty close. I can't tell you 100 percent.
16    Q. Okay. The best you can tell us is it's pretty
17 close?
18    A. More than pretty close, but --
19    Q. It's pretty darn close?
20    A. Is it exact as I just gave you an illustration an
21 example? It's hard to tell because of the quality.
22    Q. Is it your testimony that when you looked at the
23 video it broke it down in 10ths of a second?
24    A. I don't remember now. I don't remember now.
25    Q. Okay. Let's go on. Going at this last

Page 38

1 sentence --
2       MR. RUSSELL: What exhibit are you looking
3 at and what page?
4       MR. STORMER: I am looking at Exhibit 161,
5 Page 7, second full paragraph.
6       MR. CHRISTIANSEN: From the top or from the
7 bottom?
8       MR. STORMER: From the top.
9 BY MR. STORMER:
10    Q. It says, "At the time of the incident Saycon was
11 wearing a thick jacket." Do you see that?
12    A. Yes, sir.
13    Q. How do you know he's wearing a thick jacket?
14    A. Well, just from the video. It appears to be --
15 might be leather. I'm not real sure of the exact
16 material. It looks to be a bulky jacket. There may
17 have been some testimony that it was a thick jacket.
18 Maybe in the investigation. That's all I can --
19    Q. So it just appeared to you to be a thick jacket
20 from the video, correct?
21       MR. RUSSELL: Misstates his testimony.
22       THE WITNESS: Just based on the statements
23 and viewing the video it looked bulky. I don't know how
24 thick is thick. I'm just using what I reviewed in my
25 understanding.

Page 39

1 BY MR. STORMER:
2    Q. You said thick. So what did you mean by thick?
3    A. Well, it's going to be thicker than the shirt I'm
4 wearing.
5    Q. Okay.
6    A. I don't know the exact material to be honest with
7 you.
8    Q. Did you read Officer Cruz's testimony as to what
9 Mr. Saycon was wearing?
10    A. You know, I know they mentioned a black-and-white
11 jacket. I don't know that he ever testified the type of
12 jacket it was.
13    Q. Did you read the testimony of Officer Nguyen as
14 to what type of jacket it was?
15    A. Just a black-and-white jacket.
16    Q. Okay. So at what point did Officer Nguyen first
17 unholster his weapon in looking at the timeline that you
18 have at the top of Page 2 of your notes of Exhibit 162?
19    A. The exact moment? I couldn't tell you the exact
20 moment. My understanding is as he's coming through the
21 door, the north door, he's unholstered or already
22 unholstered. I know as he's coming into the business he
23 has his weapon.
24    Q. And how do you know that?
25    A. Just based on his statement in the video.

Page 40

1    Q. Okay. So you saw in the video that as he came
2 through the door he had his weapon unholstered?
3    A. I believe so. What you see is what's similar to
4 the shooting stance or the way you would hold the
5 weapon.
6    Q. In the video?
7    A. Yes.
8    Q. And what does it mean to have a weapon at low
9 ready?
10    A. Low ready would be kind of downward angle.
11 You're still holding the weapon in both hands, but it's
12 down below your waist.
13    Q. It's pointed down or lowered?
14    A. Both. Let me clarify. You can have the weapon
15 at chest level, but it's pointing in a downward towards
16 the ground.
17    Q. That would be low ready as well?
18    A. Yeah. Some officers use that as low ready. Some
19 use the low ready holding in down below your waist.
20    Q. Do you know how Officer Nguyen used the term low
21 ready?
22    A. No.
23    Q. Can you tell us whether he used the -- when he
24 entered where his weapon was pointed?
25    A. If I remember correctly and just based on my

Page 41

11 (Pages 38 to 41)

**Robert Fonzi**
**September 8, 2017**

**Atkinson-Baker Court Reporters**
**www.depo.com**

| | |
|---|---|
| 1 recollection, I think he had his arms extended out in | 1    A. Yes, sir. |
| 2 front of it. | 2    **Q. Are you still?** |
| 3    **Q. So at the ready position?** | 3    A. Probably not. |
| 4    A. Well, low ready with the arms extended out would | 4    **Q. And is that because the training expires at a** |
| 5 be below the waist. What I showed you earlier and | 5 **certain time?** |
| 6 trying to demonstrate to you, there's another low ready | 6    A. No. It doesn't really expire with respect to |
| 7 where I had it at chest level, but I'm holding the | 7 POST, but I'm not a POST peace officer anymore. I would |
| 8 weapon in a downward fashion. There are kind of two | 8 have to evaluate that. I know taser requires either |
| 9 different low readies. | 9 annual or biannual training to update on certain things. |
| 10    **Q. So we can get it on the record. The low ready** | 10 I wouldn't say I'm a certified instructor. I was and |
| 11 **that you think Officer Nguyen was with his arm extended** | 11 have been. |
| 12 **with his elbows slightly bent both hands on the weapon** | 12    **Q. When?** |
| 13 **with the weapon below his waist?** | 13    A. Pardon? |
| 14    A. I never said anything about his elbows being | 14    **Q. When?** |
| 15 slightly bent. Perhaps they were. I really don't know | 15    A. The last time would have been 2012. |
| 16 for sure. | 16    **Q. So did you after 2012 at any point thereafter** |
| 17    **Q. Describe to me, if you would, what his arms were** | 17 **certify again?** |
| 18 **like when he entered the north door holding his weapon?** | 18    A. Probably before I retired I did. I believe I did |
| 19    A. Just extended out. I don't know if they were | 19 a four hour recert but I haven't done it. |
| 20 slight bent or not. The quality of the video doesn't | 20    **Q. Okay. And what were you trained in? Which model** |
| 21 lend itself to that much detail that you're asking. All | 21 **of the taser?** |
| 22 I can see is that it appeared that his arms was extended | 22    A. M26, M2. |
| 23 out. | 23    **Q. And do you know what taser was being used by** |
| 24    **Q. Straight out?** | 24 **Officer --** |
| 25    A. More or less. Yes. I'd say more straight than | 25    A. I'm sorry. X26 and X2. There was an M a long |

·

| | |
|---|---|
| 1 bent. | 1 time ago. There was an M. It was a long time ago. I |
| 2    **Q. Okay. And the weapon was pointed where?** | 2 started out with an M. |
| 3    A. At what point? | 3    **Q. Okay. And that's what you were certified in,** |
| 4    **Q. As he entered the north door?** | 4 **correct?** |
| 5    A. At some point I know he's pointing the weapon. | 5    A. X26 and the X2. The M2 is two years ago. |
| 6    **Q. As he entered the north door where was his weapon** | 6    **Q. Did you go to Phoenix?** |
| 7 **pointed?** | 7    A. No. I didn't physically go to Phoenix. They |
| 8    A. You know, I don't know if he ever said | 8 were out here. |
| 9 specifically where its. At some point he's got to open | 9    **Q. Did you read the autopsy?** |
| 10 the door. I would assume he's pointing the weapon at | 10    A. Yes. |
| 11 the ground if he's trying to manipulate or go through | 11    **Q. Okay. Do you know if there was any indication in** |
| 12 the door. | 12 **the autopsy as to whether the taser -- I'm sorry. I'm** |
| 13    **Q. Do you know how he open the door?** | 13 **forgetting the term. Did the taser ever actually** |
| 14    A. One of his hands I would assume. | 14 **connect from dart to dart?** |
| 15    **Q. I'm not asking for you to assume. Do you know** | 15    A. I don't believe so. No. |
| 16 **how he said he opened the door?** | 16    **Q. You don't believe that there was anything in the** |
| 17    A. I don't remember. I don't know if it was a push | 17 **autopsy indicated that the taser was ever put in** |
| 18 bar or a turn handle or what. I know those questions | 18 **effect; is that correct?** |
| 19 were asked. I don't think he specifically said one way | 19    MR. CHRISTIANSEN: I don't know that this is |
| 20 or the other. | 20 within the scope. It's PMK designation. |
| 21    **Q. Okay. Now, have you been trained in taser use?** | 21    MR. STORMER: That would be good if he was a |
| 22    A. I have, yes. | 22 PMK. |
| 23    **Q. And are you -- were you POST certified?** | 23    MR. CHRISTIANSEN: I'm sorry. As expert |
| 24    A. Yes, I was. | 24 witness. |
| 25    **Q. Were you POST certified as a trainer?** | 25    MR. RUSSELL: He's a police practices |

·

**Robert Fonzi**
**September 8, 2017**

**Atkinson-Baker Court Reporters**
**www.depo.com**

expert.

MR. STORMER:  I want to find out what he knows.  If he knows or he doesn't.

BY MR. STORMER:

Q.  Do you know if the darts -- if there was anything in the autopsy which indicated that the taser actually became effective and activated that is that the electrical current ran from one dart to the other?

A.  I don't believe so.  I don't believe there's anything that would indicate that the probes actually made any contact with the skin, the typical marks that you would see with probe deployment.

Q.  Okay.  Did that fact play any role in your formulation of your opinions?

A.  No.  Not specifically.

Q.  Generally?

A.  No.

MR. RUSSELL:  Off the record.

(Off the record.)

BY MR. STORMER:

Q.  Back to Page 7 of Exhibit 161.  The facts that are on this page from Page 6 through Page 12.  Do you see that?

A.  Yes, sir.

Q.  Those are the facts upon which you base your

Page 46

opinion, correct?

A.  Yes.

Q.  And the accuracy of those facts is -- would affect, of course, the accuracy of your opinions?

A.  Yes.

Q.  Looking at Page 7 again, how long was it -- I'm looking at the paragraph beginning with "Officer Nguyen then reholstered his handgun."  Do you see that?

A.  I do.

Q.  How long was it from the point at which Officer Nguyen reholstered his handgun until he took his handgun out again?

A.  How long a period of time?

Q.  Correct.

A.  I can only estimate based on some timestamps.  I don't know that he specifically testified to any specific time, but based on 10 seconds as an estimate.

Q.  So approximately 10 seconds passed between the time that Officer Nguyen reholstered his handgun until the time he took it out again, correct?

A.  I would say no more.

Q.  No more than 10 seconds?

A.  Most likely less.

Q.  Well, do you know?

A.  Not specifically.

Page 47

Q.  Generally?

A.  No.

Q.  Looking at the top of Page 2 the timeline that you used do you see that on Exhibit 162?

A.  Yes, sir.

Q.  And it says under 22:13:42 "Cruz activates his taser for five seconds."  Do you see that?

A.  Yes, sir.

Q.  When he activates his taser, is there a certain time period that it stays cycling?

A.  Yes.

Q.  And how long is that?

A.  Five seconds.

Q.  And would the same be true for Officer Nguyen?

A.  Yes.

Q.  And is that because that's what the taser does automatically?

A.  That's correct.

Q.  So in the timeline looking at the top of Page 2 of Exhibit 162, we have here the timeline that you reviewed looking at the time stamps on the video, correct?

A.  Yes.

Q.  Okay.  And so we see is at 13:58 Nguyen activates his taser for five seconds.  Do you see that?

Page 48

A.  Yes, sir.

Q.  Does that mean he deployed his taser against the body of Mr. Saycon?

A.  He deploys it.

Q.  He tasers darts?

A.  He deploys the taser towards Mr. Saycon.

Q.  Where is Officer Cruz when Officer Nguyen uses his taser?

A.  If I remember correctly he had stepped back after his deployment.

Q.  He being Officer Cruz?

A.  Yes.  That's correct.  And they were I want to say off to his right, but it was a kind of a V-formation.  Off to Officer Nguyen's right on the other side of Mr. Saycon, but more at an angle because as Nguyen explained it was kind of a V configuration.  They weren't standing next to each other.  They weren't directly across.

Q.  Okay.

A.  And the tip of the V being Mr. Saycon.

Q.  How far from Mr. Saycon was Officer Cruz when Officer Nguyen deployed his taser?

A.  I'm going to say approximately 20 feet because I know he deployed his taser, didn't have the effect that he did step back, but I do know he had moved in

Page 49

13 (Pages 46 to 49)

**Robert Fonzi**
**September 8, 2017**

**Atkinson-Baker Court Reporters**
**www.depo.com**

1 initially slightly.
2     **Q. Who's the he?**
3     A. Cruz. He was probably, if I remember correctly,
4 10 to 15 feet when he deployed the taser. He being
5 Cruz. If I remember correctly, he then steps back a few
6 steps, two, three, I really don't know. I would
7 estimate based on their statements like 20 feet.
8     **Q. So just so we can get all of the hes, so Officer**
9 **Cruz is approximately 20 feet from Mr. Saycon when**
10 **Officer Nguyen deploys his taser.**
11     A. That's correct. That's a fair estimation.
12     **Q. Okay. And it's an estimation you'd make?**
13     A. Just based on their statements. That is correct.
14     **Q. And based upon the video.**
15     A. Well the video is hard to discern distance in
16 terms of feet without having any specific relationship,
17 but based on their statements I think that's a fair --
18     **Q. And then -- let's get the scenario. First**
19 **Officer Cruz deploys his taser, correct?**
20     A. Yes.
21     **Q. Then Officer Nguyen deploys his taser, correct?**
22     A. Yes.
23     **Q. Approximately 16 seconds after Officer Cruz?**
24     A. Fair statement. Yes.
25     **Q. And then Officer Cruz uses his baton against**

Page 50

1 Mr. Saycon?
2     A. Yes. That's my understanding. That is correct.
3     **Q. And is that based upon your review of both Nguyen**
4 **and Cruz's depositions?**
5     A. The statements is in the investigation as well.
6 Yes.
7     **Q. What's in the investigation?**
8     A. He used his baton. Cruz stated in his report he
9 used his baton.
10     **Q. Okay. So it's in their police reports and it's**
11 **in their depositions and you saw it there in both**
12 **places?**
13     A. Yes.
14     **Q. And you saw it in Lieutenant Cox's report?**
15     A. I'm not sure if I did or not. I don't recall.
16 It very well may be there. I just don't recall.
17     **Q. Did you see Lieutenant Cox's investigative**
18 **report?**
19     A. I'm sure I did.
20     **Q. What makes you sure you did?**
21     A. Well, if there is one I provided numerous
22 documents. I didn't memorize all of the documents I
23 reviewed. If it's in the materials I have on that thumb
24 drive, then yes.
25     **Q. Do you have any reason to believe that Officer --**

Page 51

1 excuse me -- Lieutenant Cox's report is in any way
2 incorrect or fallacious?
3     A. Do I have any reason to believe?
4     **Q. Correct.**
5     A. No.
6     **Q. So you accept as truthful what Lieutenant Cox**
7 **said in his report, correct?**
8     MR. RUSSELL: Lacks foundation. Calls for
9 speculation.
10     THE WITNESS: I have nothing to suggest that
11 it's not accurate.
12 BY MR. STORMER:
13     **Q. Did you rely upon anything from Lieutenant Cox's**
14 **report?**
15     A. Not really.
16     **Q. I'm sorry?**
17     A. Not really. He wasn't there.
18     **Q. Okay. And the timeline that you have on the top**
19 **of Page 2, where did you get that?**
20     A. From the investigation, the report.
21     **Q. Which report?**
22     A. The officer involved shooting investigation.
23     **Q. Okay. Now, the knife. Have you looked at the**
24 **knife that was involved?**
25     A. I've seen pictures. I haven't physically seen

Page 52

1 it.
2     **Q. Okay. Do you know what kind of knife it was?**
3     A. No.
4     **Q. Do you know what a gravity knife is?**
5     A. I do.
6     **Q. What's a gravity knife?**
7     A. It flips open.
8     **Q. Was it a gravity knife?**
9     A. You know, it didn't appear to be one. I saw
10 video where it certainly was used like one.
11     **Q. What do you mean?**
12     A. There was video of Mr. Saycon snapping it open
13 very quickly. It certainly resembles a gravity knife.
14 I don't know if it is or not. It's just your -- it
15 looked like to be a folding knife. I've seen hunting
16 knives similar to that. It's a folding knife.
17     **Q. What's a folding knife?**
18     A. It fold in half and collapses into the handle.
19     **Q. And how long was the knife with the blade**
20 **collapsed within the handle?**
21     A. Well, I think it was 8-and-a-half, 8 inches long
22 open so I would just doing some math there probably
23 about 4 inches, 4-and-a-half, 4-and-a-quarter closed.
24     **Q. Do you know how long the blade was?**
25     A. Probably around four inches approximately. I

Page 53

14 (Pages 50 to 53)

**Robert Fonzi**
**September 8, 2017**

**Atkinson-Baker Court Reporters**
**www.depo.com**

1 didn't measure it. It looked to be the same length as
2 the handle. The handle might be slightly different.
3     Q. So approximately four inches?
4     A. Yeah. That would be a fair estimate.
5     Q. With it open it was approximately eight inches.
6 Is that your testimony?
7     A. Yeah. Approximately.
8     Q. Do you know if it was a switch blade?
9     A. No. It was not a switch blade. Based by
10 definition it wasn't a switch blade.
11     Q. What's the definition of a switch blade.
12     A. Switch blade is propelled with a spring. Push a
13 button and it pops open on its own.
14     Q. You say "Officer Cruz" the next paragraph "then
15 moved in and delivered a baton strike to Saycon's left
16 body area." Do you see that?
17     A. Yes.
18     Q. What area of his left body?
19     A. If I remember correctly it was in the arm between
20 the wrist and the shoulder.
21     Q. Okay. Which arm?
22     A. I believe it was the left side.
23     Q. Do you know if there was any strike to his head,
24 to Mr. Saycon's head?
25     A. No. I don't believe there was. I know someone

Page 54

1 thought he was struck to the head. There's nothing to
2 suggest he was struck in the head.
3     Q. Have you seen any pictures?
4     A. Of?
5     Q. Of Mr. Saycon.
6     A. I have seen pictures.
7     Q. Have you seen any pictures with any marks on his
8 head?
9     A. I don't believe so. No. I don't believe I've
10 seen any baton strikes with marks to the head.
11     Q. Did you see any marks to the head?
12     A. It may have had a scratch or two or something to
13 that effect. I didn't see anything that supports he was
14 struck to the head nor was there anything that I read in
15 the autopsy that says he was struck in the head.
16     Q. I'm going to show you a document that's been
17 previously marked at 109. Did you see that?
18     A. Yes.
19     Q. And the mark on his head is that the scratch you
20 were talking about?
21     A. It's a mark. It's not consistent with baton
22 strike, but it's a mark.
23     Q. Why is it not consistent with the baton strike?
24     A. I've seen hundreds of baton strikes in various
25 parts of the body including the head with blunt force.

Page 55

1 It's just not consistent. Generally it's going to be a
2 lot more swollen and you're going to have a laceration.
3     Q. Have you seen deflections from baton strikes that
4 hit the head?
5     A. Yes.
6     Q. Is it your testimony that a deflection would not
7 look like that which is indicated in Exhibit 109?
8     A. Deflection might. Yes.
9     Q. You say, "As Officer Cruz," same paragraph,
10 "stepped back, Saycon motioned with both hands trying to
11 unfold and lock the blade to the knife." And you say
12 switch blade. What did you mean there?
13     A. Well, they have called it a switch blade. It was
14 reported as a switch blade. I, of course, know it's not
15 a switch blade after the fact. I'm not sure that they
16 knew one way or the other. It's just the knife that
17 we're talking about is the same knife that was, reported
18 as a switch blade. If you go back to the 911 call, they
19 even call it a switch blade. It's clearly not a switch
20 blade.
21     Q. Okay. So when it says, "Saycon motioned with
22 both hands trying to unfold and lock the blade" -- "lock
23 the blade to the knife," you're just using that to
24 identify it as to what the officer was told?
25     A. It's the same knife that had been reported

Page 56

1 earlier. It's not a switch blade. I've already said
2 that. It clearly wasn't.
3     Q. You said he was motioned with both hands trying
4 to unfold and lock the knife. What did you mean by
5 that?
6     A. I'm just using -- I believe that was in the
7 report. Somehow he was motioning with his hands whether
8 he's trying to -- the meaning of the folding knife,
9 there's a locking mechanism you have to press and then
10 you got to pull the blade out. And that's what I
11 believed from the statement somehow he was trying to
12 unfold or open the knife. That's all.
13     Q. You said that you have to press a button to
14 unfold?
15     A. I didn't say a button.
16     Q. "Press" something you said.
17     A. There's a mechanism on most folding knives is
18 what I said. You have to press it in order to open the
19 knife because it won't open. And when it opens
20 completely that little thing slides over. You know what
21 I'm talking about. You've seen pocket knives. It
22 slides over and locks the blade in place. I don't know
23 what he was doing specifically. All I know is I read he
24 was motioning in some way.
25     Q. With both hands?

Page 57

15 (Pages 54 to 57)

**Robert Fonzi**
**September 8, 2017**

**Atkinson-Baker Court Reporters**
**www.depo.com**

1    A. Correct.
2        Q. Did you see anything that indicated there was
3    such a mechanism, to use your word, that he was required
4    to use to open the knife?
5        A. No.
6        Q. What would such a mechanism look like in your
7    experience?
8        A. Well, I just explained to you what it was. Most
9    folding knives have some type of metal -- kind of like a
10   small bar or something. It usually has little grooves
11   on it where you have to push it to one side to open
12   another. The knife opens. It locks it in place. It
13   slides over so the blade doesn't collapse when using it
14   for whatever purpose you're using it.
15       Q. Where is this metal -- did you say bar?
16       A. Yeah. I'm trying to explain.
17           MR. CHRISTIANSEN: I'm going to object as
18   relevance. He already said this is not a knife he had
19   or he couldn't identify that particular knife. It's
20   irrelevant.
21           MR. RUSSELL: Join.
22   BY MR. STORMER:
23       Q. Where would such a mechanism be?
24           MR. CHRISTIANSEN: I'm going to object
25   again. It's incomplete hypothetical.

Page 58

1    THE WITNESS: Generally it's on the -- if
2    you want it to call the inside of the knife where it
3    opens, the inside being the area in which the knife
4    actually opens out.
5    BY MR. STORMER:
6        Q. Okay. And you saw nothing like that on this
7    knife, correct?
8        A. I don't believe so. I saw a photograph of it and
9    if you want to pop one up or show me one I can tell you
10   if it has one or not. I just don't remember looking at
11   one. I didn't look for one to be honest with you. I
12   didn't think it was relevant.
13       Q. And why didn't you think it was relevant?
14       A. Regardless of whether he had that or not, the
15   officers' statements were he was motioning in some
16   fashion to try and open the knife based on the statement
17   I have in the report.
18       Q. Okay. And is that because the officers' actions
19   are governed by what the officer perceived at the moment
20   of the activity?
21       A. If the question is, is the officer's perspective
22   of what's occurring based or predicated on their belief
23   and what they observed, yes.
24       Q. Okay. And you're describing here what Officer
25   Cruz observed, correct?

Page 59

1    A. That is correct.
2        Q. And then it says, and we're going to the next
3    paragraph, "Officer Nguyen immediately removed his
4    firearm and aimed it at Saycon. He was approximately
5    three to four steps away." Do you see that?
6        A. Yes, sir.
7        Q. When you say "step," how many feet in the step?
8        A. It depends on the individual. It could be two
9    feet, three feet. It's just -- I think that's the term
10   that was used in his either his deposition or his
11   report. He indicated three to four steps.
12       Q. "He" being Nguyen?
13       A. Correct.
14       Q. Could you tell from the video how far Officer
15   Nguyen was when he removed his firearm?
16       A. Not exactly. No.
17       Q. Generally?
18       A. 10 feet perhaps.
19       Q. You think around 10 feet?
20       A. Approximate. Not exact.
21       Q. Could be less, could be more?
22       A. Yes.
23       Q. Do you recall what Officer Nguyen testified?
24       A. I thought he said 10 to 15.
25       Q. Is that consistent with what you saw in the

Page 60

1    video? 10 to 15 feet?
2        A. Yeah. I wouldn't dispute it. Approximately.
3        Q. "The blade," he said in a sentence further on,
4    "the blade in the knife was partially exposed as Saycon
5    moved in the manner as if he was going to stand up and
6    attack the officers." Do you see that?
7        A. Yes, sir.
8        Q. Which hand was the knife in?
9        A. Well, I do know based on the report and the
10   depositions he had it in his right hand, but there was a
11   time when he passed it to his left. He was passing
12   motion back and forth that we talked about earlier. I
13   believe it ended up in his right hand. The best that I
14   could -- my best understanding based on what I read and
15   reviewed.
16       Q. Once it was opened which hand was it in?
17       A. I believe it was his right hand.
18       Q. Only his right hand, correct?
19       A. I believe that is correct.
20       Q. And you say, "He moved in a manner as if he was
21   going to stand up and attack the officers." Can you
22   describe where you got that information.
23       A. Officer Nguyen. He said in a statement in his
24   report and his deposition that he had leaned or rocked
25   forward in a way that he perceived him standing up. He

Page 61

16 (Pages 58 to 61)

**Robert Fonzi**
**September 8, 2017**

**Atkinson-Baker Court Reporters**
**www.depo.com**

1  also indicated that he had his wrists on his knees and
2  as if to push up in a manner to stand up and moving in
3  his direction.
4  **Q. So your recollection is Officer Nguyen said that**
5  **he had his hands on his knees as if to push up. And did**
6  **you say either direction?**
7  A. He was rocking moving forward in the same motion
8  as if he was going to stand up as he's unfolding the
9  knife. He leaves the blade partially exposed.
10  **Q. I thought you just said he had his hands on his**
11  **knees as if he was going to push up to stand up. Did I**
12  **misunderstand you?**
13  A. No. I did say that.
14  **Q. Okay. So at some point he had his hands on his**
15  **knees?**
16  A. Wrists. They were more his wrists because he had
17  his knife in his right hand.
18  **Q. Where does it say it was his wrists in any**
19  **testimony?**
20  A. I think it was in Nguyen's.
21  **Q. So your testimony is that Officer Nguyen**
22  **testified that his hands -- that his wrists were on his**
23  **knee and he was pushing off on his knees with his**
24  **wrists?**
25  A. Wrists, hands. Yes.

Page 62

1  **Q. No. It's either wrists or hands.**
2  A. No. I'm going to say it was his hands or his
3  wrists is what I recall reading.
4  **Q. Okay. His hands or his wrists?**
5  A. Yes. They were on his knees as if he were
6  pushing off.
7  **Q. His hands or his wrists?**
8  A. Yes.
9  **Q. And then you say here, "In fear for his life and**
10  **that of others Officer Nguyen fired approximately three**
11  **to four times." Do you see that?**
12  A. Yes, sir.
13  **Q. "In response Saycon did not respond to being**
14  **shot, but continued to open the knife." What do you**
15  **mean by "continued to open the knife"?**
16  A. My understanding is he had opened it completely
17  meaning the knife snapped open in the full extended
18  position. My understanding is it was partially open and
19  after the shots he didn't respond or react as if being
20  shot and he completed the process of opening the knife
21  is my understanding.
22  **Q. Okay. Okay. So your understanding is that he**
23  **starts to open the knife before he shot. He shot three**
24  **or four times. He continues to open the knife. And**
25  **then what does Nguyen do?**

Page 63

1  A. He fires an additional three, four rounds.
2  **Q. Do you know how many rounds in total Nguyen**
3  **fired?**
4  A. My understanding is eight.
5  **Q. Okay. And do you know what type of weapon he**
6  **had?**
7  A. A Kibler 911.
8  **Q. And do you know how many bullets go in the -- I'm**
9  **drawing a complete blank.**
10  A. Magazine.
11  **Q. The magazine.**
12  A. If I remember his testimony, seven.
13  **Q. Is that standard police policy to have one in the**
14  **chamber?**
15  A. That's what the chamber is used for.
16  **Q. And why is that?**
17  A. The firearm needs to be in a ready position.
18  I've been doing this 30-plus years. FBI keeps a round
19  in the chamber. That's standard. I've never seen an
20  agency in this country where there is not eight rounds.
21  **Q. I'm not challenging you. It was just a question.**
22  **And why is it in the chamber?**
23  A. So that the weapon is ready.
24  **Q. And can quickly be fired?**
25  A. Yeah. That's fair.

Page 64

1  **Q. Did you time the firing of the shots?**
2  A. No.
3  **Q. Did you in viewing it notice any hesitation**
4  **between the third or fourth shot and the next shots?**
5  **Was there a period in which reflection --**
6  A. I can't discern exactly all of the shots from the
7  video. You can see some. The quality doesn't lend
8  itself to actually see every single round being fired.
9  I couldn't tell you for sure.
10  **Q. You would agree that it was unknown to Officer**
11  **Nguyen as to whether Saycon was using his knife before**
12  **his arrival in a threatening or nonthreatening fashion?**
13  A. Well, I'm not going to necessarily agree. I
14  think the report and dispatch information he received is
15  that he had been brandishing it. Had he stabbed anyone
16  with the knife? No. My understanding he didn't have
17  that information. Didn't believe that was accurate. He
18  knew that the knife was being presented in some fashion
19  based on the information he received.
20  **Q. Okay. Did he have any information whether it was**
21  **threatening or nonthreatening the fashion that the knife**
22  **was being brandished?**
23  A. I would say it was more of a threatening manner,
24  but there's no information to suggest he had threatened
25  anyone specifically. I think he said that based on what

Page 65

17 (Pages 62 to 65)

**Robert Fonzi**
**September 8, 2017**

Case 2:16-cv-05614-JFW-AS    Document 170-1    Filed 10/20/17    Page 101 of 123
Page ID #:5736
**Atkinson-Baker Court Reporters**
**www.depo.com**

1  I reviewed in the report. He didn't specifically
2  threaten anyone.
3      Q. I'm looking at Page 8, Section 2, the next full
4  paragraph, the next to the last sentence. It says, "It
5  was unknown to Officer Nguyen as to the manner in which
6  Saycon was brandishing knife threatening or
7  nonthreatening." Do you see that?
8      A. It's the last paragraph?
9      Q. No. It's the second paragraph in that section,
10 the next to last sentence in the second paragraph.
11     A. The one on Page 8, it's the second paragraph?
12     Q. No. It's the second paragraph under Section 2.
13     A. Yes. I do see it here. That's my understanding.
14     Q. Okay. And was it your understanding also that
15 Officer Nguyen believed that had Mr. Saycon was under
16 the influence of alcohol?
17     A. Yes.
18        MR. CHRISTIANSEN: I'm sorry. Mr. Saycon
19 was under the influence of alcohol?
20        MR. STORMER: This is good because it was an
21 improper question.
22 BY MR. STORMER:
23     Q. Was it Officer Nguyen's belief that Mr. Saycon
24 was under the influence of alcohol?
25     A. Just based on the reports. Yes.

Page 66

1  reaction time and that the general rule is that if
2  you're within 21 feet -- if you're within 21 feet and a
3  subject has a knife, an officer who is who holstered up
4  in most cases won't have enough reaction time based on
5  the distance and the time it would take.
6      Q. And when you say holstered up, what do you mean?
7      A. The firearm in the holster.
8      Q. And in this case -- and how does one prevent
9  oneself from getting within 21 feet of the suspect?
10     A. How do you prevent it?
11     Q. Yeah.
12     A. Don't show up.
13     Q. How about staying outside of 21 feet?
14     A. Not always possible.
15     Q. When it is possible is that what an officer
16 should do?
17     A. It's predicated on circumstances and that's an
18 incomplete question. Would an officer prefer to be
19 outside 21 feet? Yes. Is it a good miss practice? Is
20 it good public safety to remain outside 21 feet? It may
21 not be.
22     Q. In this situation could he have stayed outside of
23 21 feet?
24     A. Well, you always have a choice to do many things.
25     Q. This case. We're just talking this case.

Page 68

1      Q. How do you know it's just based on the reports?
2      A. Well, he was provided that information in the
3  dispatch that he was possibly under the influence.
4      Q. Do you know if he thought he was under the
5  influence once he arrived?
6      A. I don't think so.
7      Q. You don't think that Officer Nguyen thought that
8  Mr. Saycon was under the influence, correct?
9      A. I don't recall if he indicated that he was or
10 not. I just know that was information provided to him
11 as information he relied upon. Whether he knew for sure
12 or not I don't know.
13     Q. I'm not asking for sure. I'm asking whether he
14 had some belief that this might -- that Mr. Saycon might
15 be under the influence based upon his perception in
16 addition to what he had been told?
17     A. I don't believe said perception, but he had been
18 told and I believe it relies upon that as information
19 that he had received in addition to the other
20 information he received from dispatch that is mentioned
21 in the 911 call as well.
22     Q. Is there something called the Tueller Rule?
23     A. Tueller. You're talking about the Tueller Drill?
24     Q. Yes. What is that?
25     A. It's a sergeant that did a study based on action

Page 67

1      A. Would it have been reasonable?
2      Q. No.
3      A. Could have. Of course he could have.
4      Q. Do you know why he didn't?
5      A. My understanding is there was a concern for the
6  safety of others.
7      Q. And what was that concern?
8      A. If you have an individual that's armed with a
9  knife, that's displayed a knife, you've been asked to
10 leave, who appears to be -- and I did put in my report
11 on Page 8 about the alcohol -- who appears to be under
12 the influence of alcohol based on his behavior.
13     Q. That's just because your lawyer showed it to you.
14     A. Well, it's in my report.
15        MR. RUSSELL: It's not in the report because
16 I showed it to him.
17        MR. STORMER: Good point.
18        THE WITNESS: A number of factors. The
19 information that he had been provided he believed the
20 situation was escalating with this individual and was
21 concerned because there was other patrons. I think
22 there's statement there's 15 to 20 other people in the
23 store or business. It wasn't a store, but in the
24 business. So would that play into an officer's decision
25 whether to stay out of 21 feet? Absolutely.

Page 69

18 (Pages 66 to 69)

**Atkinson-Baker Court Reporters**
**www.depo.com**

BY MR. STORMER:

Q. Okay. How close were other patrons to Mr. Saycon when Nguyen arrived?

A. Well, we know from the video that Mr. Donovan was still seated at the table which was well -- was probably 20 feet. It wasn't that far away.

Q. Was Mr. Donovan -- did he appear to be threatened by Mr. Saycon?

A. I don't know what he personally was. I know he had some concerns based on his statements.

Q. Was there a single patron that -- whose statement you read or who you saw in the video who appeared in some way intimidated by Mr. Saycon?

A. Yes.

Q. Which one?

A. I'm going to review and I'll tell you all of them.

Q. Upon arrival of the police.

MR. CHRISTIANSEN: So you're changing your question?

MR. STORMER: I'm clarifying my question.

THE WITNESS: And I'm only going to reference a couple of them because there were many that provided statements, but only three that provided declarations. But the first one I believe is Sue -- I'm

Page 70

not sure how to pronounce her name. Lafoya. Her first name is Mary Fern. In her recorded interview she said she was in fear for her safety and other patrons in the business. She even indicated she took -- she walked around and took the long route just to get around and away from them. The reporting party, Jorge Zuniga, he even reported that there was some customers concerned or he was scaring customers. And Tony Antonia, I think he said something to the effect that he felt safe once the police arrived. These are all indications that there was some concern for their safety.

BY MR. STORMER:

Q. Did Officer Nguyen or Officer Cruz know any of these concerns?

A. Not each of them individually.

Q. Any one of them?

A. Yes. There was some reports that they received that he was -- either customers were concerned or they were leaving or fearful.

Q. Okay. So your testimony is that when Officer Nguyen entered he had information that the customers were concerned, leaving, and fearful?

A. Yes.

Q. Okay. And when he arrived did he look at the video when the officer -- to use your description --

Page 71

approached the north door which includes him coming in through the door. Was there any indication that any patron was intimidated by Mr. Saycon?

MR. CHRISTIANSEN: Objection. That misstates prior testimony.

MR. RUSSELL: Join.

THE WITNESS: First of all, I don't see him approach. I do see him appearing in the door or coming through the door that's on the north side. Do I know if anyone was intimidated? I don't know at that point.

BY MR. STORMER:

Q. Did the police officers know?

A. The only information he had was what was provided in the dispatch.

Q. Doesn't good police practices tell you to assess the situation upon arrival?

A. As quickly as you can.

Q. And wouldn't one of the issues to assess in this circumstance is the potential for harm to others within the facility?

A. Yes. I would agree.

Q. And would you agree that upon arriving at a situation which you have to assess it's a good thing to make a plan?

A. Depends on the situation.

Page 72

Q. So would it be correct that POST teaches you upon arrival at a scene in which there are emerging issues that you have to make a plan to deal with those issues or you should make a plan?

A. Well, it depends in the context in which you say make a plan. Are you talking about sitting there on the hood of a car and sketching out a play as to who does what, when and where, or are you talking about relying on your training and in your policies to guide you through the situation that you really don't have all of the knowledge of what's transpiring.

Q. No. My question is, what do you mean by make a plan?

MR. CHRISTIANSEN: I don't think that was the question.

THE WITNESS: That wasn't the question earlier.

BY MR. STORMER:

Q. It is the question now.

A. Well, I guess you can change the rules.

Q. I can. I can changing the question, not the rules.

A. The question is?

Q. What does it mean to make a plan upon arriving at a potential crime scene?

Page 73

19 (Pages 70 to 73)

**Robert Fonzi**
**September 8, 2017**

Case 2:16-cv-05614-JFW-AS   Document 170-1   Filed 10/20/17   Page 103 of 123
Page ID #:5738
**Atkinson-Baker Court Reporters**
**www.depo.com**

1    MR. CHRISTIANSEN:  Objection.  Incomplete
2  hypothetical.  Calls for speculation.
3    MR. RUSSELL:  Join.
4    THE WITNESS:  It's entirely incomplete.  Do
5  I have a hostage situation?
6  BY MR. STORMER:
7    Q.  In this situation.
8    A.  In this situation based on the information
9  provided be the plan the officers had would be the plan
10  to rely upon their training and their experience and
11  their policies to guide them.  That's the plan.  You
12  follow your training.
13    Q.  Okay.  So it's your testimony that in this case
14  the proper plan is to rely upon their training?
15    MR. CHRISTIANSEN:  Object.  Incomplete
16  hypothetical.  Calls for speculation.
17    MR. RUSSELL:  Join.
18    THE WITNESS:  Based on the call for service,
19  the circumstances by which these officers were
20  confronted with, the best practice and approach is to
21  follow the training to initiate contact and to respond
22  to whatever is transpiring.
23  BY MR. STORMER:
24    Q.  Okay.  And in this case did they have the
25  opportunity to speak with each other, Officers Nguyen

Page 74

1  and Cruz?
2    A.  Nothing prevented them.
3    Q.  Do you know if they had the opportunity?
4    MR. CHRISTIANSEN:  Objection.  Calls for
5  speculation.
6    THE WITNESS:  I was just going to say
7  there's nothing that prevented them.  They arrived
8  almost at the same time.  There's nothing that precluded
9  them from stopping and talking.
10  BY MR. STORMER:
11    Q.  But your assessment is there was no need to make
12  a plan because of the circumstances as they were in this
13  case?
14    MR. RUSSELL:  It misstates his testimony.
15    MR. CHRISTIANSEN:  Join.
16    THE WITNESS:  Their plan -- they have a
17  plan.  I think even Nguyen said he had a plan.  His plan
18  was based on his experience to follow his training and
19  they will respond to whatever the circumstances are.
20  Your question suggests that they need to sit there and
21  figure out who's going to do what.  The problem with
22  that question or mindset is you don't know what you're
23  dealing with yet until you step inside the building.
24  BY MR. STORMER:
25    Q.  Correct.  So you have to figure out what you're

Page 75

1  dealing with once you step inside the building.  Would
2  you agree to that?
3    A.  I agree.
4    Q.  Would you agree that the best thing to do in this
5  type of situation is to gather information?
6    MR. CHRISTIANSEN:  Objection.  Incomplete
7  hypothetical.  Calls for speculation.
8    MR. RUSSELL:  Join.
9    THE WITNESS:  Your first priority is public
10  safety.  And until you have established public safety,
11  the investigative part, the fact finding and all of that
12  will be secondary to public safety if you have a concern
13  that public safety may or is compromised.
14  BY MR. STORMER:
15    Q.  And how do you determine whether public safety is
16  compromised?
17    A.  Make contact.
18    Q.  With whom?
19    A.  Mr. Saycon.
20    Q.  Just Mr. Saycon?
21    A.  Well, he's the one reported to be armed with a
22  knife and acting in the manner they described to the
23  officers.
24    Q.  And as they arrived is how he is acting when they
25  arrived play into your role in their determination how

Page 76

1  to carry out their plan based upon their training?
2    A.  Yes.
3    Q.  Okay.  And how was he acting?
4    A.  He was armed with a knife.
5    Q.  That's how he was acting?
6    A.  He was armed with a knife and he was asked to
7  drop the knife repeatedly.
8    Q.  Or words to that effect?
9    A.  He os --
10    MR. CHRISTIANSEN:  Can we put quotes around
11  that.
12    THE WITNESS:  He was instructed by Officer
13  Nguyen to drop the knife.
14  BY MR. STORMER:
15    Q.  Okay.  And did Officer Nguyen know whether
16  Mr. Saycon could hear him?
17    A.  I believe based on the distance yes.  There was
18  some eye contact.  There's nothing to suggest he had any
19  type of hearing issue or disability.  Yeah.  I believe
20  he believed he heard him.  Nothing to suggest he didn't.
21    Q.  Okay.  And then was there anything to suggest
22  that he was under the influence of some substance
23  whether alcohol or drugs?
24    A.  Well, the reports that the officers were seeing
25  was that he was under the influence.  They were told

Page 77

20 (Pages 74 to 77)

**Robert Fonzi**
**September 8, 2017**

1  alcohol.  We know based on the toxicology he was heavily
2  medicated on methamphetamines.  A very high degree.
3  **Q.  What was the high degree?**
4  A.  3600-something.  I know the numbers are fairly
5  high.
6  **Q.  What does it mean to be at 3600?**
7  A.  I'm not an expert in the area of the medical
8  terminology in the toxicology report, but I know these
9  are high numbers.  I just know from my experience.  I
10  couldn't tell you that's a double, triple, quadruple or
11  normal.
12  **Q.  Would it be correct that you would know the**
13  **physical -- the behavioral results of methamphetamines?**
14  A.  Well, I can tell you based on my experience 33
15  years having worked in the jails, having seen probably
16  500-plus that the effects of methamphetamine on an
17  individual could be hazy.
18  **Q.  So you've seen situations where it calms people**
19  **down when they are on methamphetamine?**
20  A.  I wouldn't say it calms them down.  It numbs them
21  up quite a bit.  It puts them in a catatonic type
22  mentality or state.  Have no pain tolerance.  Have a
23  very high pain tolerance.  Not rational.  They can
24  appear quiet, but extremely volatile and dangerous.
25  They explode and snap at the snap of a finger.  I've

Page 78

1  seen them where they are acting out, animated, kind of
2  like they are in fast motion, very jittery, and a lot of
3  motion with hands and feet and eyes and jumping up and
4  down.  I've seen them from A to Z.
5  A lot of it is predicated on size, weight,
6  tolerance, how often they use narcotics.  If they are
7  heavy user, they are a light user, the dosage, how
8  strong the dosage was because they cut it in different
9  manners and fashions to make it more.  I mean, there's a
10  hundred variables here, but my statement and my
11  testimony is I've seen it from A to Z.
12  MR. RUSSELL:  Can we take a short break?
13  MR. CHRISTIANSEN:  Off the record.
14  (Off the record.)
15  BY MR. STORMER:
16  **Q.  Back on the record.  Would you agree that Officer**
17  **Cruz described Mr. Saycon as being under the influence**
18  **of something?**
19  MR. RUSSELL:  Would you agree with who?
20  You?
21  MR. STORMER:  Yes.
22  THE WITNESS:  He said Officer Cruz.
23  MR. RUSSELL:  I know.  Was the question,
24  would Mr. Fonzi agree with you that Officer Cruz
25  described Mr. Saycon as being under the influence of

Page 79

1  something?
2  MR. STORMER:  Exactly.
3  THE WITNESS:  Yes.
4  BY MR. STORMER:
5  **Q.  And how did Officer Cruz describe the behavior of**
6  **Mr. Saycon?**
7  A.  If I remember correctly something as far as his
8  mannerisms or the way he was moving or something to that
9  effect.
10  **Q.  Moving slowly?**
11  A.  Slowly.
12  **Q.  Speech slurred?**
13  A.  I believe that's correct.
14  **Q.  Mumbling incoherently?**
15  A.  I don't know if he heard the mumbling.  If I
16  remember correctly Nguyen heard some mumbling, but
17  didn't understand exactly what was being said.
18  **Q.  And Cruz what did he say?**
19  A.  He may have heard something, but wasn't sure what
20  was said.
21  **Q.  Swaying side to side?**
22  A.  Yes.
23  **Q.  That's Cruz's description?**
24  A.  I believe that's correct.
25  **Q.  Speech impaired?**

Page 80

1  A.  I don't know if he used the word "Speech
2  impaired".
3  **Q.  Speech affected?**
4  A.  I think he said he was talking to himself or
5  saying something, but it was just a mumbling.  He
6  couldn't discern what was being said.
7  **Q.  If somebody told you that as an expert in police**
8  **practices, would you assume that they were somehow under**
9  **the influence of something?**
10  A.  Yes.
11  **Q.  And as an officer how would you recommend an**
12  **officer take into consideration those factors?**
13  A.  It certainly would depend on the circumstances.
14  How it affects the circumstances.
15  **Q.  Assuming the circumstances are this case?**
16  A.  How would an officer take that into
17  consideration?
18  **Q.  No.  How should Officer Cruz and Officer Nguyen**
19  **have taken that consideration?**
20  A.  If someone that they believe is under the
21  influence of something they are unpredictable, they can
22  be dangerous.
23  **Q.  So how would they handle that?**
24  A.  It depends on what he's doing.  Is he following
25  instructions?  Is he --

Page 81

21 (Pages 78 to 81)

**Robert Fonzi**
**September 8, 2017**

**Atkinson-Baker Court Reporters**
**www.depo.com**

```
 1          MR. CHRISTIANSEN:  I'll do the belated
 2    objection of an incomplete hypothetical and calls for
 3    speculation.
 4    BY MR. STORMER:
 5        Q.  The fact that he's seated would that make any
 6    difference?
 7        A.  It depends on while seated what is transpiring.
 8    Is he a threat?  Is he not a threat?  Is he armed?  Is
 9    he not armed?  I mean, there's a lot of factors that
10    would be considered in any situation.
11        Q.  I'm talking about this situation.
12        A.  Well, if you're asking me about this situation
13    based on what they have reported, they had a concern for
14    public safety based on the fact that he was armed with a
15    knife.  He wasn't complying with their direction.  And
16    they tried to resolve it in several different ways.
17        Q.  And what were those several different ways they
18    tried to resolve it?
19        A.  Well, as far as forced options their presence,
20    verbal commands, the use of a taser, the use of baton,
21    and then when it escalated of course Nguyen resorted to
22    his firearm.
23        Q.  Other than shouting "Drop the gun, get on the
24    ground," or words to that effect, did they use any
25    nonforce approaches that you can tell?
```

Page 82

```
 1          MR. CHRISTIANSEN:  I'm going to object to
 2    misstates the prior testimony and I don't think we ever
 3    used the term shouting.
 4          MR. RUSSELL:  Join.
 5          THE WITNESS:  My understanding wasn't
 6    shouting as your question indicates.  I believe one of
 7    the witnesses said it was a rather calm command.  Those
 8    are force options, specific commands, asking somebody to
 9    do something, uniform presence are your lower levels of
10    force.
11    BY MR. STORMER:
12        Q.  Then what's next?
13        A.  It's predicated in the circumstances.
14        Q.  In this circumstance what's the next level of
15    force?
16        A.  That was used?
17        Q.  Yes.
18        A.  Well, based on the reports that a taser was used.
19        Q.  And then what was the next level of force used?
20        A.  Well, in the moderate levels a baton was in the
21    moderate levels, for intermediate the baton was used,
22    and then after the baton and another taser there was the
23    use of the firearm.
24        Q.  Are you saying it was a taser, baton, taser in
25    that order?
```

Page 83

```
 1        A.  No.  Taser, taser, baton.
 2        Q.  And in the hierarchy of force which is higher,
 3    baton or taser?
 4        A.  They are both intermediate.
 5        Q.  What's at the high end?
 6        A.  There's no high end.  They are in the same
 7    category.
 8        Q.  What's higher than taser and baton?
 9        A.  I'm sorry.  Deadly force.
10        Q.  Would you agree that Mr. Saycon presented
11    movements which were slow and uncoordinated?
12          MR. RUSSELL:  Would you agree with who?
13          MR. STORMER:  With me.
14          MR. RUSSELL:  Would he agree with you that
15    Mr. Saycon presented movements that were uncoordinated?
16          MR. STORMER:  Slow and uncoordinated.
17          MR. RUSSELL:  Would you agree with him?
18          THE WITNESS:  No.
19    BY MR. STORMER:
20        Q.  Was there any testimony which indicated to you
21    that Mr. Saycon's movements were slow and uncoordinated?
22          MR. RUSSELL:  At what point?
23          MR. STORMER:  At any point.
24          THE WITNESS:  If I recall, there was some
25    testimony that at some point he appeared slow.  I don't
```

Page 84

```
 1    know if they ever used the term "uncoordinated."  That
 2    his movements appeared at some point slow.
 3    BY MR. STORMER:
 4        Q.  But not uncoordinated to the best of your
 5    recollection?
 6        A.  I don't know if I recall the term uncoordinated
 7    was ever used.  I don't believe so.
 8        Q.  I'm going to bring your attention to Page 11, the
 9    next to last full paragraph.
10        A.  Of my report?
11        Q.  On Page 11.
12        A.  Of my report?
13        Q.  Of your report.  Yeah.
14        A.  Give me a second.  I'm sorry.  You said the last
15    paragraph.
16        Q.  Next to last.  The one beginning with, "According
17    to."  Do you see that?
18        A.  Yes.
19        Q.  And then it says, "Officer Cruz observed Saycon's
20    movements and formed the opinion that he was under the
21    influence of an unknown substance."  Do you see that?
22        A.  Yes.
23        Q.  And then it says, "Saycon's movements were slow
24    and uncoordinated."  Do you see that?
25        A.  Yes, I do.
```

Page 85

22 (Pages 82 to 85)

**Robert Fonzi**
**September 8, 2017**

**Atkinson-Baker Court Reporters**
**www.depo.com**

| | |
|---|---|
| 1    **Q.** Would you agree that that's how he presented to | 1    few seconds. Yes. |
| 2    Officer Cruz at that time? | 2    **Q.** You say in your timeline based on video stamps |

**Q.** Would you agree that that's how he presented to
Officer Cruz at that time?
   **A.** Yes.  When you put it in the context of what was
occurring, this had to do with the wires.  I was taking
it as earlier while he was seated there.  So perhaps I
misunderstood your question earlier.  This is clearly
specific to after a taser deployment he was picking at
it.
   **Q.** Where does it say that?
   **A.** Attempted to pull the wires with both hands.
That's the reference point.
   **Q.** Well, what it says in fact is "Officer Cruz
observed Saycon's movements and formed the opinion that
he was under the influence of an unknown substance.
Saycon's movements were slow and uncoordinated.  His
face was flushed.  His words were slurred and he was
swaying slowly from side to side while sitting in the
chair.  Officer Nguyen then deployed his taser."  Do you
see that?
   **A.** Yes.
   **Q.** Is it your testimony still that Officer Cruz was
talking about Mr. Saycon after he had been tased?
   **A.** His deployment of the taser, he being Cruz.
That's correct.
   **Q.** So after Cruz, according to your testimony, had

Page 86

used his taser, Saycon's movements were slow and
uncoordinated.  His face was flushed.  His face was
slurred and he was swaying slowly from side to side
while sitting in the area, correct?
   **A.** Yes.
   **Q.** Officer Nguyen then deployed his taser correct?
   **A.** That's correct.
   **Q.** And then the next paragraph, "According to
Officer Cruz, as Saycon was distracted by pulling at the
wires, he removed his baton and struck Saycon's left
hand one time in an attempt to get him to drop the
knife."  Do you see that?
   **A.** Yes, I do.
   **Q.** Do you know which hand the knife was in when he
struck him on his left hand?
   **A.** I think I believe based on my recollection at
that moment he may have had it in his left hand.  I know
it wasn't stationary my understanding because that's why
he struck him right then.
   **Q.** Okay.  And then two seconds after the baton
strike Officer Nguyen starts shooting, correct?
   **A.** I know it happened after the baton strike.  I
don't know if it was two seconds.
   **Q.** It's what it says in your notes, isn't it?
   **A.** It's fairly close.  I would say it was within a

Page 87

few seconds.  Yes.
   **Q.** You say in your timeline based on video stamps
and taser logs you have a timeline and it says, "At
22:13:59 Cruz used baton strike.  22:14 Nguyen drops his
taser to the ground.  That's one second later.  Two
second later at 22:14:01 the first shot was fired."  Do
you see that?
   **A.** Yes.
   **Q.** So that's the timeline you adopted, correct?
   **A.** Yes.
   **Q.** And at the time that Officer Nguyen opened fire,
the knife was in Mr. Saycon's left hand and pointed
towards Officer Nguyen?
   MR. RUSSELL:  I'm sorry.  Can you read the
question back?
   (QUESTION READ BY THE COURT REPORTER.)
   THE WITNESS:  I don't know if it was in his
left hand or not.  Again, as I said the knife was moved
back and forth during different periods of time.  I
don't know if it was in his left or his right hand at
the exact moment that he fired.  My understanding was it
was in his hand.
BY MR. STORMER:
   **Q.** Which hand?
   **A.** I don't recall.  I really don't know which hand.

Page 88

   **Q.** Does it make any difference which hand in your
determinations, your opinions?
   **A.** If it's still predicated on a threat assessment
it would make a difference which hand it was in.
   **Q.** What do you mean "predicated on a threat
assessment"?
   **A.** If the officer's belief is that there was an
eminent threat to himself whether the knife was in his
left or right hand he can respond in self-defense.
   **Q.** Okay.  Looking at Page 11, the last paragraph,
the second sentence in the last paragraph, "The baton
strike," do you see that?
   **A.** Yes, sir.
   **Q.** It says, "The baton strike was also ineffective
and Saycon maintained possession of knife while
continuing to sit in the chair.  As Officer Cruz was
backing away from Saycon, it was apparent that he was
very upset.  Saycon was making a grunting noise taking
deep breaths and saying something to himself while he
opened the knife," correct?  Is that your understanding
what Officer Cruz testified?
   **A.** Yes.
   **Q.** And then it says, "The knife approximately five
to seven inches in length was now in the opened position
in Saycon's left hand that was resting on his left leg

Page 89

23 (Pages 86 to 89)

**Robert Fonzi**
**September 8, 2017**

**Atkinson-Baker Court Reporters**
**www.depo.com**

1    and pointed towards Officer Nguyen." Do you see that?
2        A. Yes.
3        Q. Is that your understanding what Officer Cruz
4    testified to?
5        MR. RUSSELL: It's vague.
6        THE WITNESS: Based on my understanding yes.
7    BY MR. STORMER:
8        Q. Okay. And those facts are facts you relied upon
9    in forming your determinations and opinions in this
10   case, correct?
11       A. Yes.
12       Q. What are learning domains?
13       A. I'm sorry?
14       Q. What are learning domains?
15       A. Basic academy curriculum.
16       Q. And what is a basic academy curriculum?
17       A. Basic academy is entry level civilians that are
18   either hired or sponsoring themselves to go through a
19   law enforcement academy. They have to go to a POST
20   certified academy. A POST certified academy has
21   learning domains which 43 of them you have to complete
22   and pass each one.
23       Q. Is there a learning domain 99?
24       A. No.
25       Q. Have you are heard of a learning domain 99?

Page 90

1    would apply to the facts of this case as set forth in
2    your report?
3        MR. RUSSELL: It's still vague, but you can
4    answer if you understand.
5        THE WITNESS: I don't.
6    BY MR. STORMER:
7        Q. What don't you understand?
8        A. The question.
9        Q. What about the question?
10       A. I just don't understand what you mean as it
11   relates to 37.
12       Q. There are standards in learning domain that
13   you're supposed to follow, correct, for all learning
14   domains?
15       A. Well, first of all, learning domain approaches
16   are not standards. They are guidelines from which you
17   are supposed to teach from.
18       Q. What does it mean for police officer standards
19   and training?
20       A. Well, that has to do with a lot of mandates. For
21   example, a standard or a mandate is you have to complete
22   a law enforcement academy that's POST certified to be a
23   POST certified police officer in California.
24       Q. So are you saying learning domain 37 is not a
25   standard?

Page 92

1        A. No.
2        Q. If the police department created a learning
3    domain 99 would it have anything to do with POST?
4        A. I don't know.
5        Q. What's learning domain 37?
6        A. That has to do with dealing with the mentally
7    disabled and other handicapped associated issues with
8    subjects.
9        Q. Do you know if there's anything in the facts as
10   you understand them in this case that would bring the
11   standards of learning domain 37 into play?
12       MR. RUSSELL: That's vague.
13       THE WITNESS: I'm not sure I understand the
14   question.
15   BY MR. STORMER:
16       Q. Do you know what learning domain 37 is?
17       A. I do, but I don't understand your question.
18       Q. I'm not asking if you understand the question.
19   I'm asking if you understand what learning domain 37 is?
20       MR. RUSSELL: It's asked and answered.
21   BY MR. STORMER:
22       Q. And do you understand the facts of this case as
23   set forth in your Rule of 16 report?
24       A. Yes.
25       Q. Is there anything in learning domain 37 which

Page 91

1        A. No.
2        Q. Are you saying it is a standard?
3        A. I'm saying it's a guideline by which to train
4    police officers with respect to the learning objectives
5    stated in learning domain 37.
6        Q. Is there anything in the guideline that you would
7    have recommended the officers apply to the facts of this
8    case?
9        A. No.
10       Q. And why is that?
11       A. Learning domain 37 has so many different
12   applications. It talks about epilepsy. It talks about
13   cerebral palsy. It talks about autism. It's a hundred
14   plus pages of various types and descriptions of
15   disabilities. There is types and descriptions of
16   disabilities. Talks about officers are not to diagnose
17   a mental disability. Talks about mental retardation.
18   Physical handicap and disabilities. Talks about the
19   ADA. I believe it talks about the Letterman's Act
20   associated with the Health and Safety Code 5150. I
21   don't see any application of those things.
22       Q. Just to be clear you don't see any application of
23   learning domain 37 to the facts of this case?
24       A. No.
25       Q. You mean yes. Yes you don't?

Page 93

24 (Pages 90 to 93)

**Robert Fonzi**
**September 8, 2017**

**Atkinson-Baker Court Reporters**
**www.depo.com**

1  A. It's a double negative question I guess.  I don't
2  see any applicability with respect to the facts as I
3  understand them and the information provided to the
4  officers at the time.
5  **Q. You don't see any application of learning domain**
6  **37, correct?**
7  A. Not specifically.  No.
8  **Q. Or generally?**
9  A. No.
10  **Q. Do you see any -- what's learning domain 33?**
11  A. Arrest and control.
12  **Q. Do you see any application for that in this case?**
13  A. No.
14  **Q. And why not?**
15  A. Subject is armed with a knife.  You're not going
16  to go in and attempt a control hold, a takedown.  You're
17  not going to use personal weapons.
18  **Q. Okay.**
19  A. I'm sorry.  33 also includes a baton.  There is
20  some applicability because a baton was used.
21  **Q. Would you agree that the only portion of learning**
22  **domain 33 that you believe applies to the facts of this**
23  **case is that portion which references batons?**
24  A. No.  Not entirely.  There's portions of 33 that
25  references positioning, position of vantage, things

Page 94

1  safe and secure and then you're going to start asking
2  questions of the individuals or others there.  You're
3  going to find out if an assault has taken place.  Find
4  out if somebody has been stabbed.  See if anyone's been
5  threatened.  Things of that nature.  If you have someone
6  that's under the influence you're going to try and look
7  at their sobriety and determine if it's alcohol and/or a
8  combination of alcohol and/or narcotics.  If they are
9  exhibiting some behaviors that are of a mental illness,
10  then you're going to take some steps and look for
11  resources and things of that nature.  There are things
12  you will do once the situation is safe and under the
13  officer's control.
14  **Q. So it's your testimony that the officer should**
15  **conduct this form of investigation that you just**
16  **described before determining whether to arrest the**
17  **suspect, in this case, Mr. Saycon?**
18  A. You have to have some facts by to base an arrest
19  on.  Yes.  You'll have to do some investigative steps to
20  make a determination of what crimes have been committed.
21  Specific crimes.
22  **Q. What is learning domain 21?**
23  A. Well, you're really testing me here.  It might be
24  vehicle pullover techniques.  I'm not real sure.
25  **Q. You can't tell us what learning domain 21 is as**

Page 96

1  along those lines which I believe occurred in this based
2  on the statements of the officers.  So there is some
3  other areas that may apply as well.
4  **Q. And is it your testimony that the officers comply**
5  **with the guidelines provided under learning domain 33**
6  **concerning arrest and control?**
7  A. Yes.
8  **Q. In every aspect?**
9  A. You can't say in every aspect because some of it
10  doesn't apply here.
11  **Q. In every aspect it applies?**
12  A. I would say yes.
13  **Q. Now, do you recall what Officer Nguyen said he**
14  **was going to do upon arrival concerning Mr. Saycon?**
15  A. If I remember correctly he just wanted to render
16  the situation safe and try to resolve it.
17  **Q. Okay.  So it's your testimony that Officer Nguyen**
18  **intended to render the situation safe and resolve it?**
19  A. Resolve whatever the issues might be.
20  **Q. Do you know if he intended to arrest anyone?**
21  A. I don't believe so.  Not initially.  You can't
22  make that determination until you've had some
23  investigative opportunities.
24  **Q. What do you mean by "Investigative opportunity"?**
25  A. Well, you got to first make sure the situation is

Page 95

1  we sit here today; is that correct?
2  A. I don't know.
3  **Q. What is learning domain 20?**
4  A. 20 is use of force.  Has to do with classroom
5  application and discussion on the use of force.  21 may
6  be narcotics, but I thought 12 was.  I just don't know
7  all of the numbers.
8  **Q. Okay.  What's learning domain 12?**
9  A. I just said I don't know if it's 21 or 12 is
10  narcotics.  I really don't remember a lot of the numbers
11  and titles.  I know a lot of them.
12  **Q. Did I ask you 20?**
13  A. You did.  20 is use of force.
14  **Q. Okay.  And then 15.  Do you know what learning**
15  **domain 15 is?**
16  A. Laws of arrest.
17  **Q. And is there anything in learning domain 15 which**
18  **was applicable under the circumstance of this case?**
19  A. Yes.
20  **Q. What is that?**
21  A. Reasonable suspicion, detention, and probable
22  cause.
23  **Q. And is this the investigative process that you**
24  **described earlier leading up to a determination of**
25  **arrest or 5150 or some other step?**

Page 97

25 (Pages 94 to 97)

**Robert Fonzi**
**September 8, 2017**

**Atkinson-Baker Court Reporters**
**www.depo.com**

1      A.  No.
2      **Q.  What is it?**
3      A.  What is what?
4      **Q.  What is learning domain 15 if it's not that?**
5      A.  I just told you what it was.
6      **Q.  What?**
7      A.  Laws of arrest.
8      **Q.  What does that mean?**
9      A.  It identifies a police officer authority to stop
10     and detain based on reasonable suspicion and a probable
11     cause for an arrest.
12     **Q.  Right.  Maybe we have a disconnect here.  Is that**
13     **what you were talking about when you were describing**
14     **collecting information in order to determine whether to**
15     **make an arrest at the scene of an incident?**
16     A.  It wasn't your question earlier so you've changed
17     it.  I'm not sure what you're talking about now.
18     **Q.  Just answer my question --**
19     A.  I'm trying.
20     **Q.  -- without referring to or recusing me of what I**
21     **did previously.  Just answer the following question.  No**
22     **air quotes.**
23          **Does learning domain 15 apply to the process of**
24     **determining whether to arrest someone?**
25     A.  Yes.

Page 98

1      **Q.  In what way?**
2      A.  Reasonable suspicion, stop and detain, probable
3      cause for arrest.  That is what learning domain 15
4      covers.  And it has some other things in there like
5      search warrants, misdemeanor infraction, felony.  Can
6      you make an arrest for a misdemeanor committed outside
7      your presence or not as a police officer.  Has something
8      in there with respect to citizen's arrest.  There's a
9      lot of information in 15, but it generally is the lesson
10     plan and objectives for laws of arrest.
11     **Q.  What's reasonable suspicion?**
12     A.  It is facts that an officer can articulate that
13     would tend to support that there was a criminal act or
14     criminal acts had occurred and that the individual that
15     they suspect is confronting.
16     **Q.  And what is probable cause for arrest?**
17     A.  That is an officer can articulate specific facts,
18     like crimes have been committed.  If the crime is
19     committed by the person which they are confronting.
20     **Q.  And you said something about a misdemeanor not**
21     **committed in the officer's presence.  What were you**
22     **referring to there?**
23     A.  Well, there's case law in the law by which police
24     officers have to follow with to a misdemeanor and
25     felony.

Page 99

1      **Q.  And what does that mean if it's not committed**
2      **within their presence?**
3      A.  A police officer cannot make an arrest for a
4      misdemeanor committed outside their presence.
5      **Q.  What does the officer need?  Do you mean he can't**
6      **make an arrest simply at all or does he have to**
7      **separately ascertain information to make an arrest?**
8      A.  It depends on the circumstance.
9      **Q.  Looking at the circumstances here, are you saying**
10     **that.**
11          MR. CHRISTIANSEN:  I don't understand
12     the question.
13          MR. STORMER:  That's why I'm going to
14     clarify it.
15     BY MR. STORMER:
16     **Q.  Are you saying -- let me withdraw.  Were there**
17     **felonies that were committed in this situation prior to**
18     **Officer Nguyen and Officer Cruz's arrival?**
19     A.  They weren't aware of them.  That's part of not
20     knowing what they're confronting with.  It was unknown to
21     them is my understanding.
22     **Q.  That's where I'm confused.  So how are they**
23     **determining -- if they can't arrest for a misdemeanor**
24     **not committed in their presence, how would they arrest**
25     **Mr. Saycon?**

Page 100

1      A.  They need to investigate.
2      **Q.  Oh, okay.  And that investigation would take play**
3      **once they arrived?**
4      A.  Not necessarily.  No.
5      **Q.  When would it take place?**
6      A.  I said earlier you have to make sure that the
7      situation is safe first.
8      **Q.  Let me change the question.  It would take place**
9      **after that arrived and determined that everything is**
10     **safe?**
11     A.  If the situation safe for the officers to engage
12     in the investigative process, yes.  They would then take
13     steps to determine what they are dealing with.
14          MR. CHRISTIANSEN:  I'm going to belatedly
15     object here.  It's an incomplete hypothetical.  Calls
16     for speculation.  There was no arrest here.  It's
17     irrelevant.
18     BY MR. STORMER:
19     **Q.  Would you agree that there was no arrest here?**
20     A.  There was no arrest.
21     **Q.  So Officer Nguyen would have to have specific**
22     **articulable reasons for an arrest that he used the**
23     **tending upon his investigative process after his**
24     **arrival, correct, in order to arrest Mr. Saycon?**
25          MR. RUSSELL:  That's not relevant to the

Page 101

26 (Pages 98 to 101)

**Robert Fonzi**
**September 8, 2017**

**Atkinson-Baker Court Reporters**
**www.depo.com**

| | |
|---|---|
| 1  claim or defense, but he can answer. | 1  for the reasons in the information provided to the |
| 2  THE WITNESS:  I'm not sure I followed the | 2  officers, yes.  I agree they would have to have been |
| 3  entire question. | 3  afforded the opportunity to investigate further. |
| 4  BY MR. STORMER: | 4  BY MR. STORMER: |
| 5  **Q.  Actually I am sure you do, but I'll ask another.** | 5  **Q.  After his arrest?** |
| 6  MR. RUSSELL:  I have a question first.  You | 6  A.  That is correct. |
| 7  don't have a false arrest claim. | 7  MR. STORMER:  We're done.  This is a |
| 8  MR. STORMER:  You're correct. | 8  beautiful moment. |
| 9  MR. RUSSELL:  So what is -- how are any | 9  BY MR. STORMER: |
| 10  questions about arrest relevant to any claim or defense | 10  **Q.  So is it correct that you cannot tell us what** |
| 11  you actually have.  And if they are not relevant, you're | 11  **learning domain 21 or learning domain 12 is?** |
| 12  going beyond Rule of 26. | 12  MR. RUSSELL:  From memory or he can't tell |
| 13  MR. STORMER:  Okay.  I believe they are | 13  you at all? |
| 14  relevant.  I think they are relevant based upon a number | 14  BY MR. STORMER: |
| 15  of the facts right out of this case.  I only have a | 15  **Q.  You can't tell me from memory.** |
| 16  couple more questions.  You can direct him not to | 16  A.  Not specifically.  There's 43 of them.  I don't |
| 17  answer.  That's fine.  Let's move on.  I don't think | 17  know the titles and numbers to all 43. |
| 18  it's incumbent upon me to tell you why. | 18  **Q.  Okay.  Do you know what's the title or number of** |
| 19  MR. RUSSELL:  Can you tell me which claim or | 19  **12?  Do you know the number of number 12?  Do you know** |
| 20  defense that exists that you believe questions regarding | 20  **what number 12 learning domain addresses?** |
| 21  arrest are relevant to.  Can you tell me that much? | 21  A.  Not off the top of my head.  I just told you I |
| 22  MR. STORMER:  Yes. | 22  don't know all of the names and title.  I don't recall |
| 23  MR. RUSSELL:  Will you tell me now? | 23  the names and title.  I know what the topics are if I |
| 24  MR. STORMER:  I will.  It's for the shooting | 24  see what the list is. |
| 25  of Mr. Saycon.  It's part of the claim as it relates to | 25  **Q.  Do you know what patrol techniques are?** |
| Page 102 | Page 104 |

| | |
|---|---|
| 1  the shooting.  The improper police techniques. | 1  A.  I do. |
| 2  MR. RUSSELL:  But that's not in the federal | 2  **Q.  Do you know which learning domain that applies** |
| 3  case. | 3  **to?** |
| 4  MR. STORMER:  I think it is. | 4  A.  No. |
| 5  MR. RUSSELL:  Well, you can ask your | 5  **Q.  Okay.  Do you know what's taught in the patrol** |
| 6  questions and we'll object accordingly. | 6  **technique -- do you know if patrol techniques is one of** |
| 7  BY MR. STORMER: | 7  **the learning domains?** |
| 8  **Q.  So in order to have arrested -- let's take a step** | 8  A.  It is. |
| 9  **back.  You would agree that Mr. Saycon was never** | 9  **Q.  And do you know what's contained within the** |
| 10  **arrested?** | 10  **learning domain entitled patrol techniques?** |
| 11  A.  Correct. | 11  A.  Quite a few topics in patrol techniques. |
| 12  **Q.  You would agree that he could not have arrested** | 12  **Q.  Do you know if any of them apply to the** |
| 13  **him based upon the information that he received prior to** | 13  **circumstances of this case?** |
| 14  **his arrival?** | 14  A.  I have to look at the lesson plan.  I believe so. |
| 15  MR. RUSSELL:  Misstates his testimony. | 15  I don't have all of the lesson plans memorized. |
| 16  BY MR. STORMER: | 16  **Q.  Are you familiar with the manual of the Long** |
| 17  **Q.  What's incorrect about that?** | 17  **Beach Police Department?** |
| 18  A.  No.  I said no.  He could not have arrested him. | 18  A.  No.  I'm not sure what you're referring to. |
| 19  **Q.  In order to arrest him he would have had to** | 19  **Q.  Any manual that relates to the requirements of** |
| 20  **conducted an investigation at the scene after taking the** | 20  **Long Beach Police Department.  Have you reviewed any** |
| 21  **steps to assure safety?** | 21  **such manual?** |
| 22  MR. RUSSELL:  Any questions about arrests | 22  A.  I've reviewed policies and things that have been |
| 23  are not relevant to any claim or defense.  They are | 23  provided with respect to specific topics, but I haven't |
| 24  improper in the Rule of 26. | 24  seen the entire manual. |
| 25  THE WITNESS:  In order to arrest Mr. Saycon | 25  **Q.  Which parts of the manual did you review?** |
| Page 103 | Page 105 |

27 (Pages 102 to 105)

**Robert Fonzi**
**September 8, 2017**

**Atkinson-Baker Court Reporters**
**www.depo.com**

---

1   A. I've seen sections related to use of force,
2   taser, baton, firearm.
3       Q. Did you see any manual section which you felt
4   contradicted the standards of POST?
5       A. No.
6       Q. Do you have any information that at any point
7   Mr. Saycon verbally refused to do anything in the
8   presence of either Officer Cruz or Officer Nguyen?
9       A. Did he verbally respond directly to the officers?
10  I don't think so.
11      Q. Did he ever verbally respond to either of the
12  officers at any point prior to being shot?
13      A. Not that I'm aware of.  No.
14      Q. You at some point say on Page 13 of your report
15  in the very top -- do you see the part that's in
16  italics?
17      A. Yes, sir.
18      Q. In Number 2 you say, "Saycon was reported to be
19  armed with a knife and was waving it around at customers
20  and employees."  Do you see that?
21      A. Yes.
22      Q. Where do you get the information that he was
23  waving it around at customers and employees and that the
24  officers knew that?
25      A. It was in the initial -- in one of the dispatch

Page 106

---

1   updates they were provided information that he was
2   waving the knife around.
3       Q. At customers and employees?
4       A. Yes.  I believe, if I remember correctly, he was
5   asked to leave.  He pulled the knife out or something
6   along those lines is my understanding.
7       Q. Do you have any that says that upon arrival the
8   officers had heard from staff that Saycon was reported
9   to be armed with a knife and was waving it around at
10  customer and employees?
11      A. No.
12      Q. Recommendation in the future I would drop that
13  "I" in "wave."
14          And you say that, "Saycon's deliberate and
15  intentional act of arming himself with a knife and his
16  actions and movements which lead Officer Nguyen to
17  believe he was attempting to assault the officers with a
18  deadly weapon."  What are the actions and movements that
19  you are referring to here?
20      A. The one being armed with a knife refusing to drop
21  it when directed to do so.  The movements and actions of
22  opening the knife and actually opening it all the way
23  and movements and actions that lead the officer to
24  believe that he was going to stand up, direct his
25  attention towards Officer Nguyen, and use the knife

Page 107

---

1   towards him.
2       Q. You would agree that he only opened the knife all
3   the way after he had been shot three or four times?
4       MR. RUSSELL:  It's vague.
5       THE WITNESS:  I'm not exactly sure when it
6   was completely open, but I would agree in that process
7   the knife was open.
8   BY MR. STORMER:
9       Q. In what process?
10      A. When he was trying to stand up and his actions
11  towards Officer Nguyen.  At some point it ends up fully
12  open and locked.
13      Q. You would agree that the testimony of Officer
14  Nguyen is that he did not open the knife all the way
15  until he had been shot three or four times?
16      MR. RUSSELL:  It's vague.
17      THE WITNESS:  My understanding is that he
18  had completed opening it.  He wasn't opening it.
19  BY MR. STORMER:
20      Q. He completed opening it after he had been shot
21  three or four times?
22      A. I believe that's a fair statement.
23      Q. And how do you know it was a deliberate and
24  intentional act arming himself with a knife?
25      A. Based on my experience and having read and

Page 108

---

1   reviewed the documents.  Anyone that is confronted by
2   two police officers and opens and exposes a knife
3   towards these officers to me is an intentional act.
4       Q. You would agree he did not open the knife until
5   he had been tased once by Cruz, once by Nguyen, and then
6   was hit with the baton and then was shot as he was
7   attempting to open it?
8       MR. RUSSELL:  Vague.  Misstates prior
9   testimony.
10      MR. CHRISTIANSEN:  Vague as to time.
11      THE WITNESS:  My understanding is he was
12  opening it before he was shot.
13  BY MR. STORMER:
14      Q. With two hands?
15      A. Yes.
16      Q. What suspicious activity was he engaged in that
17  caused bystanders to fear for their safety and the
18  safety of others that the officers were aware of?
19      A. Well, they were told that he was armed with a
20  knife.  He is refusing to drop it.  He is brandishing it.
21  All of course is suspicious activity.  Someone in a
22  business handling a knife exposing a knife, things of
23  that nature.
24      Q. What do you mean by "things of that nature"?
25      A. What I just said.

Page 109

---

28 (Pages 106 to 109)

**Robert Fonzi**
**September 8, 2017**

**Atkinson-Baker Court Reporters**
**www.depo.com**

Page 110

```
 1        Q.  When you say things of that nature is like words
 2   to that effect.  I need to know the specific of things
 3   of that nature.
 4        A.  Things that I just mentioned.
 5        Q.  Okay.  Anything else?
 6        A.  No.
 7        Q.  Looking at Page 15 you say, "The following law
 8   enforcement principles apply."  Do you see that?
 9        A.  Yes, sir.
10        Q.  It says, "An officer is vested with an
11   affirmative duty to ensure public safety."  Is that
12   correct?
13        A.  Yes.
14        Q.  And is it the safety of everyone who is in the
15   public?
16        A.  Yes.
17        Q.  Including the potential perpetrator?
18        A.  Yes.
19        Q.  And an officer is vested with an affirmative duty
20   to investigate unknown circumstances that tend to
21   support criminal activity, correct?
22        A.  Yes.
23        Q.  And you would agree with that statement?
24        A.  Yes.
25        Q.  And you would agree with the following statement,
```

Page 110

```
 1   "An officer maintains the absolute right to self-defense
 2   of a reasonably perceived threat"?
 3        A.  Yes.
 4        Q.  And what is a reasonably perceived threat?
 5        A.  It would be circumstances that an officer would
 6   reasonably believe would affect their safety depending
 7   on circumstances with a knife, a weapon, or with a
 8   vehicle.  They would have to articulate what that
 9   reasonable threat is and their actions, their behaviors,
10   threat assessment.
11        Q.  Let me show you documents which we'll mark as
12   163.
13            (Exhibit 163 marked.)
14        MR. RUSSELL:  What is 163?
15        MR. STORMER:  It's just a notice.  And 164.
16            (Exhibit 164 marked.)
17   BY MR. STORMER:
18        Q.  Have you seen 163 before?
19        A.  Yes, I have.
20        Q.  And did you bring the documents that are
21   requested in 163?
22        A.  I believe so.
23        Q.  And those are the documents that are contained
24   within the flash drive.  You're going to give me at the
25   end of this?
```

Page 111

```
 1        A.  I have a question.  I give it to him or is it
 2   attached to the deposition?  I don't care either way.
 3        Q.  I'll tell you what.  I can just --
 4        MR. CHRISTIANSEN:  I think he's asking, are
 5   we going to attach it as an exhibit?  I don't think we
 6   need to.
 7        THE WITNESS:  You're absolutely right.
 8   BY MR. STORMER:
 9        Q.  Have you brought your billing statements?
10        A.  It's on the flash drive.
11        Q.  How much have you billed at this point?
12        A.  Probably just my retainer.  6,000.
13        Q.  So have you -- how many hours have you worked?
14        A.  Too many.
15        MR. CHRISTIANSEN:  On this case?
16        MR. STORMER:  On this case.
17        THE WITNESS:  30-plus.
18   BY MR. STORMER:
19        Q.  And how much is your hourly rate?
20        A.  300.
21        Q.  So you have been paid 6,000.  They probably owe
22   you another 3,000.
23        A.  I don't know if I've been paid anything yet.  I
24   really don't know if I've been paid.
25        Q.  You billed 6,000?
```

Page 112

```
 1        A.  That's correct.
 2        Q.  Do you have any reason to believe that they are
 3   deadbeats down in Long Beach.
 4        A.  Absolutely not.
 5        Q.  How many times have you worked for the City of
 6   Long Beach?
 7        A.  Four, five times.
 8        Q.  How many times have you worked for Mr. Russell?
 9        A.  Three, maybe four.
10        Q.  And in every occasion that you worked with
11   Mr. Russell has it been in defense of a police officer.
12        A.  Yes.
13        Q.  And every time you've worked for the City of Long
14   Beach has it been in the defense of a police officer?
15        A.  Yes.
16        Q.  And have you worked for Mr. Ferguson's firm?
17        A.  I have.
18        Q.  And how many occasions have you worked for
19   Mr. Ferguson's firm?
20        MR. CHRISTIANSEN:  I'm going to object.
21   It's irrelevant, but you're speaking in the past tense.
22   I don't think he's ever worked for our firm.  Well,
23   maybe.
24        THE WITNESS:  Once or twice maybe.
25   BY MR. STORMER:
```

Page 113

**Robert Fonzi**
**September 8, 2017**

**Atkinson-Baker Court Reporters**
**www.depo.com**

| | |
|---|---|
| 1 **Q.  And in every case you worked for Mr. Ferguson's** | 1 MR. RUSSELL:  And how long do we have to |
| 2 **firm has it been in defense of a police officer?** | 2 notify you that the deposition is being reviewed and |
| 3 A.  I believe so.  Yes. | 3 sign? |

---

1     **Q.  And in every case you worked for Mr. Ferguson's**
2 **firm has it been in defense of a police officer?**
3     A.  I believe so.  Yes.
4         MR. STORMER:  Let's take a break.  I think
5 we may be done.
6                (Break taken.)
7 BY MR. STORMER:
8     **Q.  Looking back on the report, why is this portion**
9 **of the report handwritten?**
10     A.  That's because it was handwritten.
11     **Q.  Why is it handwritten as opposed to the rest**
12 **which is typed?**
13     A.  Because it was handwritten.  That's Mr. Zuniga.
14 It was handwritten.
15     **Q.  You're saying that this was Mr. Zuniga's**
16 **handwriting?**
17     A.  Yes.
18     **Q.  Do you have any testimony you would like to**
19 **change or correct?**
20     A.  No.
21         MR. STORMER:  You're out of here.
22         MR. RUSSELL:  We need a stipulation.
23         MR. STORMER:  And money?
24         MR. RUSSELL:  He needs the money for sure.
25 Why don't you propose the stipulation?

Page 114

1         MR. RUSSELL:  And how long do we have to
2 notify you that the deposition is being reviewed and
3 sign?
4         MR. STORMER:  20 days from receipt.
5         MR. RUSSELL:  So in 20 days he's got to
6 complete the review and we have to notify you?
7         MR. STORMER:  And return the original.
8         MR. RUSSELL:  So the original has to be to
9 you on the 20th day?
10         MR. STORMER:  I'll give you a couple days to
11 mail it.
12         MR. RUSSELL:  So the stipulation that you
13 want me to agree to is that I have 20 days from when the
14 original gets to my office to get it to Mr. Fonzi to
15 have him review it.  Then within that same 20 days I
16 notify you and I at least get it in the mail back to
17 you.
18         MR. STORMER:  Correct.  We can also since
19 we're getting an electronic copy if we sent it
20 electronically if that's easier for the two of you.
21         MR. RUSSELL:  I just want to make sure what
22 the time is.
23         MR. STORMER:  That is the question.  Do you
24 want to just get it electronically?
25         MR. RUSSELL:  I prefer electronically.

Page 116

1         MR. STORMER:  I would propose the following
2 stipulation.  That the deposition be signed under
3 penalty of perjury.  That the court reporter can be
4 relieved of her obligations under the Federal Rules.
5 That the original will be sent to -- whom?
6         MR. RUSSELL:  She can send it to our office
7 and we'll make it available for Mr. Fonzi to review.
8         MR. STORMER:  We agreed today that we would
9 have a 20-day turnaround for the police practices
10 expert.
11         MR. RUSSELL:  So 20 days from when our
12 office receives it Mr. Fonzi is supposed to get his
13 review completed.
14         MR. STORMER:  Correct.  And that the
15 original will be sent to my office.  That a copy may be
16 used as if it were an original if the original is lost
17 or destroyed.  That the original would be produced for
18 any litigation purpose.
19         MR. RUSSELL:  And that your office is going
20 to prepay the postage and sent it to us so we can sent
21 it back the original to you.
22         MR. STORMER:  Okay.  We'll do that.  I have
23 to make sure that happens.
24         MR. CHRISTIANSEN:  And a copy will be a
25 certified copy.

Page 115

1         MR. STORMER:  Okay.  You will be sending it
2 electronically.  The electronic will go to you.
3         MR. RUSSELL:  He still has to sign the
4 original, right?
5         MR. STORMER:  Let's go off the record.
6             (Off the record.)
7         MR. STORMER:  Let's go back on the record.
8 If you want, you can have the electronic copy.  I don't
9 care.  If you get an electronic copy, then I would
10 propose it's 20 days from when you get the electronic
11 copy.  I don't care one way or the other.  If you don't
12 get an electronic copy, it's 20 days from receipt of the
13 hard copy.
14         MR. RUSSELL:  My question still is if
15 Mr. Fonzi reviews the electronic copy, which is not the
16 actual original, and he signs the signature page on the
17 electronic copy, are we using that as the signature as
18 to the original.  That's the issue.
19         MR. STORMER:  Sure.  That's fine with me.
20         MR. RUSSELL:  I'll stipulate to that.
21         MR. CHRISTIANSEN:  Sounds good.  Stipulate.
22         MR. RUSSELL:  Copy.
23         MR. CHRISTIANSEN:  Copy.
24         (DEPOSITION CONCLUDED AT 7:25 P.M.)
25

Page 117

30 (Pages 114 to 117)

**Robert Fonzi**
**September 8, 2017**

**Atkinson-Baker Court Reporters**
**www.depo.com**

```
1    STATE OF CALIFORNIA      )
2                             ) ss.
3    COUNTY OF RIVERSIDE       )
4
5
6
7         I, the undersigned, hereby declare that I am the
8    witness in the within matter, that I have read the
9    foregoing deposition and know the contents thereof, and
10   I declare that the same is true of my own knowledge
11   except as to those matters which are therein stated upon
12   my information and belief, and as to those matters, I
13   believe them to be true.
14        I declare under penalty of perjury that the
15   foregoing is true and correct.
16
17        Executed this_____day of _____, 2017, at
18   _____, California.
19
20
21        _____
22              ROBERT FONZI
23
24
25
```

Page 118

```
1    STATE OF CALIFORNIA      )
2                             ) ss.
3    COUNTY OF RIVERSIDE       )
4
5
6         I, CRYSTAL A. JOHNSON, CSR No. 13696, do hereby
7    certify:
8         That prior to being examined, Robert Fonzi, the
9    witness named in the foregoing deposition, was by me
10   duly sworn to testify the truth, the whole truth,
11   and nothing but the truth.
12        That said deposition was taken before me at the
13   time and place therein set forth, and was taken by me in
14   shorthand and thereafter was transcribed into
15   typewriting under my direction and supervision, and I
16   hereby certify that the said deposition is a full, true
17   and correct transcript of my shorthand notes so taken.
18        I further certify that I am neither counsel for
19   nor related to any party to said action, nor in any way
20   interested in the outcome thereof.
21        IN WITNESS WHEREOF, I hereto subscribe my name
22   this 8th day of September, 2017.
23
24        _____
25           CRYSTAL JOHNSON, CSR#13696
```

Page 119

31 (Pages 118 to 119)

**Robert Fonzi**
**September 8, 2017**

**Atkinson-Baker Court Reporters**
**www.depo.com**

Page 1

---

**A**

**AB09B81** 1:25
**able** 25:16
**absolute** 111:1
**absolutely** 34:20 35:19
38:8 69:25 112:7 113:4
**academy** 90:15,16,17,19
90:20,20 92:22
**accept** 52:6
**accuracy** 37:24 47:3,4
**accurate** 18:24 24:18
25:12,15,17 32:9 34:9
35:16 38:1,8,12 52:11
65:17
**achristiansen@law4co...**
3:15
**act** 93:19 99:13 107:15
108:24 109:3
**acted** 18:7
**acting** 76:22,24 77:3,5
79:1
**action** 38:4 67:25 119:19
**actions** 15:20 16:17
17:14 18:19 34:18
59:18 107:16,18,21,23
108:10 111:9
**activated** 46:7
**activates** 48:6,9,24
**activity** 59:20 109:16,21
110:21
**acts** 99:14
**actual** 117:16
**ADA** 93:19
**added** 6:4
**addition** 67:16,19
**additional** 64:1
**addresses** 11:15 104:20
**administrative** 13:8
15:18
**adopted** 88:9
**affect** 47:4 111:6
**affirmative** 110:11,19
**afforded** 104:3
**agency** 64:20
**ago** 8:13 10:7 11:1 15:16
18:15 29:3 45:1,1,5
**agree** 7:25,25 14:8 15:6
25:21 31:8 65:10,13
72:21,22 76:2,3,4 79:16
79:19,24 84:10,12,14
84:17 86:1 94:21
101:19 103:9,12 104:2
108:2,6,13 109:4
110:23,25 116:13
**agreed** 115:8
**aimed** 60:4
**air** 36:9,11,13,14,16,25
98:22
**alcohol** 66:16,19,24
69:11,12 77:23 78:1
96:7,8
**ALLEN** 3:13
**allow** 8:22 22:10
**amount** 13:17
**Ana** 3:14
**and/or** 18:21 27:18 31:13

96:7,8
**angle** 41:10 49:15
**animated** 79:1
**ANNA** 1:4 2:3
**annual** 44:9
**answer** 4:17 8:23 31:25
35:9 92:4 98:18,21
102:1,17
**answered** 91:20
**Antonia** 71:8
**anymore** 44:7
**anyone's** 96:4
**APC** 3:12
**apologize** 16:15 32:13
**apparent** 89:17
**apparently** 35:23
**appear** 53:9 70:7 78:24
**APPEARANCES** 3:1
**appeared** 39:19 42:22
70:12 84:25 85:2
**appearing** 72:8
**appears** 39:14 69:10,11
**apples** 15:15
**applicability** 94:2,20
**applicable** 97:18
**application** 93:21,22 94:5
94:12 97:5
**applications** 93:12
**applies** 7:6 94:22 95:11
105:2
**apply** 92:1 93:7 95:3,10
98:23 105:12 110:8
**approach** 72:8 74:20
**approached** 25:22 26:3,7
26:16,18 27:5 72:1
**approaches** 26:11 82:25
92:15
**appropriate** 16:17
**approximate** 34:19 60:20
**approximately** 14:14,22
14:23 15:1 16:9,23,24
47:18 49:23 50:9,23
53:25 54:3,5,7 60:4
61:2 63:10 89:23
**approximates** 16:3,7
**arbitration** 14:16 17:17
**arbitrations** 15:19
**area** 8:17 13:15 14:20
23:20 54:16,18 59:3
78:7 87:4
**areas** 7:15 8:18 17:22
37:11 95:3
**argued** 19:16
**argumentative** 7:21 23:3
23:4 27:9 29:8 31:20
34:24 36:19
**arm** 42:11 54:19,21
**armed** 69:8 76:21 77:4,6
82:8,9,14 94:15 106:19
107:9,20 109:19
**arming** 107:15 108:24
**arms** 42:1,4,17,22
**arrest** 17:20 94:11 95:6
95:20 96:16,18 97:16
97:25 98:7,11,15,24
99:3,6,8,10,16 100:3,6
100:7,23,24 101:16,19

101:20,22,24 102:7,10
102:21 103:19,25 104:5
**arrested** 103:8,10,12,18
**arrests** 103:22
**arrival** 22:12,14 23:9 24:8
65:12 70:18 72:16 73:2
95:14 100:18 101:24
103:14 107:7
**arrived** 20:17 21:23 22:4
22:9,9,18,21 23:8,14,25
67:5 70:3 71:10,24 75:7
76:24,25 101:3,9
**arriving** 23:2 72:22 73:24
**articulable** 101:22
**articulate** 99:12,17 111:8
**ascertain** 100:7
**asked** 8:8 9:9 10:5 12:20
13:1 35:13,15 43:19
69:9 77:6 91:20 107:5
**asking** 7:18 8:5,10,22
15:25 42:21 43:15
67:13,13 82:12 83:8
91:18,19 96:1 112:4
**aspect** 95:8,9,11
**assault** 96:3 107:17
**assess** 72:15,18,23
**assessment** 75:11 89:3,6
111:10
**associated** 91:7 93:20
**assume** 33:20 43:10,14
43:15 81:8
**Assuming** 81:15
**assure** 103:21
**ASx** 1:4 2:3
**ATKINSON-BAKER** 1:19
**attach** 112:5
**attached** 112:2
**attack** 61:6,21
**attempt** 87:11 94:16
**Attempted** 86:10
**attempting** 107:17 109:7
**attention** 83:8 107:25
**Attorney** 3:4,9,13 7:21
**audio** 28:6
**authority** 98:9
**autism** 93:13
**automatically** 48:17
**autopsy** 45:9,12,17 46:6
55:15
**available** 7:22 9:8 115:7
**Avenue** 2:19 3:4
**aware** 22:11 100:19
106:13 109:18

---

**B**

**B** 4:10
**back** 11:14 22:2,6,11
23:15 35:9 46:21 49:9
49:25 50:5 56:10,18
61:12 79:16 88:15,19
103:9 114:8 115:21
116:16 117:7
**background** 5:11 12:21
**backing** 89:17
**bar** 43:18 58:10,15
**base** 46:25 96:18
**based** 28:24 33:19,20,20

38:13 39:22 40:25
41:25 47:15,17 50:7,13
50:14,17 51:3 54:9
59:16,22 61:9,14 65:19
65:25 66:25 67:1,15,25
68:4 69:12 70:10 74:8
74:18 75:18 77:1,17
78:1,14 82:13,14 83:18
87:16 88:2 90:6 95:1
98:10 102:14 103:13
108:25
**basic** 90:15,16,17
**baton** 37:25 50:25 51:8,9
54:15 55:10,21,23,24
56:3 82:20 83:20,21,22
83:24 84:1,3,8 87:10,20
87:22 88:4 89:11,14
94:19,20 106:2 109:6
**batons** 94:23
**Beach** 1:9 2:8 3:10
105:17,20 113:3,6,14
**beautiful** 104:8
**beginning** 47:7 85:16
**begins** 20:16
**behalf** 2:19 13:9 15:12
**behavior** 69:12 80:5
**behavioral** 78:13
**behaviors** 96:9 111:9
**belated** 82:1
**belatedly** 101:14
**belief** 59:22 66:23 67:14
89:7 118:12
**believe** 23:20 33:16 34:7
37:25 41:3,4 44:18 45:15
45:16 46:9,9 51:25 52:3
54:22,25 55:9,9 57:6
59:8 61:13,17,19 65:17
67:17,18 70:25 77:17
77:19 80:13,24 81:20
83:6 85:7 87:16 93:19
94:22 95:1,21 102:13
102:20 105:14 107:4,17
107:24 108:22 111:6,22
113:2 114:3 118:13
**believed** 57:11 66:15
69:19 77:20
**bent** 42:12,15,20 43:1
**best** 16:4,4,7 17:11 28:16
31:16 38:16 61:13,14
74:20 76:4 85:4
**better** 6:11
**beyond** 102:12
**biannual** 44:9
**bigger** 21:8
**billed** 112:11,25
**billing** 112:9
**binding** 15:18
**bit** 21:8 78:21
**black-and-white** 40:10
40:15
**blade** 53:19,24 54:8,9,10
54:11,12 56:11,12,13
56:14,15,18,19,20,22
56:23 57:1,10,22 58:13
61:3,4 62:9
**blank** 64:9
**blunt** 55:25

**board** 17:25
**Boardroom** 2:20
**body** 49:3 54:16,18 55:25
**bottom** 39:7
**Boulevard** 3:9
**brandished** 65:22
**brandishing** 65:15 66:6
109:20
**break** 13:14 79:12 114:4
114:6
**breakdown** 16:3
**breaths** 89:19
**briefly** 12:21
**bring** 9:9 85:8 91:10
111:20
**broke** 38:23
**brought** 9:21 112:9
**bucks** 36:20
**building** 75:23 76:1
**bulky** 39:16,23
**bullet** 25:3
**bullets** 64:9
**bunch** 5:15
**business** 32:18,23 33:6,7
33:10 40:22 69:23,24
71:4 109:22
**button** 54:13 57:13,15
**bystanders** 109:17

---

**C**

**CA** 5:1
**California** 1:2,16 2:2,20
3:5,10,14 92:23 118:1
118:18 119:1
**call** 56:18,19 59:2 67:21
74:18
**called** 56:13 67:22
**calls** 52:8 74:2,16 75:4
76:7 82:2 101:15
**calm** 83:7
**calms** 78:18,20
**capacity** 10:12,13
**car** 73:7
**care** 10:23 17:5 112:2
117:9,11
**carry** 77:1
**case** 1:4 2:3 11:25 12:24
19:16 68:8,25,25 74:13
74:24 75:13 81:15
90:10 91:10,22 92:1
93:8,23 94:12,23 96:17
97:18 99:23 102:15
103:3 105:13 112:15,16
114:1
**cases** 12:24,25 14:21
15:5,19 16:8 17:13 68:4
**catatonic** 78:21
**category** 84:7
**cause** 97:22 98:11 99:3
99:16
**caused** 109:17
**CD** 10:6
**CDs** 10:2,2,3,25 11:1,4,6
**CENTRAL** 1:2 2:2
**cerebral** 93:13
**certain** 34:16 44:5,9 48:9
**certainly** 53:10,13 81:13

**Atkinson-Baker Court Reporters**
**www.depo.com**

Page 2

**certified** 43:23,25 44:10
45:3 90:20,20 92:22,23
115:25
**certify** 44:17 119:7,16,18
**chair** 21:14 28:20 86:18
89:16
**challenging** 64:21
**chamber** 64:14,15,19,22
**change** 35:11 73:20
101:8 114:19
**changed** 35:10 98:16
**changes** 34:12
**changing** 70:19 73:21
**chest** 41:15 42:7
**choice** 68:24
**CHRISTIANSEN** 3:13
5:19 9:15 10:13,16 19:7
24:13 27:10 29:7 30:22
31:19 34:23 35:1 36:18
36:22 37:2 39:6 45:19
45:23 58:17,24 66:18
70:19 72:4 73:14 74:1
74:15 75:4,15 76:6
77:10 79:13 82:1 83:1
100:11 101:14 109:10
112:4,15 113:20 115:24
117:21,23
**circumstance** 72:19
83:14 97:18 100:8
**circumstances** 68:17
74:19 75:12,19 81:13
81:14,15 83:13 100:9
105:13 110:20 111:5,7
**citizen's** 99:8
**City** 1:9 2:8 113:5,13
**civil** 13:7 14:15 15:18
**civilians** 90:17
**claim** 33:5 102:1,7,10,19
102:25 103:23
**claimed** 15:9
**clarified** 30:21
**clarify** 14:13 41:14
100:14
**clarifying** 70:21
**classroom** 97:4
**clear** 22:16 34:14 93:22
**clearly** 56:19 57:2 86:6
**click** 33:11
**clicker** 33:25
**clips** 33:24
**close** 20:25 35:12 38:1,14
38:15,17,18,19 70:2
87:25
**closed** 53:23
**Code** 93:20
**collapse** 58:13
**collapsed** 53:20
**collapses** 53:18
**collecting** 98:14
**Colton** 2:19
**combination** 35:5 96:8
**come** 12:3
**coming** 40:20,22 72:1,8
**command** 29:3 83:7
**commands** 25:24 26:4,6
26:12,17,19 27:6 28:25
29:13,16 30:13,16,17

31:15 82:20 83:8
**commencing** 2:20
**comment** 6:4,11 7:19
**committed** 96:20 99:6,18
99:19,21 100:1,4,17,24
**complete** 64:9 90:21
92:21 116:6
**completed** 63:20 108:18
108:20 115:13
**completely** 7:25 8:1 38:4
57:20 63:16 108:6
**comply** 28:19,23 95:4
**complying** 82:15
**compromised** 76:13,16
**computer** 20:19 21:4,5,7
**concern** 69:5,7 71:11
76:12 82:13
**concerned** 69:21 71:7,18
71:22
**concerning** 95:6,14
**concerns** 70:10 71:14
**CONCLUDED** 117:24
**conduct** 96:15
**conducted** 103:20
**configuration** 49:16
**confirm** 34:8 37:19
**confirmed** 36:4
**conflict** 21:6
**confronted** 74:20 109:1
**confronting** 99:15,19
100:20
**confuse** 15:15
**confused** 29:2 100:22
**connect** 45:14
**consideration** 81:12,17
81:19
**considered** 82:10
**consistent** 17:15 55:21
55:23 56:1 60:25
**consult** 24:16
**contact** 46:11 74:21
76:17 77:18
**contain** 6:2
**contained** 6:15,19 8:11
35:6 105:9 111:23
**contains** 20:12
**contents** 118:9
**context** 73:5 86:3
**continued** 28:20 63:14
63:15
**continues** 63:24
**continuing** 89:16
**contradicted** 106:4
**contrary** 18:8
**control** 94:11,16 95:6
96:13
**converge** 21:6
**copy** 5:18,19 9:4,11,11
9:12,13 10:10 115:15
115:24,25 116:19 117:8
117:9,11,12,13,15,17
117:22,23
**copying** 10:12
**correct** 10:22 11:6,7,9,10
11:13 12:16,17 13:1,3
15:7 18:4 20:13 22:7
24:3,4 26:19 27:2,3,7

28:4,12 29:22 32:22
34:22 36:1,2,6 37:6
38:10 39:20 45:4,18
47:1,14,20 48:18,22
49:12 50:11,13,19,21
51:2 52:4,7 58:1 59:7
59:25 60:1,13 61:18,19
67:8 73:1 75:25 78:12
80:13,24 86:24 87:4,6,7
87:21 88:9 89:20 90:10
92:13 94:6 97:1 101:24
102:8 103:11 104:6,10
110:12,21 113:1 114:19
115:14 116:18 118:15
119:17
**correctly** 41:25 49:9 50:3
50:5 54:19 80:7,16
95:15 107:4
**counsel** 119:18
**country** 64:20
**COUNTY** 118:3 119:3
**couple** 10:2 37:15 70:23
102:16 116:10
**course** 24:17 47:4 56:14
69:3 82:21 109:21
**courses** 25:7
**court** 1:1,19 2:1 14:15
17:19 88:16 115:3
**cover** 8:17,18
**covers** 8:19 99:4
**Cox** 52:6
**Cox's** 51:14,17 52:1,13
**created** 91:2
**creation** 34:21
**crime** 73:25 99:18
**crimes** 96:20,21 99:18
**criminal** 13:8 99:13,14
110:21
**critical** 25:11,14,14
**Cruz** 20:17 21:11,22
22:17 23:24 24:9,21
32:17,23 33:6,10 34:2
37:25 48:6 49:7,11,21
50:3,5,9,19,23,25 51:8
54:14 56:9 59:25 71:13
75:1 79:17,22,24 80:5
80:18 81:18 85:19 86:2
86:12,21,23,25 87:9
88:4 89:16,21 90:3
106:8 109:5
**Cruz's** 40:8 51:4 80:23
100:18
**CRYSTAL** 1:24 2:21
119:6,25
**CSR** 1:24 2:22 119:6
**CSR#13696** 119:25
**current** 46:8
**curriculum** 90:15,16
**customer** 107:10
**customers** 71:7,8,18,21
106:19,23 107:3
**cut** 79:8
**cycling** 48:10

**D**

**D** 4:1
**DAN** 3:3

**dandy** 5:13
**dangerous** 78:24 81:22
**darker** 12:3
**darn** 38:19
**dart** 45:14,14 46:8
**darts** 46:5 49:5
**day** 116:9 118:17 119:22
**days** 115:11 116:4,5,10
116:13,15 117:10,12
**deadbeats** 113:3
**deadly** 84:9 107:18
**deal** 73:3
**dealing** 75:23 76:1 91:6
101:13
**deceased** 1:6 2:5
**decision** 69:24
**declarations** 70:25
**declare** 118:7,10,14
**deduce** 34:18
**deep** 89:19
**defendant** 3:7 18:4
**Defendants** 1:11 2:10
**defense** 12:24 15:4,13
102:1,10,20 103:23
113:11,14 114:2
**define** 22:10 26:9
**definition** 54:10,11
**deflection** 56:6,8
**deflections** 56:3
**Defoe** 6:5,11,13,20 7:2,4
7:6,8,10,17,19 8:12,14
8:18
**Defoe's** 7:19,22 8:2,15
11:15
**degree** 12:6 78:2,3
**deliberate** 107:14 108:23
**delivered** 54:15
**demonstrate** 42:6
**department** 91:2 105:17
105:20
**depend** 81:13
**depending** 111:6
**depends** 13:6 60:8 72:25
73:5 81:24 82:7 100:8
**deployed** 32:19 33:22
49:2,22,24 50:4 86:18
87:6
**deployment** 34:3 46:12
49:10 86:7,23
**deploys** 24:21 49:4,6
50:10,19,21
**deposed** 13:21 14:17,19
**deposition** 1:14 2:18
13:13,15 14:23 15:2
16:9,13 27:24 29:17
31:4,5,21 32:10 60:10
61:24 112:2 115:2
116:2 117:24 118:9
119:9,12,16
**depositions** 14:7,10
15:23 16:23 51:4,11
61:10
**describe** 42:17 61:22
80:5
**described** 76:22 79:17,25
96:16 97:24
**describing** 59:24 98:13

**description** 4:11 32:9
71:25 80:23
**descriptions** 93:14,15
**designated** 13:21
**designation** 45:20
**destroyed** 115:17
**detail** 42:21
**detain** 98:10 99:2
**detention** 97:21
**determination** 76:25
95:22 96:20 97:24
**determinations** 89:2 90:9
**determine** 25:4 76:15
96:7 98:14 101:13
**determined** 34:11 101:9
**determining** 96:16 98:24
100:23
**diagnose** 93:16
**dialogue** 27:20
**differ** 7:15,18 8:16
**difference** 7:17 82:6 89:1
89:4
**different** 9:2 10:25 13:7
15:17 37:7,10,11 42:9
54:2 79:8 82:16,17
88:19 93:11
**direct** 102:16 107:24
**directed** 107:21
**direction** 62:3,6 82:15
119:15
**directly** 11:15 49:18
106:9
**disabilities** 93:15,16,18
**disability** 77:19 93:17
**disabled** 91:7
**discern** 26:9 50:15 65:6
81:6
**discernible** 38:5
**disclose** 19:6,9
**disconnect** 98:12
**discuss** 20:13
**discussion** 97:5
**dispatch** 65:14 67:3,20
72:14 106:25
**displayed** 69:9
**dispute** 61:2
**distance** 20:24 21:4,5
34:17 50:15 68:5 77:17
**distinct** 32:19 33:2,3,4,11
**distracted** 87:9
**DISTRICT** 1:1,2 2:1,2
55:16
**document** 5:14,21,23
55:16
**documents** 5:16 9:21
21:18,19 51:22,22
109:1 111:11,20,23
**doing** 53:22 57:23 64:18
81:24
**domain** 90:23,25 91:3,5
91:11,16,19,25 92:12
92:15,24 93:5,11,23
94:5,10,22 95:5 96:22
96:25 97:3,8,15,17 98:4
98:23 99:3 104:11,11
104:20 105:2,10
**domains** 90:12,14,21
92:14 105:7

**Robert Fonzi**
**September 8, 2017**

Case 2:16-cv-05614-JFW-AS    Document 170-1    Filed 10/20/17    Page 117 of 123
Page ID #:5752
**Atkinson-Baker Court Reporters**
**www.depo.com**

Page 3

**Donovan** 70:4,7
**door** 26:12 30:2 40:21,21 41:2 42:18 43:4,6,10,12 43:13,16 72:1,2,8,9
**dosage** 79:7,8
**double** 78:10 94:1
**double-negative** 12:9
**downward** 41:10,15 42:8
**dozen** 15:19,22 16:9 17:23
**drawing** 64:9
**Drill** 67:23
**drive** 9:8,10 10:2,3,6,8,9 10:11,20 11:2,3,6,8,12 51:24 111:24 112:10
**drop** 27:16,17,22 28:13 28:24,25 29:3,5,13,14 29:18,21 30:3,4,18 31:1 31:6,12,17 77:7,13 82:23 87:11 107:12,20
**drops** 88:4
**drugs** 77:23
**dstormer@hadsellstor...** 3:6
**duly** 5:4 119:10
**duties** 15:14
**duty** 15:9 16:11,25 17:2,3 110:11,19

**E**

**E** 3:14 4:1,10
**earlier** 38:2 42:5 57:1 61:12 73:17 86:5,6 97:24 98:16 101:6
**earning** 19:24
**easier** 12:19 20:20 21:9 116:20
**easy** 12:11
**effect** 27:18,19,23 28:2,4 28:13,15 29:4,6,13,18 29:19,22 30:5,12,19 31:2,7,13,18 32:1,6,11 36:16,17 45:18 49:24 55:13 71:9 77:8 80:9 82:24 110:2
**effective** 46:7
**effects** 78:16
**eight** 54:5 64:4,20
**either** 13:13 18:19 21:22 44:8 60:10 62:6 63:1 71:18 90:18 106:8,11 112:2
**elbows** 42:12,14
**electrical** 46:8
**electronic** 116:19 117:2,8 117:9,10,12,15,17
**electronically** 116:20,24 116:25 117:2
**emerging** 73:2
**eminent** 89:8
**emphasis** 12:12
**employed** 19:23 20:3
**employees** 106:20,23 107:3,10
**employment** 13:5
**ended** 61:13
**ends** 108:11

**enforcement** 90:19 92:22 110:8
**engage** 101:11
**engaged** 109:16
**ensure** 110:11
**enter** 26:12 32:17,23 33:6 33:10
**entered** 26:6,19 33:21 41:24 42:18 43:4,6 71:21
**entering** 26:7,8
**enters** 34:2
**entire** 9:9,9 10:1 102:3 105:24
**entirely** 74:4 94:24
**entitled** 105:10
**entrance** 25:23 26:3,16 26:19 27:5 32:18,24 33:7,10
**entry** 90:17
**epilepsy** 93:12
**escalated** 82:21
**escalating** 69:20
**established** 76:10
**estimate** 14:5 17:8,11 18:25,25 20:7 47:15,17 50:7 54:4
**estimates** 16:4
**estimation** 50:11,12
**evaluate** 44:8
**event** 31:21
**exact** 22:9 28:7,8,8 34:20 35:19 38:20 39:15 40:6 40:19,19 60:20 88:21
**exactly** 27:7,21 34:12,13 35:9,17 60:16 65:6 80:2 80:17 108:5
**exacts** 16:5
**EXAMINATION** 4:4 5:7
**examined** 5:5 119:8
**example** 37:24,24 38:21 92:21
**excessive** 15:21 17:21 18:20
**exchange** 7:24
**excuse** 52:1
**Executed** 118:17
**exhibit** 4:12,13,14,15 5:24 8:11 20:12 35:7 39:2,4 40:18 46:21 48:4 48:20 56:7 111:13,16 112:5
**exhibiting** 96:9
**Exhibits** 9:22
**exists** 102:20
**experience** 58:7 74:10 75:18 78:9,14 108:25
**expert** 1:14 2:18 13:19,24 14:1,10,25 15:2 18:23 20:1 25:20 27:8 32:8 45:23 46:1 78:7 81:7 115:10
**expire** 44:6
**expires** 44:4
**explain** 23:5 38:3 58:16
**explained** 49:16 58:8
**explode** 78:25

**exposed** 61:4 62:9
**exposes** 109:2
**exposing** 109:22
**extended** 42:1,4,11,19,22 63:17
**extremely** 78:24
**eye** 20:24,24 21:1,5,6 77:18
**eyes** 21:3 79:3

**F**

**face** 86:16 87:2,2
**facility** 72:20
**fact** 8:16 46:13 56:15 76:11 82:5,14 86:12
**factors** 69:18 81:12 82:9
**facts** 46:21,25 47:3 90:8 90:8 91:9,22 92:1 93:7 93:23 94:2,22 96:18 99:12,17 102:15
**fair** 3:4 12:25 14:5,24 17:7 18:5,10 51,17,24 54:4 64:25 108:22
**fairest** 13:17
**fairly** 78:4 87:25
**fallacious** 52:2
**falls** 18:9
**false** 102:7
**familiar** 105:16
**far** 49:21 60:14 70:6 80:7 82:19
**fashion** 42:8 59:16 65:12 65:18,21
**fashions** 79:9
**fast** 79:2
**FBI** 64:18
**fear** 63:9 71:3 109:17
**fearful** 71:19,22
**federal** 17:19 19:12 103:21 15:4
**feet** 49:23 50:4,7,9,16 60:7,9,9,18,19 61:1 68:2,2,9,13,19,20,23 69:25 70:6 79:3
**fell** 17:16
**felonies** 100:17
**felony** 99:5,25
**felt** 71:9 106:3
**FERGUSON** 3:12
**Ferguson's** 113:16,19 114:1
**Fern** 30:1 71:2
**figure** 22:19 31:5 32:8 75:21,25
**file** 1:25 9:9,9 10:1,5 12:14
**find** 12:19 32:5 46:2 96:3 96:3
**finding** 76:11
**fine** 5:12 10:18 20:21 102:17 117:19
**finger** 78:25
**finish** 7:13
**fire** 88:11
**firearm** 60:4,15 64:17 68:7 82:22 83:23 106:2
**fired** 63:10 64:3,24,25 65:8

88:6,21
**fires** 64:1
**firing** 65:1
**firm** 113:16,19,22 114:2
**first** 5:4 34:3 40:16 50:18 70:25 71:1 72:7 76:9 88:6 92:15 95:25 101:7 102:6
**five** 48:7,13,25 89:23 113:7
**flash** 111:24 112:10
**flips** 53:7
**Floor** 3:10
**flushed** 86:16 87:2
**fold** 53:18
**folding** 53:15,16,17 57:8 57:17 58:9
**follow** 9:3 16:20 74:12,21 75:18 92:13 99:24
**followed** 102:2
**following** 81:24 98:21 110:7,25 115:1
**follows** 5:5
**font** 21:8
**Fonzi** 1:15 2:18 4:2 5:3 79:24 115:7,12 116:14 117:15 118:22 119:8
**Fonzi's** 7:23
**force** 17:21 55:25 83:8,10 83:15,19 84:2,9 97:4,5 97:13 106:1
**forced** 82:19
**foregoing** 118:9,15 119:9
**forget** 18:7
**forgetting** 45:13
**form** 10:6 17:17 36:4 96:15
**format** 9:3 14:14
**formats** 13:7 15:17
**formed** 85:20 86:13
**forming** 90:9
**formulation** 46:14
**forth** 22:2,6,11 23:16 61:12 88:19 91:23 92:1 119:13
**forward** 61:25 62:7
**foundation** 52:8
**four** 44:19 53:25 54:3 60:5,11 63:11,24 64:1 108:3,15,21 113:7,9
**fourth** 65:4
**Friday** 2:21 5:1
**front** 42:2
**full** 39:5 63:17 66:3 85:9 119:16
**fully** 108:11
**further** 61:3 104:3 119:18
**future** 107:12

**G**

**game** 29:12
**gather** 76:5
**gathered** 22:3
**general** 7:5 68:1
**generally** 6:22 11:24 46:16 48:1 56:1 59:1 60:17 94:8 99:9

**generic** 24:24
**getting** 36:20,22 68:9 116:19
**give** 7:13 10:4,5,9,16 11:11 16:2,5,6 17:11 24:14 37:24 85:14 111:24 112:1 116:10
**given** 28:25 29:16
**go** 8:21 14:21 20:8 25:22 32:16 36:25 38:25 43:11 45:6,7 56:18 64:8 90:18,19 94:16 117:2,5 117:7
**going** 5:14,14,15 7:11 9:13 10:9 16:2 17:1,24 24:11 26:20 29:7,25 31:19 34:13 36:18 37:8 38:25 40:3 49:23 55:16 56:1,2 58:17,24 60:2 61:5,21 62:8,11 63:2 65:13 70:16,22 75:6,21 83:1 85:8 94:15,17 95:14 96:1,3,6,10 100:13 101:14 102:12 107:24 111:24 112:5 113:20 115:19
**good** 45:21 66:20 68:19 68:20 69:17 72:15,23 117:21
**gosh** 18:24
**governed** 59:19
**gravity** 53:4,6,8,13
**Great** 18:22 32:3 37:17
**greater** 12:6,12,15
**green** 12:14
**Griffin** 6:11
**grooves** 58:10
**ground** 27:22 30:18 31:1 31:6,7,12,18 41:16 43:11 82:24 88:5
**grunting** 89:18
**guess** 73:20 94:1
**guide** 73:9 74:11
**guideline** 93:3,6
**guidelines** 92:16 95:5
**gun** 25:23 26:17 30:2 82:23
**guys** 20:9

**H**

**H** 4:10
**half** 53:18
**halfway** 32:20
**hand** 22:2,6,7 24:3,3,10 24:10 25:2,2 36:25 37:1 61:8,10,13,16,17,18 62:17 87:11,14,15,17 88:12,18,20,22,24,25 89:1,4,9,25
**handgun** 27:5 47:8,11,11 47:19
**handicap** 93:18
**handicapped** 91:7
**handing** 5:17
**handle** 43:18 53:18,20 54:2,2 81:23
**handling** 109:22

**Atkinson-Baker Court Reporters**
**www.depo.com**

Page 4

**hands** 28:21 30:3 41:11
42:12 43:14 56:10,22
57:3,7,25 62:5,10,14,22
62:25 63:1,2,4,7 79:3
86:10 109:14
**HANDSELL** 3:3
**handwriting** 114:16
**handwritten** 114:9,10,11
114:13,14
**Hang** 29:7
**happened** 87:22
**happens** 115:23
**happy** 36:21
**hard** 9:11 38:21 50:15
117:13
**harm** 72:19
**hazy** 78:17
**head** 54:23,24 55:1,2,8
55:10,11,14,15,19,25
56:4 104:21
**Health** 93:20
**hear** 8:1 77:16
**heard** 29:15 32:18 33:2,2
33:4,11 35:13 77:20
80:15,16,19 90:25
107:8
**hearing** 14:15 17:17
77:19
**hearings** 13:4
**heavily** 78:1
**heavy** 79:7
**heirs** 1:5 2:4
**hereto** 119:21
**hes** 50:8
**hesitation** 65:3
**hierarchy** 84:2
**high** 78:2,3,5,9,23 84:5,6
**higher** 14:3 84:2,8
**highlight** 12:12,18
**highlighted** 12:4,5
**highlights** 12:2,13,14
**hired** 90:18
**hit** 56:4 109:6
**hold** 28:20 41:4 94:16
**holding** 30:2 41:11,19
42:7,18
**holster** 68:7
**holstered** 68:3,6
**honest** 40:6 59:11
**honestly** 8:16
**hood** 73:7
**hostage** 74:5
**hour** 36:21 44:19
**hourly** 112:19
**hours** 112:13
**HOWARD** 3:8,8
Howard.Russell@long....
3:11
**hundred** 37:23 38:4
79:10 93:13
**hundreds** 55:24
**hunting** 53:15
**hypothetical** 58:25 74:2
74:16 76:7 82:2 101:15

**I**

**identifies** 98:9

**identify** 12:10 56:24
58:19
**illness** 96:9
**illustration** 38:20
**immediately** 25:23 26:17
27:6 33:1 60:3
**impaired** 80:25 81:2
**importance** 12:6,10
**improper** 66:21 103:1,24
**inappropriate** 15:21
17:14 18:8,20
**inches** 53:21,23,25 54:3
54:5 89:24
**incident** 26:25 27:2 39:10
98:15
**include** 35:14
**includes** 17:21,23 72:1
94:19
**including** 55:25 110:17
**inclusive** 1:10 2:9
**incoherently** 80:14
**incomplete** 37:2 58:25
68:18 74:1,4,15 76:6
82:2 101:15
**incorrect** 29:23,24 52:2
103:17
**incumbent** 102:18
**indicate** 46:10
**indicated** 45:17 46:6 56:7
58:2 60:11 62:1 67:9
71:4 84:20
**indicates** 83:6
**indication** 45:11 72:2
**indications** 71:10
**individual** 60:8 69:8,20
78:17 99:14
**individually** 1:4 2:3 71:15
**individuals** 96:2
**ineffective** 89:14
**influence** 66:16,19,24
67:3,5,8,15 69:12 77:22
77:25 79:17,25 81:9,21
85:21 86:14 96:6
**information** 61:22 65:14
65:17,19,20,24 67:2,10
67:11,18,20 69:19
71:21 72:13 74:8 76:5
94:3 98:14 99:9 100:7
103:13 104:1 106:6,22
107:1 118:12
**informational** 19:10,14
19:19
**infraction** 99:5
**initial** 106:25
**initially** 50:1 95:21
**initiate** 74:21
**inside** 59:2,3 75:23 76:1
**instructed** 4:17 77:12
**instructions** 81:25
**instructor** 44:10
**intend** 10:15
**intended** 95:18,20
**intentional** 16:21 107:15
108:24 109:3
**interaction** 23:14
**interest** 1:5 2:4
**interested** 119:20

**intermediate** 83:21 84:4
**interview** 30:25 71:2
**interviews** 21:20
**intimidated** 70:13 72:3
72:10
**investigate** 101:1 104:3
110:20
**investigation** 34:7,11
35:6,14 36:4 37:16
38:11 39:18 51:5,7
52:20,22 96:15 101:2
103:20
**investigative** 51:17 76:11
95:23,24 96:19 97:23
101:12,23
**involved** 52:22,24
**involving** 11:25
**irrelevant** 58:20 101:17
113:21
**issue** 26:6 77:19 117:18
**issued** 25:24 26:4,17,19
27:6 30:16 31:15
**issues** 13:5 26:12 72:18
73:2,3 91:7 95:19
**italics** 106:16

**J**

**jacket** 39:11,13,16,17,19
40:11,12,14,15
**jails** 78:15
**January** 17:19
**jittery** 79:2
**job** 27:8
**JOHNSON** 1:24 2:22
119:6,25
**Join** 24:13 29:10 31:23
35:1 58:21 72:6 74:3,17
75:15 76:8 83:4
**Jorge** 71:6
**JPL** 19:21
**JR** 1:4 2:3
**jumped** 35:24
**jumping** 79:3

**K**

**keep** 17:1,7
**keeps** 64:18
**kept** 11:23
**KHANLY** 1:4 2:3
**Kibler** 64:7
**kind** 34:13 41:10 42:8
49:13,16 53:2 58:9 79:1
**knee** 62:23
**knees** 27:16 62:1,5,11,15
62:23 63:5
**knew** 5:13 28:7 29:4
56:16 65:18 67:11
106:24
**knife** 21:14,24 22:6,11,18
22:20,24 23:15 24:2,10
24:22 27:16,17,22
28:13,20,25,25 29:4,5
29:13,14,18,21 30:3,4
30:18 31:1,6,12,17
52:23,24 53:2,4,6,8,13
53:15,16,17,19 56:11

56:16,17,23,25 57:4,8
57:12,19 58:4,12,18,19
59:2,3,7,16 61:4,8 62:9
62:17 63:14,15,17,20
63:23,24 65:11,16,18
65:21 66:6 68:3 69:9,9
76:22 77:4,6,7,13 82:15
87:12,14 88:12,18 89:8
89:15,20,23 94:15
106:19 107:2,5,9,15,20
107:22,25 108:2,7,14
108:24 109:2,4,20,22
109:22 111:7
**knives** 53:16 57:17,21
58:9
**know** 7:23 8:3,4 13:7
19:16 23:13 28:3 29:3
29:15,25 30:8,10,11,11
32:9,10 33:13 35:12
37:17 39:13,23 40:6,10
40:10,11,22,24 41:20
42:15,19 43:5,8,8,13,15
43:17,18 44:8,23 45:11
45:19 46:5 47:16,24
49:24,25 50:6 53:2,4,9
53:14,24 54:8,23,25
56:14 57:20,22,23 61:9
64:2,5,8 67:1,4,10,12
69:4 70:4,9,9 71:13
72:9,10,12 75:3,22
77:15 78:1,4,8,9,12
79:23 80:15 81:1 85:1,6
87:14,17,22,23 88:17
88:20,25 91:4,9,16
95:20 97:2,6,9,11,14
104:17,18,19,19,22,23
104:25 105:2,5,6,9,12
108:23 110:2 112:23,24
118:9
**knowing** 100:20
**knowledge** 73:11 118:10
**knows** 46:3,3

**L**

**laceration** 56:2
**Lacks** 52:8
**Lafoya** 30:1 71:1
**lap** 28:21
**Lasiks** 21:1
**law** 3:4,9,13 19:12 90:19
92:22 99:23,23 110:17
**laws** 97:16 98:7 99:10
**lawyer** 69:13
**lead** 107:16,23
**leading** 97:24
**leaned** 61:24
**learning** 90:12,14,21,23
90:25 91:2,5,11,16,19
91:25 92:12,13,15,24
93:4,5,11,23 94:5,10,21
95:5 96:22,25 97:3,8,14
97:17 98:4,23 99:3
104:11,11,20 105:2,7
105:10
**leather** 39:15
**leave** 69:10 107:5 109:20
**leaves** 62:9

**leaving** 71:19,22
**left** 21:5 54:15,18,22
61:11 87:10,15,17
88:12,18,20 89:9,25,25
**leg** 89:25
**lend** 42:21 65:7
**length** 54:1 89:24
**lesser** 12:6,15
**lesson** 99:9 105:14,15
**let's** 8:21 13:14 20:8,15
25:22 32:16 38:25
50:18 102:17 103:8
114:4 117:5,7
**Letterman's** 93:19
**level** 41:15 42:7 83:14,19
90:17
**levels** 83:9,20,21
**Lieutenant** 51:14,17 52:1
52:6,13
**life** 63:9
**light** 79:7
**line** 12:4
**lined** 38:8
**lines** 34:22 95:1 107:6
**list** 104:24
**listening** 16:22
**litigation** 6:1 13:8 115:18
**little** 21:8,25 29:2,12
57:20 58:10
**lock** 56:11,22,22 57:4
**locked** 108:12
**locking** 57:9
**locks** 57:22 58:12
**logs** 33:20 88:3
**long** 1:9 2:8 3:10 23:11
33:5,9 44:25 45:1 47:6
47:10,13 48:12 53:19
53:21,24 71:5 105:16
105:20 113:3,6,13
116:1
**look** 7:13,14 10:14,15,23
10:24 12:13 19:15
20:15,18 29:25 33:24
56:7 58:6 59:11 71:24
96:6,10 105:14
**looked** 10:21 34:10 35:15
38:22 39:23 52:23
53:15 54:1
**looking** 20:16 33:19
37:13 39:2,4 40:17 47:6
47:7 48:3,19,21 59:10
66:3 89:10 100:9 110:7
114:8
**looks** 38:14 39:16
**lost** 115:16
**lot** 5:11 24:17 56:2 79:2,5
82:9 92:20 97:10,11
99:9
**love** 30:24
**low** 41:8,10,17,18,19,20
42:4,6,9,10
**lower** 83:9
**lowered** 41:13
**LUNA** 1:9 2:8
**LUZ** 1:4 2:3

**M**

**Robert Fonzi**
**September 8, 2017**

**Atkinson-Baker Court Reporters**
**www.depo.com**

Page 5

**M** 44:25 45:1,2
**M2** 44:22 45:5
**M26** 44:22
**magazine** 64:10,11
**mail** 116:11,16
**maintained** 89:15
**maintains** 111:1
**majority** 13:20,23,24 14:2
14:2
**making** 11:25 89:18
**mandate** 92:21
**mandates** 92:20
**manipulate** 43:11
**manner** 61:5,20 62:2
65:23 66:5 76:22
**mannerisms** 80:8
**manners** 79:9
**manual** 105:16,19,21,24
105:25 106:3
**mark** 5:14 55:19,21,22
111:11
**marked** 5:23 9:19,22
55:17 111:13,16
**marking** 9:20
**marks** 46:11 55:7,10,11
**Mary** 30:1 71:2
**material** 24:17 39:16 40:6
**materials** 51:23
**math** 16:6 53:22
**matter** 118:8
**matters** 118:11,12
**mean** 12:4,8 27:7,19
30:10,11 40:2 41:8 49:2
53:11 56:12 57:4 63:15
68:6 73:12,24 78:6 79:9
82:9 89:5 92:10,18
93:25 95:24 98:8 100:1
100:5 109:24
**meaning** 30:11 57:8
63:17
**means** 12:5 23:6,8 26:10
26:24
**measure** 54:1
**mechanism** 57:9,17 58:3
58:6,23
**medical** 78:7
**medicated** 78:2
**memorize** 51:22
**memorized** 105:15
**memory** 104:12
**mental** 93:17,17 96:9
**mentality** 78:22
**mentally** 91:6
**mention** 8:14
**mentioned** 14:20 40:10
67:20 110:4
**met** 5:9
**metal** 58:9,15
**methamphetamine** 78:16
78:19
**methamphetamines** 78:2
78:13
**MHARLOUN** 1:6 2:5
**mind** 13:23
**mindset** 75:22
**mine** 7:14 8:16
**minutes** 32:4

**misdemeanor** 99:5,6,20
99:24 100:4,23
**misstates** 17:2 24:12
27:10 28:5 29:8 34:25
39:21 72:5 75:14 83:2
103:15 109:8
**mistake** 16:19
**misunderstand** 62:12
**misunderstood** 86:6
**model** 44:20
**moderate** 83:20,21
**moment** 8:13 10:7 11:1
15:16 18:15 22:9 24:14
40:19,20 59:19 87:17
88:21 104:8
**moments** 24:21
**money** 114:23,24
**monovision** 20:19,23
**motion** 38:3 61:12 62:7
79:2,3
**motioned** 56:10,21 57:3
**motioning** 57:7,24 59:15
**motions** 36:17 37:1
**move** 30:23 102:17
**moved** 49:25 54:15 61:5
61:20 88:18
**movements** 84:11,15,21
85:2,20,23 86:13,15
87:1 107:16,18,21,23
**moving** 62:2,7 80:8,16
**mumbling** 80:14,15,16
81:5
**music** 37:9

**N**

**N** 3:4 4:1
**name** 8:14 71:1,2 119:21
**named** 119:9
**names** 104:22,23
**narcotics** 79:6 96:8 97:6
97:10
**nature** 96:5,11 109:23,24
110:1,3
**nebulous** 36:8
**necessarily** 65:13 101:4
**need** 8:3,4,22,24 35:23
36:9 37:8 75:11,20
100:5 101:1 110:2
112:6 114:22
**needed** 37:17
**needs** 64:17 114:24
**negative** 94:1
**neither** 119:18
**never** 32:12,13 42:14
64:19 103:9
**Nguyen** 1:9 2:8 20:17
21:10,22,22 17 24:6,7
25:22 26:16 27:4,16
28:11,14 30:15 31:14
31:16,21 32:1,5,10,17
32:23 33:5,9 40:13,16
41:20 42:11 47:7,11,19
48:14,24 49:7,16,22
50:10,21 51:3 60:3,12
60:15,23 61:23 62:4,21
63:10,25 64:2 65:11
66:5,15 67:7 70:3 71:13

71:21 74:25 75:17
77:13,15 80:16 81:18
82:21 86:18 87:6,21
88:4,11,13 90:1 95:13
95:17 100:18 101:21
106:8 107:16,25 108:11
108:14 109:5
**Nguyen's** 27:24 49:14
62:20 66:23
**noise** 89:18
**noncompliance** 29:1
**nonconsistent** 18:20
**nonforce** 82:25
**nonthreatening** 65:12,21
66:7
**normal** 78:11
**north** 25:23 26:3,16 27:5
30:2 40:21 42:18 43:4,6
72:1,9
**notes** 4:13 8:25 9:2,4,14
9:20 11:22,23,25 12:1,2
12:11,19 20:11 24:16
24:25 25:1 29:25 31:17
32:22 34:5 35:5,6 40:18
87:24 119:17
**notice** 4:14,15 65:3
111:15
**notify** 116:2,6,16
**number** 4:11 69:18
102:14 104:18,19,19,20
106:18
**numbers** 15:25 78:4,9
97:7,10 104:17
**numbs** 78:20
**numerous** 51:21

**O**

**Oaks** 3:4
**oath** 14:16
**object** 17:1 19:7 24:11
29:8 31:19 36:18 58:17
58:24 74:15 83:1
101:15 103:6 113:20
**objection** 34:23 37:2 72:4
74:1 75:4 76:6 82:2
**objectives** 93:4 99:10
**obligation** 18:9,13 25:19
25:20
**obligations** 115:4
**observed** 59:23,25 85:19
86:13
**obtained** 37:15
**obviously** 37:10,11
**occasion** 113:10
**occasions** 113:18
**occurred** 24:4,5 38:7
95:1 99:14
**occurring** 34:16,18 35:18
38:4,5 59:22 86:4
**Ocean** 3:9
**offer** 6:3,12
**offered** 38:11
**office** 19:2,5 115:6,12,15
115:19 116:14
**officer** 13:11 15:8,13
16:10,24 17:20 18:7
21:22,22 24:7 25:19,22

26:16 27:4,15,24 28:11
28:14 30:2,15 31:14,16
32:9,17,17,22,23 33:5,6
33:9,10 34:2 40:8,13,16
41:20 42:11 44:7,24
47:7,10,19 48:14 49:7,7
49:11,14,21,22 50:8,10
50:19,21,23,25 51:25
52:22 54:14 56:9,24
59:19,24 60:3,14,23
61:23 62:4,21 63:10
65:10 66:5,15,23 67:7
68:3,15,18 71:13,13,20
71:25 77:12,15 79:16
79:22,24 80:5 81:11,12
81:16,18,18 85:19 86:2
86:12,18,21 87:6,9,21
88:11,13 89:16,21 90:1
90:3 92:18,23 95:13,17
96:14 98:9 99:7,12,17
100:3,5,18,18 101:21
106:8,8 107:16,23,25
108:11,13 110:10,19
111:1,5 113:11,14
114:2
**officer's** 17:14 59:21
69:24 89:7 96:13 99:21
**officers** 15:20 18:19
20:16 21:10 22:17
41:18 61:6,21 72:12
74:9,19,25 76:23 77:24
93:4,7,16 94:4 95:2,4
99:24 101:11 104:2
106:9,12,24 107:8,17
109:2,3,18
**officers'** 59:15,18
**Oh** 14:12 18:24 101:2
**okay** 5:21 6:7,12 7:12 8:9
8:18 9:1,4,19 10:4,6,7
10:23 11:14,19,21 12:2
12:21 13:12,25 14:6
15:22 16:8,21 17:16,23
18:12,22 19:11 22:15
23:8 24:23 25:7 26:22
27:1,4,15 28:16,23 30:7
32:22 33:15 37:17,19
38:16,25 40:5,16 41:1
43:2,21 44:20 45:3,11
46:13 48:24 49:19
50:12 51:10 52:18,23
53:2 54:21 56:21 59:6
59:18,24 62:14 63:4,22
63:22 64:5 65:20 66:14
70:2 71:20,24 74:13,24
77:3,15,21 87:20 89:10
90:8 94:18 95:17 97:8
97:14 101:2 102:13
104:18 105:5 110:5
115:22 117:1
**once** 22:15 61:16 67:5
71:9 76:1 96:12 101:3
109:5,5 113:24
**ones** 17:16 20:8
**oneself** 68:9
**open** 43:9,13 53:7,12,22
54:5,13 57:12,18,19
58:4,11 59:16 63:14,15

63:17,18,23,24 108:6,7
108:12,14 109:4,7
**opened** 30:2 43:16 61:16
63:16 88:11 89:20,24
108:2
**opening** 63:20 107:22,22
108:18,20 109:12
**opens** 57:19 58:12 59:3,4
109:2
**opinion** 47:1 85:20 86:13
**opinions** 5:25 6:2,10,12
6:17,18,19,25 7:2,4,5,7
7:9,14,15,16,20 8:14
11:16,18 15:20 20:8,12
46:14 47:4 89:2 90:9
**opportunities** 95:23
**opportunity** 6:8 7:13
74:25 75:3 95:24 104:3
**opposed** 23:2 114:11
**options** 82:19 83:8
**oranges** 15:16
**order** 26:14 27:13 38:6
57:18 83:25 98:14
101:24 103:8,19,25
**ordered** 27:22
**original** 6:13 7:8 11:18
115:5,15,16,16,17,21
116:7,8,14 117:4,16,18
**os** 77:9
**outcome** 119:20
**outlines** 5:25
**outside** 68:13,19,20,22
99:6 100:4
**owe** 112:21

**P**

**P.M** 2:21 5:1 117:24
**page** 4:4,11 12:13 20:15
20:22,23 24:25 25:1,3
34:4 35:7,25 37:13 39:3
39:5 40:18 46:21,22,22
46:22 47:6 48:3,19
52:19 66:3,11 69:11
85:8,11 89:10 106:14
110:7 117:16
**pages** 93:14
**paid** 112:21,23,24
**pain** 78:22,23
**palsy** 93:13
**paper** 16:6
**paragraph** 20:16 21:10
26:1,2 32:20 39:5 47:7
54:14 56:9 60:3 66:4,8
66:9,10,11,12 85:9,15
87:8 89:10,11
**parallel** 7:14
**Pardon** 44:13
**part** 11:14 76:11 100:19
102:25 106:15
**partially** 61:4 62:9 63:18
**particular** 15:9 16:10
58:19
**parts** 55:25 105:25
**party** 71:6 119:19
**Pasadena** 3:5
**pass** 90:22
**passed** 47:18 61:11

**Robert Fonzi**
**September 8, 2017**

**Atkinson-Baker Court Reporters**
**www.depo.com**

Page 6

**passing** 22:2,6,11,23,24 24:2,10,22 25:2 61:11
**patrol** 104:25 105:5,6,10 105:11
**patron** 70:11 72:3
**patrons** 69:21 70:2 71:3
**peace** 44:7
**penalty** 115:3 118:14
**people** 19:13 69:22 78:18
**perceived** 59:19 61:25 111:2,4
**percent** 12:22,23 13:2,4 13:10,20 14:2 15:4,8 17:23 18:3,6,10 34:20 35:19 37:23 38:4,8,11 38:15
**perception** 67:15,17
**period** 47:13 48:10 65:5
**periods** 88:19
**perjury** 115:3 118:14
**perpetrator** 110:17
**person** 99:19
**personal** 94:17
**personally** 70:9
**perspective** 59:21
**Phoenix** 45:6,7
**photograph** 59:8
**phrased** 23:3
**physical** 78:13 93:18
**physically** 45:7 52:25
**picking** 86:7
**pictures** 52:25 55:3,6,7
**place** 57:22 58:12 96:3 101:5,8 119:13
**places** 51:12
**plaintiff** 1:7 2:6,19 3:2 13:10 17:20
**plan** 72:24 73:3,4,6,13,24 74:9,9,11,14 75:12,16 75:17,17,17 77:1 99:10 105:14
**plans** 105:15
**play** 46:13 69:24 73:7 76:25 91:11 101:2
**playing** 29:12
**plus** 93:14
**PMK** 13:21 45:20,22
**pocket** 57:21
**point** 10:23 22:1,8,12,22 22:24 23:1,15,17,25 24:1,8 31:20 36:19 40:16 43:3,5,9 44:16 47:10 62:14 69:17 72:10 84:22,23,25 85:2 86:11 106:6,12,14 108:11 112:11
**pointed** 41:13,24 43:2,7 88:12 90:1
**pointing** 41:15 43:5,10
**police** 12:24 15:5 18:7 21:20 25:19 45:25 51:10 64:13 70:18 71:10 72:12,15 81:7 91:2 92:18,23 93:4 98:9 99:7,23 100:3 103:1 105:17,20 109:2 113:11 113:14 114:2 115:9

**policies** 17:15 18:21 73:9 74:11 105:22
**policy** 64:13
**politely** 8:9
**pop** 59:9
**pops** 54:13
**portion** 12:16 94:21,23 114:8
**portions** 12:4 94:24
**position** 42:3 63:18 64:17 89:24 94:25
**positioning** 94:25
**possession** 89:15
**possible** 15:24 68:14,15
**possibly** 67:3
**POST** 25:7 43:23,25 44:7 44:7 73:1 90:19,20 91:3 92:22,23 106:4
**postage** 115:20
**potential** 72:19 73:25 110:17
**practice** 68:19 74:20
**practices** 17:15 18:21 45:25 72:15 81:8 115:9
**PRAET** 3:12
**precluded** 75:8
**predicated** 59:22 68:17 79:5 83:13 89:3,5
**prefer** 68:18 116:25
**preference** 9:12
**prepared** 6:3,12 7:23 10:4,5 20:13
**prepay** 115:20
**presence** 82:19 83:9 99:7 99:21 100:2,4,24 106:8
**presented** 65:18 84:10 84:15 86:1
**press** 57:9,13,16,18
**pretty** 29:14 38:14,15,16 38:18,19
**prevent** 68:8,10
**prevented** 75:2,7
**previously** 12:22 55:17 98:21
**principles** 110:8
**prior** 72:5 83:2 100:17 103:13 106:12 109:8 119:8
**priority** 76:9
**privacy** 19:10,14,19
**probable** 97:21 98:10 99:2,16
**probably** 10:16 13:15 17:10 20:2 33:14 37:4 44:3,18 50:3 53:22,25 70:5 78:15 112:12,21
**probe** 46:12
**probes** 46:10
**problem** 75:21
**process** 63:20 97:23 98:23 101:12,23 108:6 108:9
**produced** 115:17
**pronounce** 71:1
**propelled** 54:12
**proper** 74:14
**properly** 21:7

**propose** 114:25 115:1 117:10
**provide** 16:4
**provided** 6:5 51:21 67:2 67:10 69:19 70:24,24 72:13 74:9 94:3 95:5 104:1 105:23 107:1
**public** 68:20 76:9,10,12 76:13,15 82:14 110:11 110:15
**pull** 29:17 57:10 86:10
**pulled** 107:5
**pulling** 87:9
**pullover** 96:24
**purpose** 58:14 115:18
**purposes** 12:11
**push** 43:17 54:12 58:11 62:2,5,11
**pushing** 62:23 63:6
**put** 33:13,16 45:17 69:10 77:10 86:3
**puts** 78:21

**Q**

**quadruple** 78:10
**qualifies** 13:22
**qualifying** 13:22
**quality** 38:13,21 42:20 65:7
**question** 7:16,21 8:5,8,10 8:22 11:14 12:9 13:6 17:24 18:3 22:16 31:4 37:3 59:21 64:21 66:21 68:18 70:20,21 73:12 73:15,16,19,21,23 75:20,22 79:23 83:6 86:6 88:15,16 91:14,17 91:18 92:8,9 94:1 98:16 98:18,21 100:12 101:8 102:3,6 112:1 116:23 117:14
**questions** 12:20 43:18 96:2 102:10,16,20 103:6,22
**quickly** 53:13 64:24 72:17
**quiet** 78:24
**quite** 15:24 78:21 105:11
**quotes** 36:10,11,13,14,16 36:25 37:1 77:10 98:22

**R**

**ran** 46:8
**rate** 112:19
**rational** 78:23
**reached** 30:3
**react** 63:19
**reaction** 68:1,4
**read** 26:18 27:24 31:4 35:9 40:8,13 45:9 55:14 57:23 61:14 70:12 88:14,16 108:25 118:8
**readers** 21:4
**readies** 42:9
**reading** 21:7 63:3
**ready** 41:9,10,17,18,19

41:21 42:3,4,6,10 64:17 64:23
**real** 39:15 96:24
**really** 16:1 42:15 44:6 50:6 52:15,17 73:10 88:25 96:23 97:10 112:24
**reask** 17:24
**reason** 20:19 51:25 52:3 113:2
**reasonable** 69:1 97:21 98:10 99:2,11 111:9
**reasonably** 111:2,4,6
**reasons** 102:1 104:1
**rebuttal** 6:10 7:3,4,5,7
**recall** 23:21 51:15,16 60:23 63:3 67:9 84:24 85:6 88:25 95:13 104:22
**receipt** 116:4 117:12
**received** 65:14,19 67:19 67:20 71:17 103:13
**receives** 115:12
**recert** 44:19
**recognize** 5:21
**recognizes** 19:13
**recollection** 31:17 42:1 62:4 85:5 87:16
**recommend** 81:11
**Recommendation** 107:12
**recommended** 93:7
**record** 9:15,17 30:23 32:15 42:10 46:18,19 79:13,14,16 117:5,6,7
**recorded** 71:2
**recording** 28:7
**recusing** 98:20
**Redlands** 1:16 2:20 5:1
**refer** 8:24 9:14
**reference** 22:1 70:23 86:11
**references** 94:23,25
**referring** 9:1 11:16 34:5 98:20 99:22 105:18 107:19
**reflect** 7:16 8:14 25:16
**reflected** 37:22
**reflection** 65:5
**reflects** 22:25 26:24 27:13
**refuse** 28:23
**refused** 28:19 106:7
**refusing** 107:20 109:20
**regarding** 102:20
**Regardless** 59:14
**reholstered** 47:8,11,19
**related** 106:1 119:19
**relates** 6:13,20 7:9 92:11 102:25 105:19
**relationship** 7:17 50:16
**relevance** 58:18
**relevancy** 19:7
**relevant** 59:12,13 101:25 102:10,11,14,14,21 103:23
**relied** 67:11 90:8

**relies** 67:18
**relieved** 115:4
**rely** 52:13 74:10,14
**relying** 73:8
**remain** 68:20
**remaining** 13:10
**remember** 38:24,24 41:25 43:17 49:9 50:3,5 54:19 59:10 64:12 80:7 80:16 95:15 97:10 107:4
**remotely** 35:12
**removed** 60:3,15 87:10
**render** 95:15,18
**RENICK** 3:3
**repeatedly** 30:16 77:7
**report** 4:12 5:25 6:5,13 6:16 7:8,10,22,23 8:2,4 8:11,15,21,21,24,25 9:1 9:19 11:15,16,17,18,19 11:24 12:1,1 22:10,13 22:14 25:9,11 26:10 51:8,14,18 52:1,7,14,20 52:21 57:7 59:17 60:11 61:9,24 65:14 66:1 69:10,14,15 78:8 85:10 85:12,13 91:23 92:2 106:14 114:8,9
**reported** 1:24 56:14,17 56:25 71:7 76:21 82:13 106:18 107:8
**reporter** 88:16 115:3
**REPORTERS** 1:19
**reporting** 71:6
**reports** 7:24 21:20 51:10 66:25 67:1 71:17 77:24 83:18
**requested** 111:21
**required** 11:24 19:6,9 58:3
**requirements** 105:19
**requires** 44:8
**resembles** 53:13
**resolve** 82:16,18 95:16 95:18,19
**resorted** 82:21
**resources** 96:11
**respect** 6:1,10 7:4,7,16 44:6 93:4 94:2 99:8 105:23
**respond** 6:9 8:6 63:13,19 74:21 75:19 89:9 106:9 106:11
**responding** 7:1 8:2,12
**response** 28:19 29:1 63:13
**rest** 114:11
**resting** 28:21 89:25
**results** 78:13
**retained** 14:1,10,25 15:2
**retainer** 112:12
**retardation** 93:17
**retired** 20:5 44:18
**retirement** 19:1,4
**return** 116:7
**review** 6:9 51:3 70:16 105:25 115:7,13 116:6

**Robert Fonzi**
**September 8, 2017**

Case 2:16-cv-05614-JFW-AS    Document 170-1    Filed 10/20/17    Page 121 of 123
Page ID #:5756
**Atkinson-Baker Court Reporters**
**www.depo.com**

Page 7

116:15
reviewed 21:18 28:24
36:6 39:24 48:21 51:23
61:15 66:1 105:20,22
109:1 116:2
reviewing 8:15 12:11
34:8
reviews 117:15
right 11:3 14:18 20:2,4
21:5 35:21 49:13,14
61:10,13,17,18 62:17
87:19 88:20 89:9 98:12
102:15 111:1 112:7
117:4
rights 19:10
RIVERSIDE 118:3 119:3
Robert 1:9,15 2:8,18 4:2
5:3 118:22 119:8
rocked 61:24
rocking 62:7
role 46:13 76:25
roughly 33:22
round 64:18 65:8
rounds 64:1,2,20
route 71:5
rule 4:12 5:25 6:15 8:11
11:17 12:1 67:22 68:1
91:23 102:12 103:24
rules 73:20,22 115:4
Russell 3:8,8 17:1 19:8
19:12,15,17,20 23:3
24:11 27:9 28:5 29:10
31:23 32:4 34:24 36:9
36:13,15 39:2,21 45:25
46:18 52:8 58:21 69:15
72:6 74:3,17 75:14 76:8
79:12,19,23 83:4 84:12
84:14,17,22 88:14 90:5
91:12,20 92:3 101:25
102:6,9,19,23 103:2,5
103:15,22 104:12 108:4
108:16 109:8 111:14
113:8,11 114:22,24
115:6,11,19 116:1,5,8
116:12,21,25 117:3,14
117:20,22

**S**

S 4:10
safe 71:9 95:16,18 96:1
96:12 101:7,10,11
safety 68:20 69:6 71:3,11
76:10,10,12,13,15
82:14 93:20 103:21
109:17,18 110:11,14
111:6
salary 20:6
Santa 3:14
saw 32:17,23 33:6 41:1
51:11,14 53:9 59:6,8
60:25 70:12
Saycon 1:4,4,6 2:3,3,5
21:14,23 22:5,18 24:9,9
25:24 26:4,18 27:6
28:19 39:10 40:9 49:3,6
49:15,20,21 50:9 51:1
53:12 55:5 56:10,21

60:4 61:4 63:13 65:11
66:6,15,18,23 67:8,14
70:2,8,13 72:3 76:19,20
77:16 79:17,25 80:6
84:10,15 86:22 87:9
89:15,17,18 95:14
96:17 100:25 101:24
102:25 103:9,25 106:7
106:18 107:8
Saycon's 54:15,24 84:21
85:19,23 86:13,15 87:1
87:10 88:12 89:25
107:14
saying 17:18 25:1 26:4
26:16 32:2 34:21 38:7
81:5 83:24 89:19 92:24
93:2,3 100:9,16 114:15
says 6:25 21:13 22:8,14
25:1 27:7 32:17 37:25
39:10 48:6 55:15 56:21
60:2 66:4 85:19,23
86:12 87:24 88:3 89:14
89:23 107:7 110:10
scaring 71:8
scenario 23:18 50:18
scene 20:17 22:4,14,18
24:8 73:2,25 98:15
103:20
Scientist 19:21
scope 45:20
Scott 6:5 11:15
scratch 55:12,19
search 99:5
seated 21:13 70:5 82:5,7
86:5
second 25:3 38:2,23 39:5
66:9,10,11,12 85:14
88:5,6 89:11
secondary 76:12
seconds 24:20 33:14,15
33:18,22,23,25 34:1
47:17,18,22 48:7,13,25
50:23 87:20,23 88:1
section 12:10,11 66:3,9
66:12 106:3
sections 106:1
secure 96:1
see 16:5 20:8,9,10,17,20
21:10,15 25:24 26:2,15
28:21 32:19,20 33:9
35:17 38:3 39:11 41:3
42:22 46:12,23 47:8
48:4,7,24,25 51:17
54:16 55:11,13,17 58:2
60:5 61:6 63:11 65:7,8
66:7,13 72:7,8 85:17,21
85:24 86:19 87:12 88:7
89:12 90:1 93:21,22
94:2,5,10,12 96:4
104:24 106:3,15,20
110:8
seeing 77:24
seen 34:16 52:25,25
53:15 55:3,6,7,10,24
56:3 57:21 64:19 78:15
78:18 79:1,4,11 105:24
106:1 111:18

self-defense 89:9 111:1
send 115:6
sending 117:1
sense 37:8
sent 115:5,15,20,20
116:19
sentence 21:13 39:1 61:3
66:4,10 89:11
separate 14:21
separately 100:7
September 1:17 2:21 5:1
119:22
sequential 26:14 27:12
38:6
sergeant 67:25
service 14:15 15:18
74:18
set 91:23 92:1 119:13
seven 33:22 64:12 89:24
sheet 37:9
sheriff's 19:2,4
SHERMAN 3:12
shirt 40:3
shooting 41:4 52:22
87:21 102:24 103:1
short 79:12
shorthand 119:14,17
shot 63:14,20,23,23 65:4
88:6 106:12 108:3,15
108:20 109:6,12
shots 63:19 65:1,4,6
shoulder 54:20
shouting 82:23 83:3,6
show 5:14 55:16 59:9
68:12 111:11
showed 42:5 103:23 39:5
side 49:15 54:22 58:11
72:9 80:21,21 86:17,17
87:3,3
sign 116:3 117:3
signature 117:16,17
signed 115:2
significance 12:15
signs 117:16
similar 41:3 53:16
simply 100:6
simultaneous 7:24
sir 5:22 20:14 21:12,16
28:18,22 30:6 32:21
37:12 39:12 44:1 46:24
48:5,8 49:1 60:6 61:7
63:12 89:13 106:17
110:9
sit 28:20 75:20 89:16 97:1
sitting 10:14 28:17 73:6
86:17 87:4
situation 68:22 69:20
72:16,23,25 73:10 74:5
74:7,8 76:5 82:10,11,12
95:16,18,25 96:12
100:17 101:7,11
situations 13:25 78:18
size 79:5
sketching 73:7
skin 46:11
slides 57:20,22 58:13

slight 42:20
slightly 8:1 9:2 42:12,15
50:1 54:2
slow 84:11,16,21,25 85:2
85:23 86:15 87:1
slowly 80:10,11 86:17
87:3
slurred 80:12 86:16 87:3
small 58:10
snap 78:25,25
snapped 63:17
snapping 53:12
sobriety 96:7
somebody 81:7 83:8 96:4
somewhat 36:8
sorry 20:22 26:2 33:8
44:25 45:12,23 52:16
66:18 84:9 85:14 88:14
90:13 94:19
sound 32:19 33:2,3,4,11
Sounds 117:21
south 32:18,24 33:7,10
speak 32:15 74:25
speaking 113:21
speaks 31:21
specific 7:4 12:20 15:25
22:22 23:12,13 27:20
29:14 33:16 36:7 47:17
50:16 83:8 86:7 96:21
99:17 101:21 105:23
110:2
specifically 6:21 8:13
13:11 43:9,19 46:15
47:16,25 57:23 65:25
66:1 94:7 104:16
speculate 34:15 35:18
38:5
speculation 52:9 74:2,16
75:5 76:7 82:3 101:16
Speech 80:12,25 81:1,3
spend 32:4
spoken 28:9
sponsoring 90:18
spring 54:12
ss 118:2 119:2
stabbed 65:15 96:4
staff 107:8
stamp 22:23
stamps 33:20 48:21 88:2
stance 41:4
stand 26:20 61:5,21 62:2
62:8,11 107:24 108:10
standard 64:13,19 92:21
92:25 93:2
standards 91:11 92:12
92:16,18 106:4
standing 49:17 61:25
start 11:25 35:23 37:8
96:1
started 45:2
starting 15:15 20:15
starts 63:23 87:21
state 78:22 118:1 119:1
stated 23:5 33:5 51:8
93:5 118:11
statement 12:25 18:5
24:25 40:25 50:24

57:11 59:16 61:23
69:22 70:11 79:10
108:22 110:23,25
statements 21:21 39:22
50:7,13,17 51:5 59:15
70:10,24 95:2 112:9
states 1:1 2:1 11:18
stationary 87:18
stay 69:25
stayed 68:22
staying 68:13
stays 48:10
step 49:25 60:7,7 75:23
76:1 97:25 103:8
stepped 49:9 56:10
steps 50:5,6 60:5,11
96:10,19 101:13 103:21
stipulate 117:20,21
stipulation 114:22,25
115:2 116:12
stop 9:11,13 98:9 99:2
stopping 75:9
store 69:23,23
Stormer 3:3,3 4:5 5:8,20
7:25 8:7 9:16,18,24
10:15,18,19 17:4 19:11
19:14,16,18,22 23:7
24:15 27:14 28:10
29:20 30:24 31:3,24
32:7 35:3 36:11,14,17
36:20,24 37:5 39:4,8,9
40:1 45:21 46:2,4,20
52:12 58:22 59:5 66:20
66:22 69:17 70:1,21
71:12 72:11 73:18 74:6
74:23 75:10,24 76:14
77:14 79:15,21 80:2,4
82:4 83:11 84:13,16,19
84:23 85:3 88:23 90:7
91:15,21 92:6 100:13
100:15 101:18 102:4,8
102:13,22,24 103:4,7
103:16 104:4,7,9,14
108:8,19 109:13 111:15
111:17 112:8,16,18
113:25 114:4,7,21,23
115:1,8,14,22 116:4,7
116:10,18,23 117:1,5,7
117:19
straight 26:15 42:24,25
Street 3:14
strike 37:25 54:15,23
55:22,23 87:21,22 88:4
89:12,14
strikes 55:10,24 56:3
strong 79:8
struck 55:1,2,14,15 87:10
87:15,19
study 67:25
subject 68:3 94:15
subjective 21:25 34:14
subjects 91:8
subscribe 119:21
substance 77:22 85:21
86:14
Successors 1:5 2:4
Sue 70:25

**Atkinson-Baker Court Reporters**
**www.depo.com**

Page 8

**suggest** 52:10 55:2 65:24
77:18,20,21
**suggested** 32:12
**suggests** 75:20
**supervision** 119:15
**supplemental** 6:5
**support** 99:13 110:21
**supports** 55:13
**supposed** 92:13,17
115:12
**sure** 13:22 20:18,21
24:18 25:17 37:9 38:9
39:15 42:16 51:15,19
51:20 56:15 65:9 67:11
67:13 71:1 80:19 91:13
95:25 96:24 98:17
101:6 102:2,5 105:18
108:5 114:24 115:23
116:21 117:19
**surprised** 8:1
**surviving** 1:5 2:4
**suspect** 68:9 96:17 99:15
**suspicion** 97:21 98:10
99:2,11
**suspicious** 109:16,21
**swaying** 80:21 86:17
87:3
**switch** 54:8,9,10,11,12
56:12,13,14,15,18,19
56:19 57:1
**swollen** 56:2
**sworn** 5:4 119:10

**T**

**T** 4:10
**table** 70:5
**take** 27:6 30:22 68:5
79:12 81:12,16 96:10
101:2,5,8,12 103:8
114:4
**takedown** 94:16
**taken** 2:18 16:9 81:19
96:3 114:6 119:12,13
119:17
**talked** 61:12
**talking** 35:21,22 55:20
56:17 57:21 67:23
68:25 73:6,8 75:9 81:4
82:11 86:22 98:13,17
**talks** 93:12,12,13,16,17
93:18,19
**tased** 24:9 86:22 109:5
**taser** 23:21,22,23 24:1,21
32:19 33:4,12,20,21
34:3 43:21 44:8,21,23
45:12,13,17 46:6 48:7,9
48:16,25 49:2,6,8,22,24
50:4,10,19,21 82:20
83:18,22,24,24 84:1,1,3
84:8 86:7,18,23 87:1,6
88:3,5 106:2
**tasers** 49:5
**taught** 105:5
**teach** 25:7,9 92:17
**teaches** 73:1
**technique** 105:6
**techniques** 96:24 103:1

104:25 105:6,10,11
**tell** 18:16,24 26:23 28:16
29:24 34:19 37:21 38:9
38:10,14,15,16,21
40:19 41:23 59:9 60:14
65:9 70:16 72:15 78:10
78:14 82:25 96:25
102:18,19,21,23 104:10
104:12,15 112:3
**telling** 26:11 27:12
**tend** 99:13 110:20
**tending** 101:23
**tense** 113:21
**tenth** 38:2
**term** 17:2,3,5,5 18:13,14
18:15,16 24:24 25:5
41:20 45:13 60:9 83:3
85:1,6
**terminology** 18:8 22:13
24:1 78:8
**terms** 18:17 50:16
**testified** 5:5 12:22 13:9
13:12,21 14:9,13 15:8
15:17,19 16:10,16,24
17:19,22 18:4,15 40:11
47:16 60:23 62:22
89:21 90:4
**testify** 12:23 13:1,18
15:12 16:12 26:10
35:18 37:23 119:10
**testifying** 13:11
**testimonies** 14:22,23
**testimony** 12:23 13:14
17:2,3,13 22:5 24:7,12
25:17 27:11,15 28:5
29:9,17 33:1 34:25 38:6
38:22 39:17,21 40:8,13
54:6 56:6 62:19,21
64:12 71:20 72:5 74:13
75:14 79:11 83:2 84:20
84:25 86:21,25 95:4,17
96:14 103:15 108:13
109:9 114:18
**testing** 96:23
**Thanks** 9:14
**thereof** 118:9 119:20
**thick** 39:11,13,17,19,24
39:24 40:2,2
**thicker** 40:3
**thing** 57:20 72:23 76:4
**things** 11:3,8 12:19 16:6
34:16 35:17 37:7 38:7
44:9 68:24 93:21 94:25
96:5,11,11 99:4 105:22
109:22,24 110:1,2,4
**think** 5:10,15 8:3 17:10
18:1 19:8,20,23 23:4,22
24:6 25:19,21 29:11
30:4 32:15 35:8,8 36:22
42:1,11 43:19 50:17
53:21 59:12,13 60:9,19
62:20 65:14,25 67:6,7
69:21 71:8 73:14 75:17
81:4 83:2 87:16 102:14
102:17 103:4 106:10
112:4,5 113:22 114:4
**third** 65:4

**thought** 16:14 32:13 35:4
55:1 60:24 62:10 67:4,7
97:6
**threat** 82:8,8 89:3,5,8
111:2,4,9,10
**threaten** 66:2
**threatened** 65:24 70:7
96:5
**threatening** 65:12,21,23
66:6
**three** 10:2 11:1 13:16
16:8 50:6 60:5,9,11
63:10,23 64:1 70:24
108:3,15,21 113:9
**thumb** 9:8,10 10:1,3,6,8,9
10:10,20 11:2,3,6,8,11
51:23
**time** 7:22 12:23 18:4 22:8
22:22 23:9,20 25:16
30:22 33:2,9,17,21,24
34:2,2,11,22 38:7 39:10
44:5,15 45:1,1 47:13,17
47:19,20 48:10,21
61:11 65:1 68:1,4,5
75:8 86:2 87:11 88:11
88:19 94:4 109:10
113:13 116:22 119:13
**timeframe** 23:12
**timeline** 33:13,19 34:4,6
38:11 40:17 48:3,19,20
52:18 88:2,3,9
**timelines** 36:1,3
**times** 13:12,18 14:14,19
15:1,1 29:15 34:19,20
35:19,21 37:15,22,23
63:11,24 108:3,15,21
113:5,7,8
**timestamp** 23:13
**timestamps** 47:15
**tip** 49:20
**title** 104:18,22,23
**titles** 97:11 104:17
**today** 5:15 6:3 9:21 20:13
28:17 97:1 115:8
**told** 31:1,12 35:13,16,25
56:24 67:16,18 77:25
81:7 98:5 104:21
109:19
**tolerance** 78:22,23 79:6
**Tony** 71:8
**top** 19:1 34:5 35:7,25
37:13 39:6,8 40:18 48:3
48:19 52:18 104:21
106:15
**topics** 104:23 105:11,23
**total** 64:2
**toxicology** 78:1,8
**train** 93:3
**trained** 43:21 44:20
**trainer** 43:25
**training** 17:15 18:21 44:4
44:9 73:9 74:10,12,14
74:21 75:18 77:1 92:19
**transcribed** 119:14
**transcript** 27:20 119:17
**transfer** 11:25
**transpiring** 73:11 74:22

82:7
**trial** 13:13,14 14:1,11,12
14:12,14,21,22 15:1
**trickery** 16:21
**tried** 82:16,18
**trifocal** 21:3
**triple** 78:10
**true** 14:6 37:21 48:14
118:10,13,15 119:16
**truth** 119:10,10,11
**truthful** 52:6
**try** 16:9 95:16 96:6
**trying** 16:6,20 17:10
22:19 23:5,20 26:9 31:5
32:8 38:2 42:6 43:11
56:10,22 57:3,8,11
58:16 98:19 108:10
**Tueller** 67:22,23,23
**turn** 43:18
**turnaround** 115:9
**turned** 16:12,18
**twice** 37:18 113:24
**two** 13:4,10 14:21 17:23
18:6,9 42:8 45:5 50:6
55:12 60:8 87:20,23
88:5 109:2,14 116:20
**type** 40:11,14 58:9 64:5
76:5 77:19 78:21
**typed** 114:12
**types** 31:15 93:14,15
**typewriting** 119:15
**typical** 46:11

**U**

**Uh-huh** 17:12
**uncoordinated** 84:11,15
84:16,21 85:1,4,6,24
86:15 87:2
**undersheriff** 20:4,6
**undersigned** 118:7
**understand** 18:2 22:5
27:2 80:17 91:10,13,17
91:18,19,22 92:4,7,10
94:3 100:11
**understanding** 22:21,23
26:11,13,21,24 27:13
27:21 29:19 30:15
39:25 40:20 51:2 61:14
63:16,18,21,22 64:4
65:16 66:13,14 69:5
83:5 87:18 88:21 89:20
90:3,6 100:21 107:6
108:17 109:11
**unfold** 56:11,22 57:4,12
57:14
**unfolding** 62:8
**Unfortunately** 5:18
**unholster** 40:17
**unholstered** 25:23 26:17
27:5 40:21,22 41:2
**unholsters** 26:13
**uniform** 83:9
**UNITED** 1:1 2:1
**unknown** 65:10 66:5
85:21 86:14 100:20
110:20
**unpredictable** 81:21

**unreasonable** 15:21
17:14,20 18:20
**update** 44:9
**updates** 107:1
**upset** 89:18
**use** 9:5 17:3,5 18:13,18
25:4,4 41:18,19 43:21
58:3,4 71:25 79:6 82:20
82:20,24 83:23 94:17
97:4,5,13 106:1 107:25
**user** 79:7,7
**uses** 37:25 49:7 50:25
**usually** 58:10

**V**

**V** 49:16,20
**V-formation** 49:14
**vague** 50:9 91:12 92:3
108:4,16 109:8,10
**vantage** 94:25
**variables** 79:10
**various** 55:24 93:14
**Vast** 14:2
**vehicle** 96:24 111:8
**verbal** 82:20
**verbally** 106:7,9,11
**vested** 110:10,19
**video** 33:20,23,24 34:8
34:10,15 36:5,6 37:20
37:22 38:13,23 39:14
39:20,23 40:25 41:1,6
42:20 48:21 50:14,15
53:10,12 60:14 61:1
65:7 70:4,12 71:25 88:2
**videos** 34:17 35:15
**viewed** 35:4
**viewing** 36:5 39:23 65:3
**violate** 15:9,13,14 16:10
16:25
**violated** 15:10
**violates** 19:9
**vision** 21:4
**volatile** 78:24
**vs** 1:8 2:7
**VUONG** 1:9 2:8

**W**

**waist** 41:12,19 42:5,13
**wait** 8:9
**walked** 71:4
**want** 9:10 24:18 25:16
29:16 30:8,10,11 33:13
46:2 49:12 59:2,9
116:13,21,24 117:8
**wanted** 95:15
**warrants** 99:5
**wasn't** 31:20 52:17 54:10
57:2 69:23 70:6 73:16
80:19 82:15 83:5 87:18
98:16 108:18
**watch** 33:23
**watched** 37:22
**watching** 34:15 37:20
**wave** 107:13
**waved** 23:15
**waving** 21:14,23,25 22:3

**Robert Fonzi**
**September 8, 2017**

**Atkinson-Baker Court Reporters**
**www.depo.com**

Page 9

22:5,18,20 24:2,9,23,24
25:5 106:19,23 107:2,9
**way** 18:7 41:4 43:19 52:1
56:16 57:24 61:25
70:13 80:8 99:1 107:22
108:3,14 112:2 117:11
119:19
**ways** 82:16,17
**we'll** 9:11,13 103:6
111:11 115:7,22
**we're** 5:15 9:20 10:14,17
17:25 28:17 35:21 37:9
37:10,11 56:17 60:2
68:25 104:7 116:19
**we've** 5:9
**weapon** 40:17,23 41:2,5
41:8,11,14,24 42:8,12
42:13,18 43:2,5,6,10
64:5,23 107:18 111:7
**weapons** 94:17
**wearing** 39:11,13 40:4,9
**weight** 79:5
**went** 34:10 35:4
**weren't** 49:17,17 100:19
**West** 2:19 3:9
**WHEREOF** 119:21
**win** 19:17
**wires** 86:4,10 87:10
**withdraw** 100:16
**witness** 4:2 8:5 9:23 23:4
24:14 27:12 28:6 29:11
30:25 31:21 35:2 37:4
39:22 45:24 52:10 59:1
69:18 70:22 72:7 73:16
74:4,18 75:6,16 76:9
77:12 79:22 80:3 83:5
84:18,24 88:17 90:6
91:13 92:5 102:2
103:25 108:5,17 109:11
112:7,17 113:24 118:8
119:9,21
**witnesses** 29:15 30:1
83:7
**word** 58:3 81:1
**words** 27:18,19,23 28:4,7
28:8,8,13,14,15 29:4,5
29:12,13,19,22 30:5,10
30:12,18,20 31:1,7,10
31:13,18 32:1,5,11 77:8
82:24 86:16 110:1
**worked** 78:15 112:13
113:5,8,10,13,16,18,22
114:1
**wouldn't** 18:13 44:10
61:2 72:18 78:20
**wrist** 54:20
**wrists** 62:1,16,16,18,22
62:24,25 63:1,3,4,7
**write** 11:24
**writing** 16:5 25:9,11
**written** 23:5 27:1
**wrong** 36:25 37:6
**wrote** 23:6
**www.depo.com** 1:20

---

**X**

**X** 4:1,10

---

**X2** 44:25 45:5
**X26** 44:25 45:5

---

**Y**

**Yeah** 10:18 14:13 19:8,25
23:19 24:17 25:21
41:18 54:4,7 58:16 61:2
64:25 68:11 77:19
85:13
**year** 19:24
**years** 45:5 64:18 78:15
**yellow** 12:3

---

**Z**

**Z** 79:4,11
**Zuniga** 71:6 114:13
**Zuniga's** 114:15

---

**0**

**04:23** 2:20 5:1
**08** 2:21

---

**1**

**1-20** 1:10 2:9
**10** 33:14,15,18,23,25 34:1
47:17,18,22 50:4 60:18
60:19,24 61:1
**100** 34:20 35:19 38:8,11
38:15
**109** 55:17 56:7
**10ths** 38:23
**11** 12:13 24:25 25:1,3
85:8,11 89:10
**111** 4:14,15
**11th** 3:10
**12** 16:16,23,24 17:7,7
46:22 97:6,8,9 104:11
104:19,19,20
**1230** 2:19
**128** 3:4
**13** 106:14
**13:58** 48:24
**13696** 1:24 2:22 119:6
**15** 32:4 50:4 60:24 61:1
69:22 97:14,15,17 98:4
98:23 99:3,9 110:7
**16** 50:23 91:23
**161** 4:12 5:15,24 7:10
8:11 9:19,22 11:16,17
20:12 39:4 46:21
**162** 4:13 9:20,22 11:21
35:7 40:18 48:4,20
**163** 4:14 111:12,13,14,18
111:21
**1631** 3:14
**164** 4:15 111:15,16
**180** 20:7
**18th** 3:14

---

**2**

**2** 34:4 35:7,25 37:13
40:18 48:3,19 52:19
66:3,12 106:18
**2:16-cv-05614JFW** 1:4
2:3
**20** 17:9 49:23 50:7,9

---

69:22 70:6 97:3,4,12,13
115:11 116:4,5,13,15
117:10,12
**20-day** 115:9
**200,000** 18:25
**2012** 44:15,16
**2016** 18:22
**2017** 1:17 2:21 5:1 118:17
119:22
**20th** 116:9
**21** 68:2,2,9,13,19,20,23
69:25 96:22,25 97:5,9
104:11
**22:13:42** 48:6
**22:13:58** 38:1
**22:13:59** 37:25 88:4
**22:14** 88:4
**22:14:01** 88:6
**26** 4:12 5:25 6:15 8:11
11:17 12:1 102:12
103:24
**285** 14:4,9,25 15:1
**288-3376** 1:20

---

**3**

**3** 14:19,23 16:23
**3,000** 112:22
**30-plus** 64:18 112:17
**300** 13:15 14:1,12,14,14
14:22 112:20
**33** 78:14 94:10,19,22,24
95:5
**333** 3:9
**340** 15:22
**3600** 78:6
**3600-something** 78:4
**37** 91:5,11,16,19,25 92:11
92:24 93:5,11,23 94:6
**380** 14:9 15:1

---

**4**

**4** 53:23
**4-and-a-half** 53:23
**4-and-a-quarter** 53:23
**400** 13:16 14:19,23 15:23
16:8,23
**43** 90:21 104:16,17

---

**5**

**5** 4:5
**500** 36:20
**500-plus** 78:16
**5150** 93:20 97:25
**562.570.2200** 3:11

---

**6**

**6** 46:22
**6,000** 112:12,21,25
**626.585.9600** 3:5

---

**7**

**7** 20:15,22,23 39:5 46:21
47:6
**7:25** 117:24

---

**8**

**8** 1:17 5:1 53:21 66:3,11
69:11
**8-and-a-half** 53:21
**80,000** 19:24
**800** 1:20
**8th** 119:22

---

**9**

**9** 4:12,13
**90802** 3:10
**911** 56:18 64:7 67:21
**91103** 3:5
**92705** 3:14
**95** 13:20 14:2,4
**98** 12:22,23 13:2 15:4,8
18:3
**99** 90:23,25 91:3

---